UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GEORGE O'DELL,

                                    Plaintiff,
                                                              9:13-CV-01275
v.
                                                              (FJS/TWD)
ALVIN TUCKER
DARIAN FRAZIER,


                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

GEORGE O'DELL
Plaintiff pro se
83271-051
St. Lawrence Psychiatric Center
1 Chimney Point Drive
Ogdensburg, New York 13669

HON. ERIC T. SCHNEIDERMAN            TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants                        615 Erie Boulevard West
The Capitol                                   Syracuse, New York 13204
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

        Pro se Plaintiff George O'Dell initially asserted a variety of claims against a number of

defendants in this civil rights action brought under 42 U.S.C. § 1983.  (Dkt. No. 1.)  Plaintiff's

sole remaining claim is one for violation of his Fourteenth Amendment right to substantive due

process against remaining Defendants Alvin Tucker ("Tucker") and Darian Frazier ("Frazier"),

arising out of their failure to protect him from an assault by another patient at the Central New

York Psychiatric Center ("CNYPC") where Defendants are employed as Secure Care Treatment Aides 1 ("SCTA").[1]  *Id*. at 2, 5-7.[2]  Defendants Tucker and Frazier have now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. No. 34.)  Plaintiff has opposed the motion.  (Dkt. No. 39.)  Plaintiff's opposition can also be construed as including an application for appointment of counsel and is treated as such herein.  *Id*. at ¶ 4; Dkt. No. 39-2 at 58-59.  For the reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted and denies Plaintiff's motion for appointment of counsel without prejudice.

## I.      BACKGROUND

Plaintiff was involuntarily committed to the Sex Offender Treatment Program ("SOTP") and was housed on Ward 405 at CNYPC in June 2013.  (Dkt. Nos. 1 at 5; 39-2 at ¶ 10.)  CNYPC is a psychiatric hospital operated by the New York Office of Mental Health.  (Dkt. No. 34-5 at ¶ 3.)  Humberto Gonzalez ("Gonzalez") was also a resident of SOTP Ward 405 in June 2013. *Id*.  Gonzalez had a history of assaultive behavior and when previously housed in SOTP Ward 405 had punched another resident in the face and broken his jaw.  (Dkt. No. 1 at 5.)  Gonzalez was returned to Ward 405 after serving his sentence for the assault in Oneida County Corrections.  *Id*.; Dkt. No. 39-2 at 18.

---

[1]  Plaintiff's claim against the individual who assaulted him was dismissed on initial review under 28 U.S.C. § 1915(e) (Dkt. No. 5.)  The remainder of Plaintiff's claims, with the exception of the claim against Tucker and Frazier, were dismissed on Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 28.)  In its Report-Recommendation on Defendants' motion to dismiss, this Court identified Plaintiff's claim against Defendants Tucker and Frazier as a Fourteenth Amendment substantive due process claim for failure to protect Plaintiff from being assaulted by another patient in violation of his Eighth Amendment rights.  (Dkt. No. 24 at 8-15.)

[2]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

According to Plaintiff, the morning after Gonzalez returned to Ward 405, he came into the day room and began to call the Ward 405 residents abusive, insulting names and told them that he would punch anyone on the wards and break his jaw like the last person he had punched. (Dkt. No. 1 at 5.) Gonzalez also told residents that when the second TV came in he was going to watch sports, and if anyone did not like it to come see him, and he would settle the matter. *Id*. Plaintiff claims that Defendant Tucker came into the day room and told everyone that Gonzalez was not threatening anyone, and that he did not want anyone writing letters saying that Gonzalez was threatening anyone. *Id*. at 6. Plaintiff also claims that even though the threats from Gonzalez continued at least into the third day following his return to Ward 405 and quite possibly longer, Defendants Tucker and Frazier continuously stated that Gonzalez was not threatening anyone and even said they liked him because he would make people watch sports. *Id*. According to Plaintiff, Gonzalez was room restricted several times for approaching and threatening several residents. *Id*. Plaintiff claims that Tucker and Frazier would not make any notes concerning any of Gonzalez' threats. *Id*. As a result, the staff on Ward 405 made no attempt to protect Plaintiff or any of the other residents from Gonzalez. *Id*. at 7.

On May 21 and 31, 2013, Plaintiff submitted written requests for a meeting with the Risk Management staff to discuss an incident that had occurred with Gonzalez in the day room. (Dkt. Nos. 39-2 at 66, 67.) Plaintiff wrote that one morning at around 11:30am, while he was sitting in the day room, Gonzalez told residents of Ward 405 they were a bunch of child molesters and predators, and that he was going to stick a few of them so that he could go back to prison and not have to be around them. *Id*. at 67. Plaintiff wrote that Frazier was letting Gonzalez get away with saying those things, and that Frazier and Tucker both stated that they did not care and did

not hear anything, and they allowed Gonzalez to continue to threaten the Ward 405 residents. *Id.*

A June 5, 2013, Patient Complaint Report regarding Plaintiff's request for a meeting reveals that his request was assigned to Risk Management Specialist Jill Porter LCSW ("Porter"), and that Treatment Team Leader ("TTL") Jim Morgan ("Morgan") was notified and asked to respond in writing to Risk Management regarding Plaintiff's concerns. *Id.* at 26. The TTL reported that staff members on the Ward were keeping a close watch on the situation between Plaintiff and Gonzalez, and that staff was aware of Gonzalez's bullying behaviors and had made that a focus point of his treatment plan. *Id.* Risk Management concluded that the Treatment Team was taking Plaintiff's concerns very seriously and attempting to resolve the conflict between Plaintiff and Gonzalez while watching them for safety. *Id.*

Porter wrote to Plaintiff in response to his concerns on June 5, 2013. *Id.* at 27. Porter wrote:

> You indicated that you did not believe staff members were taking your reports seriously, or addressing the complaints you have made. Please be advised that your Treatment Team, as do all staff members of the Central New York Psychiatric Center, take all threats of violence seriously. They will continue to address any issues related to safety per Central New York's policy and procedures.

*Id.* There is no evidence in the record describing specific instances of threatening conduct by Gonzalez between June 5, 2013, and June 23, 2013, when Plaintiff was assaulted by Gonzalez.

As documented by the CNYPC video monitoring system, after dinner on the evening of June 23, 2013, Plaintiff, Gonzalez, and a third resident went into the sun room area of the day room, which had been reopened at 5:29pm. (Dkt. No. 39-2 at 63, 72.) Plaintiff was seated in a chair between two tables with his back against the wall. *Id.* at 63. The third resident was

standing by a table.  *Id*.  According to the Incident Summary submitted by Plaintiff in opposition

to Defendants' motion, Gonzalez entered the sun room moments after the other two and was

changing the television channel.  Gonzalez was reported to have said aloud to Plaintiff and the

third resident in the sun room, "I don't give a fuck what anybody says, I'm changing it to sports

and if anybody doesn't like it they can suck my dick."  *Id.*  Plaintiff was reported to have

responded "If that's the case than (sic) you can suck my fucking dick."  *Id*.

Gonzalez is reported to have said "What did you say to me?" as he walked from the

corner of the sun room, picked up a chair and brought it directly over Plaintiff's head causing

deep lacerations and severe bleeding.  *Id*.  SCTA Jackson, who was on duty and was at the desk

in the day room at the time, heard a thump.  *Id*. at 72.  He ran into the sun room in time to see

Gonzalez drop the chair and walk away.  *Id*.  Plaintiff was given immediate medical care by

CNYPC medical staff and was taken by ambulance to the hospital where the lacerations were

sutured.  *Id*.  at 62, 72.  New York State Police placed Gonzalez under arrest, and he was taken

into custody on felony assault charges.  *Id*. at 62.

Neither Tucker nor Frazier were working at the time Gonzalez assaulted Plaintiff, nor

were they even at CNYPC.  (Dkt., Nos. 34-3 at ¶¶ 13-14; 34-5 at ¶¶ 12-13, 18.)  Neither Tucker

nor Frazier recalled any significant incidents where they felt Gonzalez posed an immediate or

imminent physical threat to Plaintiff on the days they worked leading up to the assault.  (Dkt.,

Nos. 34-3 at ¶¶ 13-14; 34-5 at ¶¶ 12-13.)  In the days preceding the assault, neither Tucker nor

Frazier considered Gonzalez to be an excessive or imminent risk to other residents' health and

safety.  (Dkt., Nos. 34-3 at ¶¶ 13-14; 34-5 at ¶¶ 17.)

## II.    APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 272-73.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to

be treated as an affidavit.[3] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ 5981

---

[3] Plaintiff's Complaint in this case was properly verified by declaration under 28 U.S.C. § 1746. *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with §1746). Complaint was properly verified. (Dkt. No. 1 at 11.)

(WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition Papers

As required under N.D.N.Y. Local Rule ("L.R.") 7.1, Defendants have filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 34-9.) Under the rule, the opposing party is required to respond to the movant's statement, and the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3). Plaintiff has failed to respond to the statement of material facts filed by Defendants in the manner required under L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[5] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

[5] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

consequences of failing to respond to the motion.  *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d

Cir. 1996).  Defendants' notice to Plaintiff of the consequences of his failure to respond to their

summary judgment motion, found in the body of their Notice of Motion, does not comply with

the L.R. 56.2 notice requirements.  (Dkt. No. 34 at 1.)  However, the docket indicates that the

Clerk's Office sent Plaintiff a copy of the L.R. 56.2 Notification of the Consequences of Failing

to Respond to a Summary Judgment Motion form with Defendants' motion papers so Plaintiff

has been advised of the consequences.  (Dkt. No. 36.)

    In his opposition papers, Plaintiff explained that he is not knowledgeable regarding the

law or the legal material the Court may be requesting, and that at the St. Lawrence Psychiatric

Center, where he is now confined, he has no access whatsoever to a law library or law books.[6]

(Dkt. No. 39-2 at 58-59.)  Moreover, according to Plaintiff, the Mental Health Legal Services has

been of no assistance to him.  *Id*. at 58.

    The Second Circuit has acknowledged a court's broad discretion to determine whether to

overlook a failure to comply with local rules.  *Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62, 73

(2d Cir. 2001).  The Court finds that in light of the unavailability to Plaintiff of a legal library or

legal assistance, the proper exercise of discretion in this case requires excusing Plaintiff's failure

to respond to Defendants' statement of material facts in accordance with L.R. 7.1(a)(3), as well

---

[6] The Court takes judicial notice of civil rights litigation pending in the Northern District
in which the lack of a law library and the unavailability of legal assistance from the Mental
Health Legal Services for involuntarily committed sex offenders in the Central New York
Psychiatric Center Sex Offender Treatment Program is presently being challenged on First
Amendment grounds.  *See, e.g., Suggs v. Maxymillian*, No. 9:13-CV-00359 (NAM/TWD), 2015
WL 5750998, at *10, 2015 U.S. Dist. LEXIS 133443, at *25-26 (N.D.N.Y. Sept. 14, 2015).

as his failure to file a memorandum of law as required under L.R. 7.1(a), and conducting an assiduous review of the entire record.  *Id.*

**B.        Legal Standard for Plaintiff's Failure to Protect Claim**

The Court noted in its Report-Recommendation and Order on Defendants' Rule 12(b)(6) motion to dismiss in this case that the Second Circuit has yet to articulate the standard for a failure to protect claim alleged by an involuntarily committed patient.  *O'Dell v. Bill*, No. 9:13-CV-1275 (FJS/TWD), 2015 WL 710544, at *6, 2015 U.S. Dist. LEXIS 182152, at *12 (N.D.N.Y. Nov. 26, 2014) (Report-Recommendation accepted in its entirety by Scullin, J.)  The Court recognized that the Supreme Court held in *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) that involuntarily committed individuals have a Fourteenth Amendment substantive due process right to be protected from confinement in unsafe conditions.  *Id.*  The Court then considered the standards for liability applied by the various circuit and district courts that had considered the issue and determined that the deliberate indifference standard applicable to Eighth Amendment failure to protect claims by prisoners[7] should be applied to claims for failure to protect from unsafe conditions under the Fourteenth Amendment alleged by an involuntarily committed patient against non-professional or low level staff members like Tucker and Frazier.[8]  *O'Dell*, 2015 WL 710544, at *8.

---

[7]  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[8] The Second Circuit has applied the professional judgment standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients against professionals.  *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188-89 (2d Cir. 2005) (citing *Rodriguez v. City of New York*, 72 F.3d 1051, 1061-62 (2d Cir. 1995)).  The Second Circuit has not articulated whether to apply the professional judgment standard to non-professionals.

"Defendants may be held liable under § 1983 if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or to act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 145 (2d Cir. 1981). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in the criminal law. (citation omitted). This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) Deliberate indifference for purposes of the Eighth Amendment exists if an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference." *Farmer*, 511 U.S. at 837. Reckless disregard of a plaintiff's "right to be free from attacks by other inmates may be shown by the existence of a 'pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk.'" *Knowles v. New York City Dept. of Corrections*, 904 F. Supp. 217, 221 (S.D.N.Y. 1995). Mere negligence will not suffice to state a claim under § 1983. *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 620 (2d Cir, 1996). "In *Lewis*, the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore v. Briggs*, 381 F.3d 771, 774 (8th Cir. 2004) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998)).

**C.      Analysis of Plaintiff's Claim**

Plaintiff claims that beginning the day Gonzalez returned to Ward 405 at CNYPC after serving time in jail for punching another resident and breaking his jaw, he began threatening to fight, beat up, and break the jaws of other residents.  (Dkt. Nos. 1 at 5-6; 39 at ¶¶ 5- 7.) According to Plaintiff, Gonzalez continued to make those threats in the days following his return, and Tucker and Frazier, who were aware of and had even heard the threats, claimed that Gonzalez was not threatening anyone and did nothing about it.  *Id*.  Plaintiff contends that if Tucker and Frazier had reported Gonzalez's repeated threats of assault, the attack on Plaintiff might not have taken place.  (Dkt. No. 39 at ¶ 5.)

Plaintiff's Complaint has left blank the date Gonzalez returned to Ward 405.  (See Dkt. No. 1. at 5.)  Although it is not entirely clear, Plaintiff appears to claim that Tucker and Frazier's alleged failure to acknowledge or do anything about Gonzalez's threats occurred in or around the three days following Gonzalez's return to Ward 405, although it may have continued for a longer period.  *Id*. at 5-6.  Evidence submitted by Plaintiff reveals that Gonzalez was back in Ward 405 at some point prior to May 21, 2013, when Plaintiff himself reported threats made by Gonzalez in the day room to Risk Management.  (Dkt. No. 39-2 at 66.)  Moreover, since in his May 21 and 31, 2013, requests to Risk Management Plaintiff specifically identified Tucker and Frazier as two of the treatment aides who had let Gonzalez get away with threatening behavior, it appears that Tucker and Frazier's alleged failure to take action had occurred prior to those requests.  *Id*. at 66-67.

12

Evidence submitted by Plaintiff also shows that TTL Morgan was apprised of Plaintiff's reports, and that staff members on the Ward were aware of Gonzalez's bullying behaviors no later than June 5, 2013, and made it a focus of his treatment plan, and that staff was keeping a close eye on the situation between Plaintiff and Gonzalez. *Id*. at 26. Thus, even if, as Plaintiff contends, Tucker and Frazier saw but failed to report Gonzalez's threatening behavior, the TTL was clearly aware of the situation and indicated it was being monitored by staff no later than June 5, 2013, well before the attack on Plaintiff on June 23, 2013. *Id*. There is no evidence in the record revealing specific threatening or assaultive behavior by Gonzalez, or of Tucker and Frazier being aware of and failing to respond to such behavior, subsequent to Porter's June 5, 2013, report and up until the June 23, 2013, assault on Plaintiff.

The averments in their Affidavits show that Tucker and Frazier had no direct control over the placement or removal of residents on the SOTP wards at CNYPC. (Dkt. Nos. 34-3 at ¶ 17; 34-5 at ¶ 18.) The Affidavits also show that prior to June 23, 2013, during the times they were working, they never considered Gonzalez to be an excessive or immediate risk to other residents' health and safety, nor were they aware of a situation that an experienced SCTA working on SOTP Ward 405 would have considered an immediate or imminent threat to Plaintiff. (Dkt. Nos. 34-3 at ¶ 16; 34-5 at ¶ 17.) Prior to June 23, 2013, neither ever witnessed, nor were they made aware of, a specific threat to Plaintiff's physical safety or well-being by Gonzalez. (Dkt. Nos. 34-3 at ¶ 18; 34-5 at ¶ 19.) Although both Defendants were aware of Gonzalez's history of assault, in the days they worked at CNYPC leading up to June 23, 2013, nothing had transpired in the presence of either Defendant that would have caused them to recommend that Gonzalez be isolated from other Ward 405 residents. (Dkt. Nos. 34-3 at ¶¶ 16,18; 34-5 at ¶¶ 17, 19.)

13

Furthermore, neither of the Defendants was working at the time of the attack on Plaintiff on June 23, 2013. On June 19, 2013, through June 23, 2013, Tucker worked his regular 7:00am to 3:00pm shift in Ward 405 and worked overtime on June 21st and 22nd. (Dkt. No. 34-5 at ¶¶ 11-14.) During the period from June 19, 2013, through the end of his shift on June 23, 2013, the day of the assault, Tucker does not recall there being any significant incident where he felt Gonzalez posed an immediate or imminent physical threat to Plaintiff. *Id*. at ¶ 16. The assault by Gonzalez occurred after the end of Tucker's shift on June 23, 2013. *Id*. at ¶ 20.

Frazier worked his regular 7:00am to 3:00pm shift in Ward 405 on June 17, 2013, through June 20, 2013. (Dkt. No. 34-3 at ¶ 13.) Frazier, who worked regularly Monday through Friday, was on vacation Friday June 21, 2013, and did not return to work until the morning of June 24, 2013, the day after the assault. *Id*. at ¶ 13. Frazier does not recall there being any significant incident where he felt Gonzalez posed an immediate or imminent physical threat to Plaintiff during the period from June17, 2013, through the end of his shift on June 20, 2013. *Id*. at ¶ 15.

The foregoing evidence shows that Defendants did not know of and disregard an excessive risk to Plaintiff's safety, and that they did not draw the inference that Gonzalez was a serious risk to Plaintiff's safety. Moreover, Defendants were not present at CNYPC at the time of the assault. Plaintiff's assertions that Tucker and Frazier were aware of Gonzalez's threatening behavior, denied that it was threatening, and failed to act on it to protect Plaintiff and other residents of Ward 405, are vague with regard to timing and conclusory with regard to the facts and circumstances surrounding Tucker and Frazier's alleged failure to act to protect Plaintiff. Therefore, they are insufficient to defeat a properly supported summary judgment

motion.[9] *See Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1292 (2d Cir. 1974) (vague assertions supported only by self-serving statements by the nonmovant are insufficient to defeat a properly supported summary judgment motion); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory assertions or unsubstantiated speculation [to defeat summary judgment].").

In addition, the evidence in the summary judgment record does not support a finding of proximate cause as required to prevail on a § 1983 claim. *See Doe v. New York City Dep't of Social Servs.*, 649 F.2d at 145. Plaintiff claims that if Tucker and Frazier had taken action with regard to Gonzalez, the assault on June 23, 2013, might not have occurred. (Dkt. No. 39 at ¶ 5.) However, the evidence shows that even if Tucker and Frazier were aware that Gonzalez was a threat to Plaintiff's safety and failed to take action or report their concerns prior Plaintiff's May 2013 requests for a meeting with Risk Management, at least as of June 5, 2013, TTL Morgan was aware of Plaintiff's concerns regarding Gonzalez, those concerns were being taken seriously, and staff was keeping a close eye on the situation and attempting to resolve the conflict between Plaintiff and Gonzalez. (Dkt. No. 26.) Given that the assault occurred despite the TTL and the staff's clear knowledge regarding Gonzalez's threatening behavior weeks before the June 23, 2013, assault and their monitoring of the situation, Plaintiff's claim that the assault might have been prevented had Tucker and Frazier reported that behavior is pure speculation.

---

[9] The Court finds that, based upon the summary judgment record, its recommendation that Defendants be granted summary judgment would have been the same had the Court applied the professional judgment or shock the conscience standards rather than the deliberate indifference standard to Plaintiff's Fourteenth Amendment substantive due process claim. See *Ammons v. Washington Dep't of Soc. & Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011).

Based upon the foregoing, the Court recommends that Defendants Tucker and Frazier's motion for summary judgment (Dkt. No. 34) be granted in its entirety.

## IV. MOTION FOR APPOINTMENT OF COUNSEL

The Court has construed Plaintiff's papers in opposition to Defendants' motion for summary judgment to include a motion for appointment of counsel. (Dkt. No. 39-2 at 58-59.) Inasmuch as the Court is recommending that Defendants' motion for summary judgment be granted in its entirety, Plaintiff's motion for appointment of counsel is denied without prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants Tucker and Frazier's motion for summary judgment (Dkt. No. 34) be **GRANTED IN ITS ENTIRETY**; and it is hereby

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 39-2 at 58-59) is **DENIED WITHOUT PREJUDICE**; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 2, 2016
 Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993,
the plaintiff was in keeplock because of an altercation with
prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock
is confined to his cell for twenty-three hours a day with
one hour for recreation. (Affidavit of Anthony Annucci
dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates
in keeplock must apply for written permission to attend
regularly scheduled religious services. (Reply Affidavit of
George Schneider in Further Support of Defendants' Motion
for Summary Judgment dated September 9, 1996 ("Schneider
Aff.") ¶ 3). Permission is granted unless prison officials
determine that the inmate's presence at the service would
create a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green Haven
is for the captain's office to review all requests by inmates
in keeplock to attend religious services. (Schneider Aff. ¶ 3).
Written approval is provided to the inmate if authorization
is granted. (Affidavit of Richard Pflueger dated April 26,
1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the
appropriate form to the gate officer before being released to
attend the services. (Pflueger Aff. ¶ 5).

**\*2**  On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment.)

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22,

1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being

released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  4

2015 WL 710544
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

George O'DELL, Plaintiff,

v.

Charmaine BILL, Treatment Team Leader; Alvin
Tucker, S.C.T.A. # 1; Darian Frazier, S.C. T.A.
# 11; Kristin Woodlock, Acting Commissioner;
Jeffrey Nowicki, Chief of Mental Health
Treatment Services; Dr. Terri Maxymillian,
Chief of Mental Health Treatment Services; and
Maureen Bosco, Acting Director, Defendants.

No. 9:13–CV–1275 (FJS/TWD).
|
Signed Feb. 18, 2015.

**Attorneys and Law Firms**

George O'Dell, Ogdensburg, NY, pro se.

Office of the New York, State Attorney General, Timothy P.
Mulvey, AAG, of Counsel, Syracuse, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse,
NY, for Defendants.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge Dancks'
November 25, 2014 Report–Recommendation and Order, *see*
Dkt. No. 24, and Plaintiff's objections thereto, *see* Dkt. No.
27. In her Report–Recommendation and Order, Magistrate
Judge Dancks recommended that this Court grant Defendants'
motion to dismiss Plaintiff's complaint for failure to state a
claim as to the claims against Defendants Bill, Woodlock,
Nowicki, Maxymillian, and Bosco with leave to amend; deny
Defendants' motion to dismiss Plaintiff's complaint for failure
to state a claim as to the claims against Defendants Tucker and
Frazier; direct Defendants Tucker and Frazier to answer the
complaint; *sua sponte* dismiss Plaintiff's claim regarding New
York Mental Hygiene Law § 10.06(k) with leave to amend;

and grant Plaintiff thirty-days in which to file an amended
complaint. *See* Dkt. No. 24 at 16–17.

Plaintiff filed a document in response to Magistrate Judge
Dancks' Report–Recommendation and Order, which the
Court construes as his objections to the same. *See* Dkt. No.
27. Plaintiff makes no specific objection to any of Magistrate
Judge Dancks' recommendations; rather, it appears that his
intent is to present the Court with more evidence to support
his claim that his injuries are real and that Defendants Tucker
and Frazier failed to protect him from sustaining such injuries.

In light of the conclusory and general nature of Plaintiff's
objections, the Court has reviewed the record for clear error
and manifest injustice and, finding none, the Court hereby

**ORDERS** that Magistrate Judge Dancks' November 25, 2014
Report–Recommendation and Order is **ACCEPTED in its
entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint for failure to state a claim, *see* Dkt. No. 19,
is **GRANTED** as to the claims against Defendant Bill,
Woodlock, Nowicki, Maxymillian and Bosco **with leave to
amend;** and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint for failure to state a claim, *see* Dkt. No. 19, is
**DENIED** as to the claims against Defendants Tucker and
Frazier; and the Court further

**ORDERS** that Defendants Tucker and Frazier shall answer
Plaintiff's complaint within **twenty (20) days** of the date of
the filing of this Order; and the Court further

**ORDERS** that Plaintiff's claim under New York Hygiene
Law § 10 .06(k) is **DISMISSED** *sua sponte* **with leave to
amend;** and the Court further

**ORDERS** that, if Plaintiff wants to pursue one or more
of the claims that the Court has dismissed with leave to
amend, he must file an amended complaint. Any amended
complaint that Plaintiff files shall supersede and replace
the original complaint in its entirety; therefore, in any such
amended complaint, Plaintiff must include the claims against
Defendants Tucker and Frazier, which the Court did not
dismiss, if he wishes to proceed with those claims. In any
amended complaint that he files, Plaintiff must allege claims
of misconduct or wrongdoing against each named defendant

that Plaintiff has a legal right to pursue and over which this Court may properly exercise jurisdiction. Furthermore, any amended complaint that Plaintiff files must comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. The Court advises Plaintiff that, if he does not file an amended complaint within **thirty (30) days** of the date of the filing of this Order, this case will proceed based solely on the claims that Plaintiff asserted against Defendants Tucker and Frazier in his original complaint; and the Court further

**\*2 ORDERS** that the Clerk of the Court shall send Plaintiff a copy of his original complaint and the form complaint available for use by litigants in Section 1983 actions to assist Plaintiff in preparing an amended complaint; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

This pro se civil rights action,[1] commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff George O'Dell alleges that Defendants violated his constitutional rights by failing to protect him from another patient at the Central New York Psychiatric Center ("CNYPC"). (Dkt. No. 1 .) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 19.) For the reasons that follow, I recommend that Defendants' motion to dismiss be granted in part and denied in part and that the Court sua sponte dismiss Plaintiffs claim regarding New York Mental Hygiene Law section 10.06(k) with leave to amend.

### I. BACKGROUND

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. *Erickson v. Pardus,*

551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Plaintiff was housed in ward 405 at CNYPC "from on or about 2012" through June 9, 2014. (Dkt. No. 1 at 5; Dkt. No. 23.) During the month of September 2013, Humberto Gonzalez, another resident at CNYPC, was brought to ward 405. (Dkt. No. 1 at 5.) Gonzalez had previously resided in ward 405 before he punched another resident "for no real known reason," broke the resident's jaw, and was sent to Oneida County Correctional Facility to serve a criminal sentence. *Id.*

The morning after his return to ward 405,[2] Gonzalez entered the day room, "started to call the residents of ward 405 all kinds of abusive, insultive names," and "began to tell the residents of ward 405, that he ... would punch and [break] anyone['s] ... jaw, like the last one he punched." (Dkt. No. 1 at 5.) Gonzalez further told the residents of ward 405 "how he [would] fight anyone o n[the] ward, from the biggest to the smallest, anyone that thinks he can fight," and that "he was going to watch sports, and if anyone don't like it, to come see him ... about that matter, and he will settle that matter." *Id.* Defendant Secure Care Treatment Aide Alvin Tucker then entered the day room and "began to tell everyone [ ] that Gonzalez wasn't threatening no one [and] how he (Tucker), didn't want anyone to write letters." *Id.* at 6.

Two days later, Gonzalez entered the mess hall and made threats similar to those he had made on his first morning back. (Dkt. No. 1 at 6.) Fifteen minutes later, Defendant Tucker entered the dining area and "began to state, how Gonzalez wasn't threatening no one, and Gonzalez wasn't going to fight, or beat up anyone." *Id.* Gonzalez then got up to leave and stated, "[e]veryone heard what I said, if [there] is anyone, come to me." *Id.*

**\*3** Gonzalez continued to make similar threats against individual residents of ward 405. (Dkt. No. 1 at 6.) Defendant Tucker and Defendant Secure Treatment Aide Darian Frazier[3] continued to state that Gonzalez was not threatening anyone and that "they liked Gonzalez, as Gonzalez [would] stand up, and make sure they watch[ed] sports." *Id.* Gonzalez was room restricted "several times" for threatening and approaching residents of ward 405. *Id.* However, neither Defendant Tucker nor Defendant Frazier made notes concerning Gonzalez's threats.[4] *Id.*

Plaintiff notes that while Gonzalez was housed in ward 405, the entire ward went to recreation with ward 605. (Dkt. No. 1 at 7.) Ward 605 housed the resident that Gonzalez had

previously punched and broken his jaw. *Id.* During these times, Gonzalez and the patient he previously punched would ride an elevator to the recreation yard and then be in the recreation yard together. *Id.* Plaintiff claims this was "[t]otally insane." *Id.*

One day, [5] Gonzalez was arguing with residents in ward 405 while Plaintiff sat in the back of the sun room reading magazines. (Dkt. No. 1 at 7.) At this time, the "staff [was] in the day room, and in the hallway that looks directly into the day room, and the sun room." (Dkt. No. 21 at 7. [6]) Plaintiff then "felt a heavy sha[rp] pain in [his] head." (Dkt. No. 1 at 7.) Plaintiff woke up with his head in bandages and was informed that Gonzalez had hit him on the head with a chair. *Id.* Plaintiff suffered "multiple pains in [his] head, ... pains in [his] neck, ... dizzy spells," and was light headed. *Id.* Plaintiff had a large laceration on the top of his head running from one side to the other. (Dkt. No. 1–3.) Plaintiff alleges that Gonzalez "split [ ] ... plaintiff's head open in several different areas." (Dkt. No. 21 at 2.)

Plaintiff cites a report by the Commission on the Quality of Care (CQC) of the Office for People with Developmental Disabilities that describes "how multiple reports ... in [CNYPC have] never been filled out as required by staff, and [the] administration does not do anything about totally improper procedures." [7] (Dkt. No. 21 at 3.) Further, Plaintiff alleges that staff, including Defendants Tucker and Frazier, allowed residents to fight one another for periods of fourteen to eighteen minutes. *Id.* Defendants Tucker and Frazier took no "precautionary actions" toward preventing Gonzalez from punching residents, breaking the jaw of residents, or hitting Plaintiff with a chair. *Id.*

Plaintiff filed this action on October 15, 2013, against Defendants Tucker, Frazier, Charmaine Bill (Treatment Team Leader), Kristin Woodlock (Acting Commissioner), Jeffrey Nowicki (Chief of Mental Health Treatment Services), Dr. Terri Maxymillian (Chief of Mental Health Treatment Services), and Maureen Bosco (Acting Director) for negligence, deliberate negligence, and deliberate indifference as violating his First, Fifth, Sixth, Eleventh, and Fourteenth Amendments rights. (Dkt. No. 1 at 1–4, 8.)

**\*4** Defendants now move to dismiss the complaint. (Dkt. No. 19.) Plaintiff has opposed the motion. (Dkt. No. 21.) Defendants have filed a reply. (Dkt. No. 22.)

## II. MOTION TO DISMISS

### A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

### B. Personal Involvement

Plaintiff names Charmaine Bill (Treatment Team Leader), Alvin Tucker (S.C.T.A. # 1), Darian Frazier (S.C.T.A.# 1), Kristin Woodlock (Acting Commissioner), Jeffrey Nowicki (Chief of Mental Health Treatment Services), Dr. Terri Maxymillian (Chief of Mental Health Treatment Services), and Maureen Bosco (Acting Director) as defendants. (Dkt. No. 1 at 1–3.) Defendants move to dismiss, arguing that Plaintiff has failed to allege facts plausibly suggesting their personal involvement. (Dkt. No. 19–1 at 3–5.) Defendants

are correct as to Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (per curiam); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

**\*5** Here, Plaintiff alleges that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco violated his constitutional rights in their supervisory capacities. (Dkt. No. 1 at 8.) Nowhere in Plaintiff's complaint does he allege that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco were personally involved in failing to protect him from Gonzalez. (Dkt. No. 1.) Plaintiff does not mention these supervisory Defendants as having any tangible connection to Gonzalez, Gonzalez's behavior, the conduct of the aides present during the threats and during the injuring incident, or Plaintiff's injury. *Id.* Therefore, accepted as true and viewed in a light most favorable to Plaintiff, these facts do not plausibly suggest that Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco were personally involved in a violation of Plaintiff's rights. Therefore, Plaintiff's complaint

fails to state a cause of action against Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco.

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* Here, Plaintiff fails to mention Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco in his claims. This may be cured with more sufficient pleading of the facts. Therefore, Plaintiff's claims against Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco should be dismissed with leave to amend.

Defendants argue that the complaint fails to sufficiently allege personal involvement by Defendants Tucker and Frazier. (Dkt. No. 19–1 at 4–5.) This argument is without merit. As discussed in more detail below, the complaint alleges facts plausibly suggesting that Defendants Tucker and Frazier personally violated Plaintiff's constitutional rights. Therefore, I recommend that the Court deny Defendants' motion to dismiss as to Defendants Tucker and Frazier.

### C. Failure to Protect

Plaintiff claims that Defendants Tucker and Frazier violated his constitutional rights by failing to protect him from Gonzalez. (Dkt. No. 1 at 4.) Defendants Tucker and Frazier argue that this claim should be dismissed. (Dkt. No. 19–1 at 5–7.) For reasons discussed below, I recommend that Defendants' motion be denied.

A prisoner has a right under the Eighth Amendment to be protected from harm. To state an Eighth Amendment failure to protect claim, a prisoner must allege facts plausibly suggesting that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference to that risk. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Deliberate indifference is a conscious disregard of a substantial risk of serious harm. *Id.* at 835.

**\*6** Here, Plaintiff is not an incarcerated prisoner, but an involuntarily committed patient at a psychiatric center under the New York Mental Hygiene Law. (Dkt. No. 1 at 5.) The Second Circuit has yet to articulate the standard for a failure to

protect claim alleged by an involuntarily committed patient. *Yeldon v. Sawyer,* No. 9:10–CV–266 (TJM/RFT), 2012 U.S. Dist. LEXIS 77043, at *19–20, 2012 WL 1995839, at *6 (N.D.N.Y. Apr.26, 2012) (citing *Lane v. Carpinello,* No. 9:07–CV–751 (GLS/DEP), 2009 U.S. Dist. LEXIS 88345, at *18, 2009 WL 3074344, at *61 (N.D.N.Y. Sept.24, 2009)). [8] The Supreme Court has held that involuntarily committed patients have substantive due process rights. *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* the Court noted that the right to personal security is a "historic liberty interest," and that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 316 (citing *Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). *See also DeShaney v. Winnebago Cnty. Dep't Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a duty to assume some responsibility for his safety and general well-being.").

The circuit courts have split as to the legal standard that should be applied to substantive due process claims alleged by involuntarily committed patients. Some circuits follow *Youngberg* and hold that the standard for determining whether an involuntarily committed patient's substantive due process rights have been violated is whether a "decision by [a] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323. *See also Amnions v. Washington Dep't of Soc. & Health Servs.,* 648 F.3d 1020, 1027 (9th Cir.2011) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Lanman v. Hinson,* 529 F.3d 673, 684 (6th Cir.2008) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but recognizing the application of the deliberate indifference standard for claims alleged against non-professionals); *Patten v. Nichols,* 274 F.3d 829, 838 (4th Cir.2001) (applying the professional judgment standard to Fourteenth Amendment claims alleged by involuntarily committed patients and rejecting the deliberate indifference standard for involuntarily committed patients); *Feagley v. Waddill,* 868 F.2d 1437, 1439–40 (5th Cir.1989) (applying the professional judgment standard to Fourteenth Amendment claims alleged by

involuntarily committed patients). *Cf. Lavender v. Kearney,* 206 F. App'x 860 (11th Cir.2006) (interpreting *Youngberg* as articulating a standard of deliberate indifference for Fourteenth Amendment claims alleged by involuntarily committed patients).

**\*7** Other circuits follow the Supreme Court's ruling in *County of Sacramento v. Lewis* which applied a "shocks the conscience" standard to all substantive due process claims involving an "abusive executive action." 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). *See Benn v. Universal Health Sys., Inc.,* 371 F.3d 165, 174 (3d Cir.2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients); *Moore ex rel. Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying the shocks the conscience standard to Fourteenth Amendment claims alleged by involuntarily committed patients, but noting that "conduct *may* shock the conscience of federal judges only if [defendants] acted with 'deliberate indifference.' " (emphasis in original).); *Davis v. Rennie,* 264 F.3d 86, 99 (1st Cir.2001) (finding lower court did not err by declining to give a shocks the conscience instruction for a claim alleged by an involuntarily committed patient. Under this standard, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis,* 523 U.S. at 849. The Court noted that in a substantive due process claim under the Fourteenth Amendment by a pretrial detainee, deliberately indifferent conduct could shock the conscience. *Id.* at 849–50.

The Second Circuit has applied the professional judgment standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients against professionals. *Olivier v. Robert L. Yeager Mental Health Ctr.,* 398 F.3d 183, 188–89 (2d Cir.2005) (citing *Rodriguez v. City of New York,* 72 F.3d 1051, 1061–62 (2d Cir.1995)). The Supreme Court has defined a professional for purposes of the professional judgment standard as:

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.

*Youngberg,* 457 U.S. at 323 n. 30.

However, the Second Circuit has not articulated whether to apply this standard to substantive due process violations under the Fourteenth Amendment alleged by involuntarily committed patients *against non-professionals.* District courts within the Second Circuit have distinguished cases applying the professional judgment standard found in *Youngberg* from cases where the defendants-such as psychiatric center aides-are "low-level staff members." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 U.S. Dist. LEXIS 20840, at *25–26, 2005 WL 2296620, at *8 (S.D.N.Y. Sept.20, 2005) (determining the defendant security hospital treatment assistants at Mid–Hudson Forensic Psychiatric Center were low-level staff members) . [9] *See also McChesney v. Hogan,* No. 9:08–CV–0563 (NAM/DEP), 2010 U.S. Dist. LEXIS 91681, at *14–16, 2010 WL 3613806, at *5 (N.D.N.Y. Aug.11, 2010) (citing *Vallen* to find that security hospital treatment assistants at Central New York Psychiatric Center were not professionals); *Dove v. City of New York,* No. 03–CV–5052 (JFB)(LB), 2007 U.S. Dist. LEXIS 18341, at *23–25, 2007 WL 805786, at *8 (E.D.N.Y. Mar.15, 2007) (acknowledging that both circuit and district courts have chosen to apply a standard of deliberate indifference to non-professionals as suggested in *Youngberg* ).

**\*8** Further, these district courts have acknowledged the potential standards for a substantive due process violation under the Fourteenth Amendment alleged by an involuntarily committed patient, but have largely declined to apply a specific standard, holding that the facts of their cases did not rise to the level of any possible standard. However, these district courts, acknowledging both the deliberate indifference standard and the professional judgment standard, have more often than not favored the deliberate indifference standard. *See Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, at *12, 2012 WL 651919, at *3 (N.D.N.Y. Feb.28, 2012); *McChesney,* 2010 WL 3613806 at *6; *Lane,* 2009 WL 3074344 at *19; *Vallen,* 2005 WL 2296620 at *9 (also considering shocks the conscience standard); *Daniel H. ex rel. Hardaway H. v. City of New York,* 115 F.Supp.2d 423, 430 (S.D.N.Y.2000) (only considering deliberate indifference standard); *cf. Yeldon,* 2012 WL 1995839 at *7 (acknowledging both standards but declining to favor one); *Dove,* 2007 WL 805786 at *8 (acknowledging both standards but declining to favor one).

I am inclined to follow this trend of cases and apply the deliberate indifference standard to a substantive due process violation under the Fourteenth Amendment alleged by an involuntarily committed patient against a non-professional.

First, since aides have a duty to protect patients who are not currently incarcerated for punitive measures, the rights of these involuntarily committed patients rise to at least the same level as those inmates who are incarcerated for punitive measures-their Eighth Amendment rights. *See DeShaney,* 489 U.S. at 199–200; *see also Groves,* 2012 WL 651919 at *3 (applying the Eighth Amendment deliberate indifference standard to a claim by an involuntarily committed patient as if he were an inmate). Second, the burden of a shocks the conscience standard is an "unduly heavy burden" on a pro se plaintiff and "would be inconsistent with the state's central role in supervising and caring for the involuntarily committed." *McChesney,* 2010 WL 3613806 at *5 (citing *Vallen,* 2005 WL 2296620 at *9). Third, it is possible to analogize the rights of a pretrial detainee with those of an involuntarily committed patient, as both are not in state custody as a means of punishment for a conviction. The standard for analyzing a pretrial detainee's Fourteenth Amendment claim is deliberate indifference. *Bourdon v. Roney,* No. 9:99–CV–0769 (LEK/GLS), 2003 U.S. Dist. LEXIS 3234, at *28–29, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003).

A non-professional official acts with deliberate indifference if he "knows of and disregards an excessive risk to [patient] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837; *see also McChesney,* 2010 WL 3613806 at *6 (using the Eighth Amendment deliberate indifference standard for a failure to protect claim made by an involuntarily committed patient under the Fourteenth Amendment).

**\*9** Here, Plaintiff alleges that Defendants Tucker and Frazier failed to protect him against patient Gonzalez who made threatening and insulting comments to other patients, including Plaintiff, in the presence of Defendants. (Dkt. No. 1 at 6–8; Dkt. No. 21 at 2–6.) Accepting the allegations of the complaint as true, Defendants Tucker and Frazier knew that patient Gonzalez posed a risk to Plaintiff and the other patients in CNYPC. Gonzalez had previously punched and broken the jaw of a patient, resulting in a criminal sentence at a correctional facility. (Dkt. No. 1 at 5.) Defendants

Tucker and Frazier also knew that Gonzalez made repeated threats to the patients in ward 405, as they even told the patients to disregard these "threats." *Id.* at 6. Not only were Defendants Tucker and Frazier aware of Gonzalez's behavior, but they also made excuses for Gonzalez's behavior and even promoted it. *Id.* Plaintiff alleges that Defendants Tucker and Frazier allowed residents to fight for periods of time. (Dkt. No. 21 at 3.) Even when Gonzalez was room restricted for his threats, Defendants Tucker and Frazier failed to make notes of his behavior, suggesting they disregarded any risk to the other patients. (Dkt. No. 1 at 6–7 .)

Accepting the facts alleged by Plaintiff as true and construing them liberally for this pro se Plaintiff, the complaint alleges facts plausibly suggesting that Defendants Tucker and Frazier knew of the excessive risk of substantial harm posed by Gonzalez and disregarded it, ultimately failing to protect Plaintiff. Plaintiff has alleged facts plausibly suggesting that Defendants Tucker and Frazier failed to protect him. Therefore, I recommend Defendants' motion to dismiss for failure to state a claim for failure to protect be denied.

### III. NEW YORK MENTAL HYGIENE LAW CLAIM

Plaintiff attaches a set of arguments at the end of his complaint, entitled "continued of facts," that addresses the New York Mental Hygiene Law Section 10.06(k). (Dkt. No. 1–1.) Plaintiff explains the term of his criminal punishment, the expiration of the punishment, and his transfer to CNYPC. *Id.* at 1. Plaintiff further appears to name the Office of the Attorney General broadly, Attorney General Eric T. Schneiderman, and Assistant Attorney General James Williams as responsible for his unconstitutional imprisonment in CNYPC under New York Mental Hygiene Law Section 10.06(k). *Id.* at 4.

Plaintiff raises the claim that the New York Mental Hygiene Law Section 10.06(k) violates his due process rights under the Fourteenth Amendment. (Dkt. No. 1–1 at 1.) Defendants did not address this claim in their motion to dismiss. (Dkt. No. 19.) For the reasons discussed below, I recommend that the Court dismiss this claim sua sponte with leave to amend.

#### A. Legal Standard

The Court may address a claim sua sponte. 28 U.S.C. § 1915(e) (2006) directs that when a person proceeds in forma pauperis, "the court shall dismiss the case at anytime if the court determines that ... the action ... (I) is frivolous or malicious; (ii) fails to state a claim on which relief may be

granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) When screening a complaint, the court has the duty to show liberality towards pro se litigants. *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties have had an opportunity to respond." *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983).

#### B. Analysis

**\*10** Here, Plaintiff failed to list any of the named Defendants as involved in his claim involving New York Mental Hygiene Law Section 10.06(k). (Dkt. No. 1–1.) As described above, a defendant must have personal involvement in the violation of the plaintiff's rights. Here, Defendants named in the complaint had no personal involvement in the alleged violations under New York Mental Hygiene Law Section 10.06(k). Plaintiff may be able to amend this complaint to either show the named Defendants' direct involvement in these violations or to name new Defendants. Therefore, I recommend that the Court dismiss this claim sua sponte with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 19) be ***GRANTED*** with leave to amend as to Defendants Bill, Woodlock, Nowicki, Maxymillian, and Bosco, and ***DENIED*** as to Defendants Tucker and Frazier; and it is further

**RECOMMENDED** that Defendants Tucker and Frazier be directed to answer the complaint; and it is further

**RECOMMENDED** that Plaintiff be granted thirty days to file an amended complaint; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Yeldon v. Sawyer,* No. 9:10–CV–266 (TJM/RFT), 2012 U.S. Dist. LEXIS 77043, 2012 WL 1995839 (N.D.N.Y. Apr.26, 2012), *Lane v. Carpinello,* No. 9:07–CV–751 (GLS/ DEP), 2009 U.S. Dist. LEXIS 88345, 2009 WL 3074344 (N.D.N.Y. Sept.24, 2009), *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 U.S. Dist. LEXIS 20840, 2005 WL 2296620 (S.D.N.Y. Sept.20, 2005), *McChesney v. Hogan,* No. 9:08–CV–0563 (NAM/DEP), 2010 U.S. Dist. LEXIS 91681, 2010 WL 3613806 (N.D.N.Y. Aug.11, 2010), *Dove v. City of New York,* No. 03–CV–5052 (JFB)(LB), 2007

U.S. Dist. LEXIS 18341, 2007 WL 805786 (E.D.N.Y. Mar.15, 2007), *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, 2012 WL 651919 (N.D.N.Y. Feb.28, 2012), and *Bourdon v. Roney,* No. 9:99–CV–0769 (LEK/GLS), 2003 U.S. Dist. LEXIS 3234, 2003 WL 21058177 (N.D.N.Y.2003).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Dated Nov. 25, 2014.

2003 WL 21058177 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Ronald D. BOURDON, Plaintiff,

v.

Frank RONEY, New York State Trooper; Alfonso Ortega, New York State Trooper; William McEvoy, New York State Trooper; Dean Edwards, New York State Trooper; Anthony Larock, New York State Trooper; and Jeffrey Dorward, New York State Trooper; Defendants.

No. 9:99–CV–0769(LEK)GLS. | March 6, 2003.

## Attorneys and Law Firms

**\*11** Ronald Bourdon, Auburn Correctional Facility, Auburn, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Department of Law, The Capitol, Albany, New York, for the Defendants.

Roger W. Kinsey, Asst. Attorney General, of counsel.

*REPORT–RECOMMENDATION and ORDER*

SHARPE, United States Magistrate Judge.

**\*1** This matter was referred to the undersigned for Report–Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

Plaintiff, *pro se* Ronald Bourdon ("Bourdon") alleges in his amended complaint that the defendants conspired to fabricate false evidence against him for the purpose of obtaining an "unlawful search warrant," destroying exculpatory evidence, and conducting an illegal search of his property. Bourdon also claims that the defendants used excessive force against him in the course of his arrest and subsequent interrogation, all in violation of his constitutional rights (*Dkt. No. 9; Am. Conpl.*). Bourdon seeks substantial monetary damages.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 (*Dkt. No. 48* ). Bourdon filed a response (*Dkt. No. 72* ). For the following reasons, this court recommends that summary judgment be granted in part and denied in part.

## I. *Summary Judgment Standard*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2502, 2510, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

## II. *Background*

Bourdon filed the present action on May 14, 1999. By Order filed August 11, 1999 ("August order"), District Judge Lawrence E. Kahn dismissed this action unless Bourdon filed an amended complaint within thirty days of the August order

(*Dkt. No. 4* ). Bourdon did not file an amended complaint. Bourdon appealed the August order to the Second Circuit Court of Appeals (*Dkt. No. 6* ).

On May 17, 2000, the Second Circuit affirmed the dismissal of Bourdon's complaint as to "the judge, the prosecutors, the appointed attorneys, Broome County, and the government informer" (*Dkt. No. 8 at 3* ). The Circuit held, however, that Bourdon was entitled to assert excessive force claims against the New York State Trooper defendants named in his original complaint as well as claims arising out of the search of his home and the seizure of property from his residence. *Id.*

**\*12** In accordance with the decision of the Second Circuit, on August 11, 2000, Bourdon filed an amended complaint (*Dkt. No. 9* ).

### A. *Bourdon's Allegations*

*2 On June 14, 1996, defendants Frank Roney ("Roney") and Alfonso Ortega ("Ortega") drafted an application to search Bourdon's home (*Am.Compl.,* ¶ 1). The application was based on information obtained from an informant whom Roney and Ortega "knew to be false and unreliable." The informant "harbored ill will against the plaintiff." *Id.* at ¶ 2. Roney and Ortega presented the application to Broome County Judge Patrick Mathews in bad faith and "intentionally misled the court with false information." *Id.* at ¶ 3. The search warrant application submitted by Roney and Ortega lacked "probable cause." *Id.* at ¶ 4. Thereafter, Judge Mathews issued a search warrant, without probable cause, permitting the search of Bourdon's home. The search of Bourdon's home was "motivated by malice and an intent to arrest and seize evidence." *Id.* at ¶ 9.

On June 14, 1996, Bourdon's home was searched pursuant to the warrant and Bourdon and another resident of the dwelling, John Verge, were arrested. *Id.* at ¶ 10. When Bourdon was arrested, "his wrists were cuffed with his palms facing outward to insure added pain and discomfort, the cuffs were [then] squeezed painfully tight." *Id.* at ¶ 13.Bourdon was placed in the back of a squad car which was parked in the sun. The car windows were closed and the inside of the car felt "like a greenhouse." *Id.* at ¶ 13.He remained in the hot car, in handcuffs, for three hours without water or the use of a toilet. *Id.* at ¶ 14.

At one point, Roney opened the car door and said that if Bourdon told him where the guns were he could have some water, use the toilet, have his handcuffs loosened, and sit outside on a bench near the house. *Id.* at ¶ 15.Bourdon denied

having guns. Roney got angry and told Bourdon that he "could suffer until he was ready to talk." *Id.* at ¶ 15.At that point, Bourdon's wrists were blue, his right leg was numb, he had wet his pants, and he had severe pain in his lower back.

Defendants seized items not included in the warrant such as Bourdon's books, his daughter's photographs and family albums, and his father's hunting license. *Id.* at ¶¶ 17–18.Defendants searched Bourdon's red van, his jeep, and the wooded area surrounding Bourdon's home, all places not listed in the warrant. *Id.* at ¶ 20.Bourdon claims that the only vehicle mentioned in the search warrant was his white van. Bourdon claims that the defendants removed a briefcase from his red van, moved it to the white van, and "staged a fraudulent photograph that depicted [the briefcase] as being originally found in the white van." Defendants also removed some items from the briefcase and placed them in Bourdon's home and then pretended that the items were originally found in the home. *Id.* at ¶ 20.Defendants later used the documents found in the briefcase to obtain an indictment against Bourdon. *Id.* The search ended at 9:35 p.m. Bourdon's home was left "in shambles." *Id.* at ¶ 21.

**\*13 \*3** During the search, defendants seized and improperly disposed of exculpatory evidence, specifically Bourdon's father's valid hunting license which was found in the same closet with the seized guns. The valid hunting license was never included in the inventory list of the items seized. *Id.* at ¶ 23.

After the search, Bourdon was taken to the state trooper barracks for interrogation. Bourdon's shoes were taken away and he was forced to stand barefoot on the cold cement floor "with one wrist painfully chained to a wall for another three hours." *Id.* at ¶ 22.Roney and Jeffrey Dorward ("Dorward") interrogated Bourdon, "inflicting pain and threats to obtain information." *Id.*

The defendants also "coerced" John Verge into providing information during an "unconstitutional interrogation." Based upon this information, the defendants returned to Bourdon's home three hours later and seized his father's guns from the rafters of the home. *Id.* at ¶ 24.

Bourdon claims that the defendants deliberately withheld evidence, conducted another illegal search of his home on the following day and seized more evidence, then "unlawfully combined all of the evidence as being seized on June 14, 1996." *Id.* at ¶ 25.Bourdon claims that the defendants violated his right to due process, to be free from unreasonable search

and seizure and false arrest, and to be free from the use of excessive force in the course of an arrest.

**B. *Defendants' Affidavits***

**1. *Defendant Roney***

Roney states that on June 12, 1996, his barracks received a citizen's complaint against Bourdon that he had physically harassed two women and "brandished a handgun" (*Dkt. No. 49; Roney Aff. at ¶¶ 3–4* ). The complainants and Paul Mollis ("Mollis"), a friend of Bourdon's, each gave written statements to the state police. *Id.* at ¶ 5–6; *see also, Ex. A (copy of the Investigation Report), pp. 6–11 & 29–37*. Mollis told the state police that he had been to Bourdon's home several times over the last year and had seen weapons there. Mollis stated that on June 13, 1996, he saw Bourdon near his white van with a pistol in his hand (*Roney Aff., Ex. A, pp. 13–16* ). On June 13, 1996, Roney went to Bourdon's home and Bourdon identified himself as "John Verge" (*Roney Aff., ¶ 11* ).

Based upon Roney's investigation and the statements given, Roney and Ortega prepared a search warrant application (*Roney Aff., ¶ 8; see also, Id., Ex. A, pp. 39–45* ). Judge Mathews determined that probable cause existed and issued a search warrant on June 14, 1996 (*Roney Aff., ¶ 9; Id., Ex. A, pp. 65–67* ).

On June 14, 1996, the defendants executed the search warrant at Bourdon's home. Bourdon again identified himself as "John Verge" and was thereafter arrested for second degree criminal impersonation. Defendant LaRock handcuffed Bourdon and placed him in a patrol car.

Roney states that at one point he asked Bourdon to tell him where the guns were located (*Roney Aff., ¶ 19* ). At some point, McEvoy took Bourdon to the woods, removed the handcuffs and allowed him to urinate. McEvoy then reapplied the cuffs and placed Bourdon in another patrol car. *Id.* at ¶¶ 19–21. The search stopped when it became too dark to work, and LaRock was assigned to guard the site for the night. *Id.* at ¶¶ 24–25.

 *\*14  \*4* Bourdon was brought to the police barracks and secured to a "bull ring" which Roney describes as a ring secured in the wall. One of Bourdon's handcuffs was attached to the bull ring. Bourdon was brought from the holding area to Roney's office several times. Each time, his shoes were removed because Bourdon was considered an escape risk. *Id.* at ¶¶ 27–28.

During Verge's interrogation on June 14, 1996, he told Dorward about a "secret compartment" in Bourdon's home. *Id.* at ¶ 29; *see also, Ex. A, pp. 22, 49–50*. McEvoy returned to the secured search area, located the secret compartment and found a shotgun, a rifle, and a handgun (*Roney Aff., ¶ 37; Id., Ex. A, pp. 23–26* ). Bourdon was then arraigned on felony charges of criminal possession of a weapon and criminal possession of forged instruments (*Roney Aff., ¶ 38* ).

**2. *Defendants Edwards and LaRock***

Edwards and LaRock stated that on the day the search warrant was executed, Bourdon falsely identified himself as John Verge. He was arrested for second degree criminal impersonation (*Dkt No. 51; Edwards Aff., ¶¶ 3–7; Dkt. No. 52; LaRock Aff., ¶¶ 1–7* ). LaRock stated that after Bourdon's arrest, he handcuffed Bourdon and put him in a patrol car. LaRock was assigned to guard the search area overnight when it became too dark to continue. Later in the evening, McEvoy returned to the search site and located a secret compartment in Bourdon's home wherein he found a rifle, a shotgun, and a **pistol** (*LaRock Aff., at ¶¶ 15–17* ).

**3. *Defendant McEvoy***

McEvoy stated that about two hours after the search began, he escorted Bourdon to the woods and allowed him to urinate (*Dkt. No. 53; McEvoy Aff., ¶¶ 3–5; see also, Id., Ex. B, Bourdon's Dep. at 79:13* ). McEvoy stated that after the search was stopped for the night, he returned to the site, located a secret compartment and found a shotgun, a rifle, and a pistol (*McEvoy Aff., ¶¶ 7–9* ).

**4. *Defendant Dorward***

Dorward stated that after the search stopped for the night, he interrogated John Verge who told him that there was a "secret compartment" in Bourdon's home (*Dorward Aff., at ¶ 15; Dkt. No. 54* ). Verge signed, in Dorward's presence, a four page statement which included information about the secret compartment. *Id.* at ¶ 16; *see also, Id., Ex. A, pp. 22, 49–52*.

**5. *Defendant Ortega***

Ortega stated that on June 14, 1996, he helped Roney prepare a search warrant application for Bourdon's home, vehicles and premises (*Dkt. No. 55; Ortega Aff, f 3* ). Ortega stated that on that same day, he was present when Roney "affirmed" the application in the presence of Judge Mathews.

**III. *Collateral Estoppel***

Under the full faith and credit statute, federal courts must give preclusive effect to state court judgments whenever the courts of the State in which the judgment was entered would do so. *Hickerson v. City of New York,* 146 F.3d 99, 103 (2d Cir.l998) (citing *inter alia Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)). New York law provides that an issue may not be relitigated if the identical issue was "necessarily decided in a previous proceeding, provided that the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue in the prior action." *Id.* at 104 (citations omitted). The party opposing the application of collateral estoppel has the burden of proving that he was denied the full and fair opportunity to litigate the issue or issues in question. *Id.* at 109 (citing *In re Sokol,* 113 F.3d 303, 306 (2d Cir.1997); *Kaufmann v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456, 482 N.E.2d 63–67, 492 N.Y.S.2d 584, 588 (1985)).

**\*15  \*5** A determination of whether the party opposing collateral estoppel had a full and fair opportunity to litigate involves considering the "realities of the prior litigation," including circumstances which may have had the practical effect of discouraging a party from fully litigating an issue. *Id.* (citing *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 501, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (1984). The factors to be considered include the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate, the actual extent of the litigation, and the competence and expertise of counsel. *Id.*

**A. *The Search Warrant***

The Fourth Amendment forbids "unreasonable searches and seizures" of a person's "papers [ ] and effects" and requires that any search warrant be supported by "probable cause." U.S. Const. Amend. IV. The existence of probable cause is a complete defense to a claim that plaintiff's Fourth Amendment rights have been violated because the search warrant was obtained unlawfully. *DeFelice v. Ingrassia,* 210 F.Supp.2d 88, 92 (D.Conn.2002).

Bourdon claims that the search warrant was not based upon probable cause and therefore the warrant was unreasonable and constitutionally infirm. Specifically, Bourdon claims that the search warrant application prepared by Roney and Ortega was (a) based upon information obtained from an unreliable informant that they knew to "harbor[ ] ill will against the plaintiff (*Am. Compl .,* ¶ 2); and, (b) presented to the Broome County Court "in bad faith" because it contained intentionally misleading and false information. *Id.* at ¶ 3.

As stated above, the party seeking the benefit of collateral estoppel has the burden of showing the identity of the issues, and the party opposing the application of collateral estoppel has the burden of showing that he did not have a full and fair opportunity to litigate the claims in the prior action. *D'Andrea v. Hulton,* 81 F.Supp.2d 440, 443 (W.D.N.Y.), *adopted by* 1999 U.S. Dist. LEXIS 20701 (W.D.N.Y. Dec. 17, 1999) (citing *inter alia Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991)). In order to find identity of issues, the court must find that the issue to be decided in the second action was material to the first action and essential to the decision in the first action. *Id.* The court must also find that a different judgment in the second action would destroy or impair rights or interests established by the first action. *Id.* (citing *Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp. Inc.,* 250 N.Y. 304, 307, 165 N.E. 456 (1929)).

Defendants argue that the validity of the search warrant and, in particular, the presence of probable cause to issue the warrant, have already been litigated twice by Bourdon in state court. First, at a suppression hearing and again, upon appeal of Bourdon's conviction; therefore, he may not litigate the issues again.

**\*16  \*6** Bourdon previously argued in state court that "the warrant was not supported by probable cause in that it relied upon an application from which there were material omissions, and which contained false statements by Roney, and information supplied by an informant who was not reliable." See *People v. Bourdon,* 258 A.D.2d 810, 811, 686 N.Y.S.2d 162 (3d Dep't 1999). The state court determined that probable cause did exist to issue the warrant and thus, the warrant was properly issued. *Id.* at 812, 686 N.Y.S.2d 162.Bourdon's attempt to relitigate the very same issues in this court must fail.

Because the state court has already decided that there was probable cause to issue the search warrant and Bourdon had a full and fair opportunity to argue this issue in state court, this court recommends that the defendants' motion for summary judgment be granted as to Bourdon's claim that the warrant was illegally issued.

**B. *Search and Seizure***

The Fourth Amendment requires that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized."

Bourdon claims that the search conducted in accordance with the warrant was unreasonable because it exceeded the scope of the warrant. Bourdon argues that the search was unreasonable because the defendants searched places not specifically identified in the search warrant. The warrant permitted the defendants to search Bourdon's person, his residence and any unattached structures, a white 1983 GMC van registered to him, any vehicle that he is found to be present in, and any person in Bourdon's residence or in any vehicle with Bourdon (*Dkt. No. 49 at 65–67* ). Bourdon claims that the defendants searched his "second van, his jeep, and property surrounding his home, and a trailer" and seized items not specifically listed in the search warrant.

Defendants argue in conclusory fashion that the issues concerning the actual search and seizure have been fully litigated in state court. They offer no evidence to support this argument.

This court is unable to determine the reasonableness of the search and seizure or whether this claim is barred by collateral estoppel. Accordingly, without addressing the merits of this claim, the court recommends that the defendants' motion for summary judgment be denied, without prejudice, as to Bourdon's claim that the search and seizure was unconstitutionally executed. Defendants are granted permission to file a renewed motion for summary judgment on this issue which must be filed within forty-five days following a final decision by the District Judge on this motion for summary judgment. Any renewed summary judgment motion filed by the defendants must include a full presentation of the record of Bourdon's underlying state court proceedings including, but not limited to, any state court decision made at Bourdon's suppression hearing, a complete transcript of Bourdon's suppression hearing, and any briefs or other relevant papers filed by him on appeal.

### C. *Fifth Amendment Claim*

**\*17** \*7 The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. Amend. V. It guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty ... for such silence." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493–94, 12 L.Ed.2d 653 (1964).

Bourdon claims that while subject to custodial interrogation, he was cuffed to the wall in a standing position for hours

and forced to stand on a cold cement floor without shoes. Bourdon claims that he did not want to talk but the defendants continued to question him. At his deposition, he claimed that the defendants threatened him with "a long term incarceration" if he didn't reveal where his guns were. He also claimed that Dorward threatened that he "better cooperate with Roney, because Roney gets very upset" (*Dkt. No. 50, Dep. at 104* ). Bourdon asserts a claim for violation of the constitutional privilege against self-incrimination.

"Even if it can be shown that a statement was obtained by coercion, there can be no Fifth Amendment violation until that statement is introduced against the defendant in a criminal proceeding ... [t]o constitute a Fifth Amendment violation 'use of the [coerced] statement at trial is not required,' but that there must be some 'use or derivative use of a compelled statement at any criminal proceeding against the declarant.' " *Deshawn v. Safir,* 156 F.3d 340, 346–47 (2d Cir.1998) (internal citations omitted).

Since Bourdon admitted at his deposition that he made no statement to police during interrogation (*Dkt. No. 50, Dep. at 123* ), he cannot prove a necessary element of the Fifth Amendment violation, namely "use or derivative use of a compelled statement" against himself. Since Bourdon alleges no injury, this Court recommends the dismissal of Bourdon's Fifth Amendment claim.

### IV. *False Arrest*

"The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right." *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997). In order to state a claim for false arrest under the federal constitution, plaintiff must show that he was arrested without probable cause. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (citing *Broughton v. New York,* 37 N.Y.2d 451, 456, 335 N.E.2d 310, 313, 373 N.Y.S.2d 87, 93 (1975)). Probable cause exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). In assessing the existence of probable cause, the court must consider the facts available to the officer at the time of the arrest and immediately before *it. Lowth,* 82 F.3d at 569. The existence of probable cause is a complete defense to an action for false arrest, even if the plaintiff is subsequently acquitted of the charges, because probable cause constitutes justification

for the arrest. *Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). In deciding whether probable cause to arrest exists, a police officer is entitled to rely on the victim's allegations that a crime has been committed. *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995)). A police officer is also entitled to rely on the allegations of fellow police officers. *Martinez,* 202 F.3d at 634 (citing *Bernard v. U.S.,* 25 F.3d 98, 102–03 (2d Cir.1994)). The evidence needed to establish probable cause is less than that necessary to support a conviction. *Krause v. Bennett,* 887 F.2d 362, 370 (2d Cir.1989). Probable cause may be determined on the law on a motion for summary judgment if there is no dispute as to the pertinent events and the knowledge of the police officer. *Weyant,* 101 F.3d at 852.

**\*18 \*8** Bourdon contends that his arrest on the night of June 14, 1996, was without probable cause. Because this court finds that the defendants had probable cause to arrest Bourdon and that Bourdon was eventually convicted, the false arrest claim fails.

Roney states that on June 13, 1996, he went to Bourdon's home and spoke to a man who identified himself as John Verge (*Roney Aff., ¶ 11* ). Unbeknownst to Roney, the man was actually Bourdon. On June 14, 1996, the date of Bourdon's arrest and search of his home, Roney spoke to Bourdon who again identified himself as John Verge. Roney held out two photographs of Ronald Bourdon for Bourdon's inspection. Bourdon affirmed that the photos were of Ronald Bourdon but persisted in holding himself out to be John Verge. *Id.* at ¶¶ 12–14.Roney, knowing the man he was conversing with was actually Bourdon, arrested Bourdon for second degree criminal impersonation. *Id.* at ¶ 16; *see also, Edwards Aff., ¶¶ 4–7; LaRock Aff., ¶¶ 1–7; and Dorward Aff., ¶¶ 1–7*. In his own affidavit, Bourdon admits that when Roney spoke to him on June 13, 1996, Bourdon "lied and said that he [Bourdon] was not Mr. Bourdon, and he [Mr. Bourdon] was not home" (*Dkt No. 72; Bourdon Aff., ¶ 9* ). Bourdon admitted that when he was asked for identification, he produced "a New York State drivers license with his photo on the license, in the name of John Verge." *Id.* at ¶ 10.Bourdon further testified that "[d]efendants Roney and Dorward were unaware that they were being duped by him, and that he was really Mr. Bourdon and not John Verge." *Id.* at ¶ 11.Additionally, Bourdon testified at his deposition that (a) he possessed a driver's license in the name of John Verge which had his picture on it; and, (b) that on June 13, 1996, he falsely identified himself to Roney as John Verge and offered the false driver's license in support of his claim. *Dep.*

*at 35–36 & 55–56*. Bourdon was arrested for second degree criminal impersonation following his second conversation with Roney.

New York Penal Law § 190. 25(1) provides: "A person is guilty of criminal impersonation in the second degree when he [i]mpersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another." Conviction of this crime requires proof that the defendant impersonated a real person and not simply used some fictitious or assumed name. *People v. Sadiq,* 236 A.D.2d 638, 654 N.Y.S.2d 35 (N.Y.App.Div.), appeal denied sub nom., *People v. Sikandar,* 89 N.Y.2d 1100, 682 N.E.2d 995, 660 N.Y.S.2d 394 (1997). The "benefit" contemplated by the statute prohibiting criminal impersonation need not be monetary but may consist of the desire to avoid apprehension or prosecution. *People v. Sherman,* 116 Misc.2d 109, 455 N.Y.S.2d 528 (Rochester City Court, Monroe County 1982).

In light of Bourdon's own admission that on June 13, 1996, he willingly and knowingly identified himself as "John Verge", a real person, and produced a driver's license containing fraudulent information in support of this claim for the ostensible purpose of misleading the state police, it is absurd that he now argues that there was no probable cause to arrest him. Moreover, an officer is not required to make a full investigation of the surrounding circumstances prior to taking action. "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti,* 124 F.3d at 128. Roney's version of the events is believable and his credibility is bolstered by the fact that Bourdon admitted to the very behavior for which he was arrested. Bourdon has not provided information or evidence to contest the defendants' allegations concerning probable cause. Under the circumstances, because probable cause is determined based upon the information available to the officer at the time of the arrest, the officers had a reasonable basis for believing there was probable cause to arrest Bourdon on June 14, 1996.

**\*19 \*9** In any event, Bourdon was ultimately convicted of second degree criminal impersonation. *See People v. Bourdon,* 258 A.D.2d 810, 686 N.Y.S.2d 162 (3d Dep't 1999). The Second Circuit has held that a plaintiff's conviction prevents his recovery on a § 1983 claim for false arrest. *Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir.l986). "Where the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of that conviction as conclusive evidence of good faith

and reasonableness of the officer's belief in the lawfulness of the arrest." *Id.* at 388.Evidence of a conviction is a complete defense to a § 1983 action for false arrest. *Id.* at 388–89.

Since probable cause and Bourdon's conviction are each a defense to a false arrest claim, this court recommends the dismissal of Bourdon's false arrest claim.

## V. *Excessive Force Claim*

The Supreme Court has made it clear that excessive force used by officers during an arrest violates the Fourth Amendment which guarantees citizens the right to be free from unreasonable seizures of the person. *Graham v. Connor,* 490 U.S. 386, 394, 1098 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). "To establish a Fourth Amendment excessive force claim, a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Horton v. Town of Brookfield,* 98CV01834, 2001 WL 263299 (D.Conn.2001) (citing *Finnegan v. Fountain,* 915 F.2d 817, 823 (2d Cir.1990) (other citation omitted).

Bourdon complains that he was handcuffed for three hours while the search was conducted. He was also handcuffed, sometimes to a wall, at the police barracks for an additional two to three hours (*Dkt. No. 50; Dep. at 105–110* ). During his time in the patrol car, the defendants were actively involved in executing the search warrant and Bourdon was left alone in the car. The defendants admit that Bourdon was later cuffed to the wall at the police barracks. However, Roney explains that this is "the only holding area available in the Troop Barracks" (*Roney Aff. at 3* ). He also explains that this system, referred to as a bull ring, is commonly used at troopers' barracks throughout the state. *Id.* at 3.

Handcuffing has been found to give rise to a claim of excessive force where an individual suffers an injury as a result of being handcuffed. *Gonzales v. City of New York,* 98-CV–3084, 2000 WL 516682, at *4 (E.D.N.Y. March 7, 2000); *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y.1990). "Where the plaintiff does not allege that a prior injury existed or that an injury resulted from being handcuffed, however, courts have found that no constitutional violation exists and have dismissed the claims." *Horton,* 2001 WL 263299, at *7 (citing *Scott v. County of Nassau,* 94CV4291, 1998 WL 874840, at *5 (E.D.N.Y. Dec.11, 1998) (granting summary judgment where there were no additional allegations of excessive force or allegations of prior injury); *Murphy v. Neuberger,* 94 Civ. 7421, 1996 WL 442797, at *8 (S.D.N.Y. Aug.6, 1996) (granting motion to dismiss where plaintiff

did not allege that he suffered any injury as a result of being handcuffed); *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (affirming grant of summary judgment where plaintiff did not provide evidence of permanent injury).

**\*20 \*10** Bourdon has not alleged or provided any evidence of permanent injury as a result of being handcuffed. He does not claim to have had a pre-existing injury of which the officers were aware, or to have requested medical treatment while being handcuffed or immediately thereafter. The mere fact that Bourdon was uncomfortable for several hours is not enough to establish a constitutional violation. *See Miller v. Glanz,* 948 F.2d 1562, 1569–70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours). Thus, this court cannot find that handcuffing Bourdon, without more, constitutes a violation of his constitutional rights.

Bourdon also claims that he was subjected to physical and emotional abuse during his confinement at the police barracks. However, at his deposition, he admits that the defendants did not hit or strike him with anything (*Dep. at 105* ). He merely states that they threatened him with a lengthy incarceration. Bourdon further states that he was in pain and he was stiff after sitting in the car for three hours. Bourdon has alleged no injury and admits that there was no physical contact between himself and the defendants beyond the handcuffing. Bourdon has failed to allege any excessive force used at the police barracks. Accordingly, this court recommends that Bourdon's excessive force claim be denied.

## VI. *Conditions of Confinement*

Pretrial detainees may not be subjected to conditions and restrictions that amount to "punishment" without due process of law. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60

L.Ed.2d 447 (1979); *Weyant,* 101 F.3d at 856.[1] A detainee's Fourteenth Amendment due process rights concerning the conditions of his confinement are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (citations omitted). The standard for analyzing a pretrial detainee's Fourteenth Amendment claim is the same as the Eighth Amendment standard. *See Weyant,* 101 F.3d at 856. Thus, a pretrial detainee's pleadings regarding the conditions of his confinement are sufficient if they meet both an objective and a subjective standard. To meet the

objective standard, the claims must be "sufficiently serious"- the deprivation must deny minimal civilized measure of life's necessities. As to the subjective standard, plaintiff must allege that the defendants "had a sufficiently culpable state of mind amounting to at least deliberate indifference." *Dawes v. Walker,* 239 F.3d 489, 493–94 (2d Cir.2001) (citations omitted); *see also,* Weyant, 101 F.3d at 856.

Bourdon alleges that the manner in which he was detained after his arrest violated his constitutional rights. Bourdon claims that immediately after his arrest, he was placed in a hot, unventilated car for three hours without water or bathroom privileges. Later at the barracks, he was required to stand, off and on, for three hours while handcuffed to a wall without shoes or socks.

**\*21 \*11** At his deposition, Bourdon admitted that he was allowed to urinate in the woods at about 9:30 p.m. Since the search began at approximately 6:30 p.m., Bourdon went, at most, three hours without bathroom privileges and water (*Roney Aff. at 2* ).

This court finds that Bourdon has failed to allege or substantiate both the objective and subjective components necessary to establish that the defendants acted with deliberate indifference in their methods of confinement. He has failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time. *See Whitted v. Lazerson,* 96 Civ. 2746, 1998 WL 259929, at \*3 (S.D.N.Y. May 21, 1998) ("temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, simply does not rise to the level of an Eighth Amendment violation"); *Warren v. Irvin,* 985 F.Supp. 350, 356 (W.D.N.Y.1997) (Depriving inmate of water for three days because he was using it to flood his cell did not amount to Eighth Amendment violation). In any event, because the defendants have stated a legitimate purpose in Bourdon's confinement-to secure Bourdon during the search and interrogation by the only means available-Bourdon has failed to establish that the defendants secured him in this manner merely as a form of punishment. Accordingly, this court recommends that the defendants' motion for summary judgment be granted as to Bourdon's conditions of confinement claim.

## VII. *Heck v. Humphrey*

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a § 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a

criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. *Heck,* 512 U.S. at 486–87.

Bourdon's claims concerning the validity of the search warrant, the false arrest claim, and the Fifth Amendment violation have been recommended to be dismissed on the merits. Thus, this court need not analyze these claims under *Heck.*

Still remaining is Bourdon's claim that the defendants exceeded the scope of the search warrant. Because this court has determined that it cannot assess the validity of these claims without further development of the record by the defendants, this court also cannot consider at the present time whether *Heck* would invalidate these claims.

## VIII. *Qualified Immunity*

As an alternative basis to grant dismissal, the defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (quotation marks and internal citations omitted).

**\*22 \*12** The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640, 107 S.Ct. at 3039; *Keane,* 196 F.3d at 332. The test for "evaluating whether a right was clearly established at the time a § 1983 defendant acted is: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d

355, 360 (2d Cir.2002); *see also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Home v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the qualified immunity issue should be addressed before the substance of a claim. The court shall now consider the defendants' claim that they are entitled to qualified immunity.

In this case, it has been clearly established that persons have a right to be free from unreasonable search and seizure, false arrest, excessive force, inhumane conditions of confinement, and self-incrimination. However, this court finds that it was objectively reasonable for the defendants to believe that their conduct did not violate Bourdon's constitutional rights. The record reflects that the defendants could not have known that the statements provided in support of the search warrant were unreliable or that they lacked probable cause to arrest Bourdon. In fact, Bourdon admits to behavior which would amount to probable cause to arrest.

The record also reflects that Bourdon was handcuffed in a car for approximately three hours without water or the use of bathroom facilities. Bourdon makes no allegations that he told the defendants during this time that he was in pain or discomfort. Finally, the record reflects that while at the police barracks, Bourdon was handcuffed to a wall for approximately one and one-half hours on two separate occasions. Again, Bourdon does not allege that he complained of pain or discomfort to the defendants at this time. Bourdon also admits that he was never physically attacked by the defendants. Under these circumstances, it was reasonably objective to believe that Bourdon was not in pain or distress. Furthermore, this court finds that the defendants did not use excessive force upon Bourdon or confine him under inhumane conditions. Finally, since Bourdon made no statement during his interrogation, it was reasonably objective for the defendants to believe that they did not violate Bourdon's right to be free from self-incrimination.

**\*23 \*13** Accordingly, as an additional basis to grant summary judgment, this court recommends that the claims concerning the search warrant, false arrest, excessive force, unconstitutional conditions of confinement, and the Fifth Amendment be dismissed because the defendants are entitled to qualified immunity on these claims.

**IX.** *Stay of Discovery*

By Order of this court filed February 27, 2002, discovery in this action was stayed until a final decision was rendered on this motion for summary judgment. Because it is recommended that the defendants may file a renewed motion for summary judgment, the stay of discovery is continued until either (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file a renewed motion for summary judgment if no such motion has been filed.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that the defendants' motion be GRANTED (*Dkt. No. 48* ) to the extent that the following claims are dismissed on the merits as well as on the basis of qualified immunity:

a. Invalid search warrant;

b. False arrest;

c. Excessive force;

d. Illegal conditions of confinement; and

e. Fifth Amendment claim, and it is further

RECOMMENDED, that the defendants' motion be DENIED in all other respects, without prejudice, the defendants may file a renewed motion for summary judgment addressing Bourdon's claim involving the search and seizure issue. Any renewed motion must be filed within forty-five days following a decision by the District Judge on this summary judgment motion; and it is further

ORDERED, that the stay of discovery is continued until either: (1) a decision by the District Judge on any renewed motion for summary judgment; or (2) absent any extensions of time granted by this court, the expiration of the time to file a renewed motion for summary judgment if no such motion has been filed.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.Roldan v. Racette,* 984 F.2d 85 (2d Cir.l993) (citing *Small v. Secretary of Health and Human*

*Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).


2007 WL 805786 Only the Westlaw citation is currently available. United States District Court, E.D. New York.


Horace DOVE, Plaintiff,

v.

CITY OF NEW YORK, Venessa Williams, Staff on Ward 53 at Kings County Hospital, The Patients on Ward 53, Jewish Board Family & Children Services, Owners of Maple Street Residence, Jeffrey Clarke, Arlene Bishop, Esther, The Staff at Maple Street, Lionel Young, and Abbot Laboratory of Illinois, Defendants.


No. 03–CV–5052 JFB LB. | March 15, 2007.

**Attorneys and** Law Firms

**\*24** Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs., Corporation Counsel of the City of New York, Marc A. Konowitz, Esq., New York State Attorney General's Office, New York, NY, for Defendants.


### MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** *Pro se* plaintiff Horace Dove ("Dove") brings this action against the City of New York (the "City"), Vanessa Williams ("Williams"), the staff on Ward 53 at Kings County Hospital, and the patients on Ward 53 (collectively, "defendants"), alleging violations of plaintiffs constitutional rights pursuant to 42 U.S.C. § 1983 and various state law claims.[1] Specifically, plaintiff alleges that, during his time as a patient at Kings County Hospital (the "Hospital"), (1) the Hospital's policy or custom of permitting patients to smoke in the Hospital violated plaintiff's rights, (2) the Hospital's staff and several patients conspired to assault plaintiff and (3) the Hospital's staff failed to protect plaintiff from assaults by other patients on four separate occasions between June 9, 2002 and July 10, 2002.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] For the reasons that follow, defendants' motion is granted.

### I. BACKGROUND

#### A. Facts

Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff, the non-moving party.[3] *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir.2005).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment of mental health issues. (Dfts.' 56. 1 ¶¶ 7–14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "PositionDescription" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56. 1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (*Id.*)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56. 1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (*Id.* ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (*Id.* ¶¶ 7, 9, 12.)On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (*Id.* ¶ 12; Compl. ¶ 29.) Plaintiffs claims arise out a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

#### 1. Smoking in the Hospital

**\*25** According to plaintiff during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiffs room. (Compl.¶ 30.) The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he

was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (*Id.*) Plaintiff also alleges that he complained to the staff about other patients' smoking, but that the staff did nothing to stop the patients from smoking. (*Id.* ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (*Id.* ¶ 33.)

### 2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl.¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were warned of the attack in advance and "gave their approval." (*Id.* ¶ 38.)According to plaintiffs deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (*Id.*) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (*Id.*, Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

### 3. The Chair–Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiffs head." (Compl.¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (*Id.* ¶ 44.)According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover, plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from

assaulting him, but the staff did not tell the other patient to stop. (*Id.* ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (*Id.*) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (*Id.*, Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time. [4] (Hewson Decl., Ex. H.) Also, according to the Hospital's records, a psychiatrist evaluated plaintiff on July 2,2002 and found that he continued to be delusional. (*Id.*)

### 4. The June 27, 2002 Incident

**\*26 \*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl.¶ 46.) In response, according to plaintiff, Williams told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.)Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl. ¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51–52.) Moreover, during his deposition, plaintiff confirmed that he had no direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Deck, Exs. F, H.)

### 5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day. (Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (*Id.,* Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (*Id.*)

**\*27 \*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.U 84.) Upon arriving at Kingsboro, plaintiff was given a full physical exam by a doctor. (Hewson Deck, Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (*Id.*)

### B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was

reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145–46 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial."* *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Christian Dior–New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 37–39 (2d Cir.1986)); *accord Perez v. N.Y. Presbyterian Hosp.,* No. 05 Civ. 5740(LBS), 2006 WL 585691, at \*3 n. 1 (S.D.N.Y. March 20, 2006).

## B. Plaintiff's Allegations

**\*28 \*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's "own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

> [W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel,* No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at \*10–\* 11, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiffs] complaint or in her subsequent missives to the court"); *Ward v. Coughlin,* No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at \*11 (S.D.N.Y.1995) (finding plaintiffs self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 275 F.Supp.2d at 475 (internal quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. *See Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,* No. 00 Civ.1910(SHS), 2006 WL 2792690, at \*9 (S.D.N.Y. Sep.27, 2006).

**\*29 \*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged injuries. [5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

Finally, plaintiffs own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep. Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at 91–92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding

these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under *Jeffreys* because no reasonable juror could credit plaintiffs unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming *arguendo* that the smoking by other patients and all of the assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

### C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli,* —— F.Supp.2d ——, 2007 WL 102073, at *18 (S.D.N.Y.2007); *Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at *1 n. 1 (S.D.N.Y. Nov.15, 2005).

### D. Due Process Claims

**\*30 \*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *9 (S.D.N.Y. Sept.20, 2005); *see also Fair v. Weiburg,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at *4 (S.D.N.Y. Sept.28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov.2, 2006). However, in this case, the complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process. [6]

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at *3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324); *Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *8 (S.D.N.Y. Aug.20, 2001) (citing *Youngberg,* 457 U.S. at 315–16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.")); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ( "[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889–90 (8th Cir.2004) ( "Because [plaintiff] was an involuntarily committed patient ... the Fourteenth Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322–24; *see Vallen,* 2005 WL 2296620, at *9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *11 (S.D.N.Y. Aug.15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL 2476440, at *8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision alleged to have

caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg, 457 U.S. at 323; see Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

**\*31 \*8** Notably, however, the Court in *Youngberg* specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg,* 457 U.S. at 323 n. 30; *see Kulak,* 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski,* 2004 WL 2476440, at \*8; *see Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg,* only to a deliberate indifference standard."); *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen,* 2005 WL 2296620, at \*9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen,* 2005 WL 2296620, at \*9.

As the Second Circuit has observed:

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's constitutional rights or that a municipal policy or custom caused the alleged deprivations.

### (i) Due Process Claims Against Williams

**\*32 \*9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)."[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54.) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) Forthe reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46–49, 51–53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*33  \*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin, 343 F.3d at 51 n. 17* ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518U.S. 343, 350 (1996)). Accordingly, plaintiff's claims

against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired and or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff. In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

### (ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108–9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986));

*accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at \*12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

**\*34 \*11** Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Com'rs of Bryan Cty., Okl. v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the *state." Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring in part and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480–81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so manifest as to imply the constructive acquiescence of senior policymaking officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

### 1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17–503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present

any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[7] In addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit,* 2006 WL 2381871, at \*13, the Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. *See Opals on Ice Lingerie v. Body Lines Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicion.' ") (quoting *Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

### 2. Assaults on Plaintiff

**\*35 \*12** Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. *See Warheit,* 2006 WL 2381871, at \*12 n. 4 (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a

trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff. Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to intervene to protect plaintiff from such assaults. *See Vallen,* 2005 WL 2296620, at *11 (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that, *following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

**\*36  \*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

### E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999). Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York,* 985 F.2d 94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999).

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thome,* 68 F.3d 547, 551 (2d Cir.1995).

### F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶ 1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50–e and 50–i. *See Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state claims. Sections 50–e and 50–i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See* N.Y. Gen. Mun. Law §§ 50–e, 50–I. "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at *22, 2006 WL 738110 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its

employees in a federal civil rights action." *Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at *3, 1999 WL 225938 (S .D.N.Y. April 19, 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)).

**\*37 \*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at *19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e) (7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted. [8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at *5–*6, 1996 WL 227824 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s] "whose conduct has caused injury.").

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121–22 (2d Cir.2006) (quoting 28 U.S.C § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, *11, 2002 WL 1561126 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

## III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

2012 WL 651919 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David W. Sill, Secure Care Treatment Aid; Thomas Nicolette, RN, Ward Nurse; Charmaine Bill, Treatment Team Leader; Jill E. Carver, Social Worker, Primary Therapist; Edwin Debroize, Psychologist Assist; Jeff Nowicki, Chief of Mental Health Treatment Serv.; Terri Maxymillian, Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet, Security Services, CNYPC; Michael Hogan, Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT). | Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against numerous employees of New York State or the Central New York Psychiatric Center ("Defendants"), are Plaintiff's motion to proceed *in forma pauperis,* his motion for a temporary restraining order and preliminary injunction, and his motion for appointment of counsel. (Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below, Plaintiff's motion to proceed *in forma pauperis* is granted; his motion for a preliminary injunction is denied; his motion for appointment of counsel is denied; Plaintiff's claims of deliberate indifference to his mental health needs against Defendants Bill, Carver and DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 assault are *sua sponte* dismissed without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed without prejudice as a Defendant in this

action; the Clerk is directed to issue summonses, and the U.S. Marshal is directed to effect service of process on Defendants Davis, Sill, and Nicolette.

## I. RELEVANT BACKGROUND

**\*38** On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis*. (Dkt.Nos.1, 2.) [2] Liberally construed, Plaintiffs Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and DeBroize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis*. (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any time if the court determines that... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to

Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F.Supp.2d204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

**\*39** On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson, 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case)*. On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson, 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases)* (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson, 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); Rusyniak v. Gensini, 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009)* (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak, 629 F.Supp.2d at 213, n. 22* (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).*

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint

had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949."[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n] that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

**\*40** Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8,10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiffs claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at \*7 (D.Minn.Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at \*15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*41 \*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiffs room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff" (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiffs Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at \*7 (N.D.N.Y.Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*42 \*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition

must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

**\*43** Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiffs deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b) (6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y.Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011).[13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

**\*44** Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in

the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b) (6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a)(4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y.Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y.Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

**\*45** "The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y.Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most

favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

 **\*46** Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by

documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*47 \*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiffs motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b) (6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiffs Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants

or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. **Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

2009 WL 3074344 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Warren LANE, Plaintiff,

v.

Sharon E. CARPINELLO, Commissioner, New York State Office of Mental Health; Donald Sawyer, Director; Sharon Barboza, M.D.; Jeffrey Nowicki, Social Worker; Anthony Lucenti, Social Worker; J. Crociata, Nurse; Michael Babula, Treatment Assistant; Frank Menz, Treatment Assistant; Stephen Coppola, Treatment Assistant Central New York Psychiatric Center; and Barbara Bebe, Facility Review Specialist, New York State Commission for Quality of Care, Defendants.

Civil Action No. 9:07–cv–751

(GLS/DEP). | Sept. 24,2009.

**\*48** West KeySummary

**1 Civil Rights**

+ Physical Access and Mobility; Carriers

A visually impaired sex offender failed to state a discrimination claim under the Americans with Disabilities Act against employees who worked in his sex offender treatment program. The sex offender alleged that the employees failed to provide him with a reasonable accommodation after taking his cane. The cane was confiscated because sex offenders were not permitted to have such items in the treatment facility and the confiscation of the cane did not exclude the sex offender from participating in the program or of the benefits of the services, programs, or activities of the sex offender treatment program. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

Cases that cite this headnote

**Attorneys and Law Firms**

Warren Lane, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

### ORDER

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge David E. Peebles, duly filed August 31, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED, that the Report–Recommendation of Magistrate Judge David E. Peebles filed August 31, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that the plaintiff's motion for partial summary judgment (Dkt. No. 57) is DENIED, defendants' cross-motion for summary judgment (Dkt. No. 79) is GRANTED, and the plaintiff's complaint is DISMISSED in its entirety, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Warren Lane, a former New York State prison inmate who alleges that he is "legally blind", has commenced this civil rights action pursuant to 42 U.S.C. §§ 1983, 1984, 1985 and 12,101 against ten defendants, eight of whom are employed at the Central New York Psychiatric Center ("CNYPC"), alleging various constitutional and statutory violations committed by the defendants during the period of his confinement in CNYPC. In his complaint, plaintiff asserts claims relating to his involuntary confinement at CNYPC in 2006, commencing upon his conditional release date from prison. Plaintiff maintains that he was transferred into CNYPC in violation of his constitutional right to due process, and that while there he was subjected to further violations, including discrimination based upon his disability, excessive force, failure to intervene to protect him from harm, indifference to his medical needs, and retaliation. Plaintiff requests redress in the form of compensatory and punitive damages as well as declaratory relief.

**\*49** Currently pending before the court in connection with this action are two motions. Plaintiff initiated the motion process by seeking partial summary judgment with respect to his claim that he was denied due process with regard to his commitment to CNYPC and for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101 et seq., while he was held there. Defendants responded in opposition and cross-moved for summary judgment requesting dismissal of plaintiffs complaint in its entirety. Having carefully reviewed the extensive record now before the court, I recommend that plaintiff's motion for partial summary judgment be denied, defendants' motion for summary judgment be granted, and plaintiff's complaint be dismissed in its entirety.

### I. BACKGROUND [1]

Plaintiff, who is visually impaired, was incarcerated by the New York State Department of Correctional Services ("DOCS") for approximately twenty-five years following

his conviction for multiple sex offenses.[2] Plaintiff's Motion for Partial Summaiy Judgment (Dkt. No. 57–4) p. 1. Prior to his DOCS conditional custody release date, plaintiff was evaluated by two physicians from the New York State Office of Mental Health ("OMH"); based upon their evaluations, on September 12, 2006, on application of the superintendent of the Sullivan Correctional Facility made pursuant to section 9. 27 of the New York Mental Hygiene Law ("MHL"), plaintiff was admitted involuntarily into CNYPC under close observation for participation in the sex offender treatment program ("SOTP").[3] Lane Aff. (Dkt. No. 57–2) ¶¶ 1–5. Although his stay at the CNYPC lasted for less than two months, plaintiff's many complaints regarding his commitment and treatment at that facility give rise to this suit.

**\*2** Admission records reflect that upon being admitted to CNYPC, plaintiff was "very agitated due to his admission to the SOTP and was making statements that he would due [sic] whatever it took to violate and get sent back to prison." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 92.[4] When admitted to CNYPC, plaintiff's mobility cane, which he claims to require when he is outdoors or in an unfamiliar environment, was confiscated by defendant Steven Coppola, a treatment assistant at the facility. Complaint (Dkt. No. 1) p. 6. According to defendants, plaintiffs cane was taken pursuant to a CNYPC safety and security policy that precludes any resident of the center from possessing such an item. Nowicki Aff. (Dkt. No. 79–5) ¶ 7. Plaintiff alleges that thereafter he was denied reasonable accommodations for his blindness despite his numerous requests. Complaint (Dkt. No. 1) p. 6. Defendant Jeffrey Nowicki, who was at all times relevant to plaintiff's complaint the Team Leader of the SOTP at CNYPC and is currently the Chief of Mental Health Treatment Services of the SOTP, explains that while plaintiff's cane was confiscated, he was offered a wheelchair or walker, both of which plaintiff refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 1, 7–8. Nowicki states further that staff at CNYPC were aware of plaintiff's left eye prosthesis and that plaintiff was given medical support for this condition. *Id.* ¶ 10. Plaintiff's in-patient nursing assessment conducted on September 12, 2006, upon his admission to CNYPC, reflects plaintiff's mobility status as fully independent without any notations that a cane or walker was needed. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 38.

**\*50** On October 13, 2006, one month after his transfer into CNYPC, plaintiff wrote a letter to defendant Donald Sawyer, director of the facility, demanding compliance with the ADA and that he be provided with reasonable accommodations for

his disability, including a laptop computer with zoom text, a scanner and inkjet color printer, a 7x magnifier, books on tape, a high intensity lamp and 20/20 pens. Complaint (Dkt. No. 1) p. 9; Plaintiff's Motion for Partial Summaiy Judgment (Dkt. No. 57–4) Exh. C; *see also* Defendants' Response to Plaintiffs Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 78) ¶ 5. Plaintiff claims that, in response, defendant Nowicki told him that accommodations were unnecessary because plaintiff "would not remain at CNYPC for much longer." Complaint (Dkt. No. 1) p. 9. Feeling threatened by Nowicki's statement, Lane sent a letter to defendant Sharon Carpinello, Commissioner of the OMH, requesting that she place him into protective custody and transfer him from CNYPC. *Id.* Plaintiff did not receive a response to that letter. *Id.*

Plaintiff claims to have been subjected to three separate attacks during his stay at CNYPC. On September 18, 2006, while in the recreation yard, plaintiff was struck by a football and subsequently attacked by a fellow patient, suffering injury to his face, nose and jaw.[5] Complaint (Dkt. No. 1) p. 7; Plaintiffs Deposition Transcript ("Tr.") pp. 27–33.[6] Plaintiff claims that upon requesting medical attention he was told by defendant J. Crociata, a nurse at CNYPC, "[t]here's nothing wrong with you," and denied treatment. Complaint (Dkt. No. 1) p. 7. Plaintiff's CNYPC records contradict his version of the events, instead reflecting that defendant Crociata witnessed plaintiff arguing with another patient near the recreation yard door entrance and tried to intervene. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. When Crociata approached Lane and inquired if he was injured, Lane stated that he was not touched and became angry when Crociata asked what had happened, accusing Crociata of being a racist. *Id.* Plaintiff was visited by a doctor later that evening during rounds; although the doctor offered to see him, plaintiff again said he was "okay" and declined any treatment. *Id.*

**\*3** Following the September 18, 2009 incident, plaintiff demanded that he be permitted to file criminal charges against the patient who assaulted him, but was allegedly denied the opportunity to contact law enforcement authorities by Nowicki and defendants Michael Babula and Frank Menz, both of whom are treatment assistants at CNYPC. Complaint (Dkt. No. 1) p. 7. Nowicki informed plaintiff that mediation was available to handle such disputes, making it unnecessary to contact the State Police.[7] *Id.* Plaintiff claims defendant Nowicki then threatened that if he insisted on filing criminal charges, Nowicki would have his parole violated. *Id.* As a result of the September 18 attack plaintiff no longer felt safe,

particularly in light of his blindness, and was fearful of losing his remaining ability to see in another altercation. *Id .* Plaintiff requested that Nowicki either transfer him to another facility or place him in protective custody. [8] *Id.* After both requests were denied, plaintiff subsequently sent a written request to defendants Sawyer and Sharon Barboza, Director of the SOTP at CNYPC, again asking for protective custody and transfer. *Id.* Plaintiff received no response from either Sawyer or Barboza. *Id.*

**\*51** Plaintiff's CNYPC records show that a call was placed to the New York State Police when plaintiff indicated that he wanted to pursue criminal charges, and that plaintiff became belligerent and threatening after the incident, touting his lengthy disciplinary record in prison and warning not only that he would "kick the shit" out of the other patient with whom he had the problem, but also that he would soon be running the ward. [9] Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 116–19. Plaintiff did contact his parole officer regarding the incident and also filed a complaint with Nowicki. *Id.*

The next relevant incident occurred on September 22, 2006 when, plaintiff claims, defendant Nowicki called him to a hallway and ordered defendants Menz and Coppola to "take him down" after Lane refused to speak with Nowicki. Complaint (Dkt. No. 1) p. 8. As a result, plaintiff was thrown to the floor and kicked and punched, put in restraints, and placed on a gurney, even though he claims he did not resist. [10] *Id.* Plaintiff alleges that he was denied medical treatment for the shoulder, lower back, and face injuries that he sustained and was instead held captive in a room for two to three days, forced to sleep on the floor, and provided only one meal during that time period. Complaint (Dkt. No. 1) p. 8; Tr. p. 55.

Once again, defendants' version of what occurred on that occasion is markedly different. Defendant Nowicki states that on September 22, 2006 plaintiff became hostile toward both staff and the residents, and threatened to instigate a riot. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 21–30; *see also* Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 139–50. Nowicki attempted to counsel Lane in the "side room"; plaintiff rebuffed those efforts and instead attempted to re-enter the day room. Nowacki Aff. (Dkt. No. 79–5) ¶¶ 23–24. As a result, plaintiff was placed in four point restraints, pursuant to a doctor's orders, for a period of seven minutes and physically removed to the side room. *Id.* ¶ 25. When plaintiff's threats continued, he was left in the side room under supervision, consistent with hospital policy, from September 22, 2006 at 1:00 p.m. until September 25 at 9:30 a.m., during which time he was

provided food, a mattress and a chair. *Id.* ¶¶ 26–30. When plaintiff was visited by a psychiatrist, he stated that he was upset because he felt that he was being treated differently than other patients with respect to unit policies, and denied any intention to hurt anyone, despite his threats. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 150. Detailed CNYPC progress notes recording plaintiff's status at fifteen minute intervals show that Lane was provided and ate all of his meals during the time he was confined to the side room. *Id.* pp. 153–81. Plaintiffs parole officer was called to CNYPC, but found that there was insufficient evidence to bring parole violation charges against plaintiff. *Id.* p. 186; *see also* Nowicki Aff. (Dkt. No. 79–5) ¶ 27 (reflecting that the parole officer was summoned at plaintiff's request).

**\*52 \*4** Following the events of September 18 and 22, 2006, plaintiff and his wife made several written complaints and placed telephone calls to various New York and federal agencies and officials. Complaint (Dkt. No. 1) p. 8. Plaintiff complains that neither he nor his wife were ever contacted by New York State Mental Hygiene Legal Services, that Prisoners Legal Services declined to represent him because he was no longer incarcerated, and that defendant Beebe, the person with the New York State Commission for Quality Care of Persons with Disabilities, assigned to investigate plaintiff's complaint, never visited CNYPC while Lane was there, and failed to interview plaintiff or his wife. *Id.* Defendants, by contrast, contend that defendant Beebe had either personal telephone conversations or exchanged voice mail messages with plaintiff's wife, Denise Lane, on October 1, October 23, November 1, November 3, and November 7, 2006. Defendants' Response to Plaintiffs Request for Admissions (Dkt. No. 62–3) ¶ 8. Defendant Beebe also visited CNYPC on November 21, 2006 to investigate plaintiff's complaints. Higgins Aff. (Dkt. No. 79–1) Exh. E, pp. 32–33.

Plaintiff asserts that in early October of 2006, he was again "attacked" by another patient whom, he maintains, has a history of assaultive behavior. Complaint (Dkt. No. 1) p. 9; Tr. p. 39. While plaintiff admits that there was no physical contact between the two, he states that out of fear he immediately requested placement in protective custody, a request that was once again denied. *Id.* After the incident, plaintiff was brought to the side room and is reported to have said that the fellow patient kept threatening him, and that he would take matters into his own hands if required. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 214. It was noted that CNYPC staff members were becoming increasingly concerned regarding plaintiff's menacing behavior and his apparent attempts to control and rally other patients, and that

Lane stated that he felt like killing the other patient. *Id.,* pp. 214, 220.

The final incident of which plaintiff complains occurred on October 31, 2006, when Lane, upset after seeing another patient attacked, requested and was given permission to return to his room instead of remaining queued with the other patients proceeding to the dining room. Complaint (Dkt. No. 1) p. 9. After returning to his room plaintiff was approached by defendant Lucenti regarding the incident; responding to Lucenti, Lane said, "[w]hat are you people waiting for someone to get stabbed?" Complaint (Dkt. No. 1) p. 9. When plaintiff left his room later that day he was confronted by defendants Nowicki, Lucenti, Menz, Coppola and Babula, at which time Nowicki allegedly stated, "[w]e got you now." Complaint (Dkt. No. 1) p. 10. Plaintiff appears to have interpreted this statement to mean that defendants falsified documents to make it seem that plaintiff had threatened defendant Lucenti. *Id.;* Tr. pp. 43–44. As a result of the incident plaintiff's parole status was revoked, and he was removed that day from CNYPC and transferred into the Oneida County Jail. Nowicki Aff (Dkt. No. 78–2) ¶¶ 6, 19; Tr. p. 18.

**\*53  \*5** According to defendants the events of October 31, 2006 were precipitated by plaintiff's refusal to stay in line and his subsequent threat, when approached regarding the incident, to put a knife to the neck of one of the CNYPC staff members. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 296–301. According to defendant Lucenti, when he went to speak with the plaintiff about getting out of line,

> Mr. Lane then got in my face, he said he was going to put a knife in a TA's [treatment assistant's] neck, a knife or something in a TA's neck. He said I am serious, I will put a knife in one of their necks, I will lay them out cold. You better call parole. I'm tired of all this, I am going to the side room.

Parole Hearing Tr. (Dkt. No. 84–5) p. 32; Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 296. Lucenti considered this to be a serious threat. Parole Hearing Tr. (Dkt. No. 84–5) p. 32. Plaintiff demanded that he be moved to the side room and returned to prison, and was informed that arrangements were being made to return him to the custody of the DOCS as soon as possible; plaintiff went to the side room, his parole officer was called, a violation was issued, and Lane was returned to prison. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on July 19, 2007, and was thereafter granted leave to proceed *in forma pauperis* on August 1, 2007. Dkt. Nos. 1,4. In his complaint plaintiff names ten defendants, including Sharon E. Carpinello, the Commissioner of the OMH; Barbara Beebe, [11] a facility review specialist from the State of New York Commission on Quality of Care for Persons with Disabilities; Donald Sawyer, the Director of the CNYPC; Sharon E. Barboza, M.D., the Director of the SOTP at CNYPC; Jeffrey Nowicki, a team leader of the SOTP at CNYPC; and Anthony Lucenti, Michael Babula, Frank Menz, Steven Coppola, and J. Crociata, all staff members at the facility. Alleging violations of the ADA as well as the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, plaintiff's complaint asserts ten enumerated causes of action, including denial of due process, failure to provide reasonable accommodations for his disability, excessive use of force, deliberate indifference to his medical needs, failure to intervene and/or protect, retaliation, conspiracy and failure to investigate his complaints. *Id.*

On October 2, 2008, following joinder of issue and the close of discovery, plaintiff moved for partial summary judgment on his due process claim as it relates to his commitment to CNYPC as well as his claims under the ADA. Dkt. No. 57. In support of his motion, relying on the doctrines of *res judicata* and collateral estoppel, plaintiff asserts that the procedures under which he was involuntarily committed to CNYPC were determined to be unconstitutional by the New York State Court of Appeals in *Harkavy v. Consilvio,* 7 N.Y.3d 610, 825 N.Y.S.2d 702 (2006), that he was unlawfully denied a mobility guide for his blindness, and that his parole violation was "fruit of a poisonous tree" and would not have occurred had he not been unlawfully detained at CNYPC in violation of the Fourth Amendment. Dkt. No. 57.

**\*54  \*6** Defendants opposed plaintiff's motion and cross-moved for summary judgment, advancing several grounds for rejection of all of plaintiff s claims, including that 1) plaintiff's section 1983 claims against defendants, acting in their official capacities, are barred by the Eleventh Amendment; 2) plaintiff has failed to establish a valid cause of action under the ADA, and defendants cannot be held individually liable for damages under that Act; 3) plaintiff has not established claims of failure to protect, deliberate indifference to his medical needs, denial of access to courts, retaliation, excessive use of force, or conspiracy; 4) plaintiff

has failed to demonstrate the requisite personal involvement by defendants Carpinello and Sawyer to support a finding of liability against them; 5) plaintiff has no cognizable constitutional interest in filing a criminal complaint, or in the pursuit of an investigation regarding his complaints made while housed at CNYPC; 6) defendants are not bound by the Court of Appeals decision in *Harkavy,* which was decided after plaintiff was released from CNYPC, and that decision does not create a constitutional right that is redressable in this court; and 7) in any event, defendants are shielded from suit by the doctrine of qualified immunity. Dkt. No. 79–3. Plaintiff has since responded in opposition to defendants' motion. Dkt. No. 84.

Both of the pending summary judgment motions, which are now ripe for determination, have been referred to me for a report and recommendation pursuant to 28 U.S.C § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509–10). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A moving party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson, All* U.S. at 250 n 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex, All* U.S. at 324, 106 S.Ct. at 2553; *Anderson, All* U.S. at 250, 106 S.Ct. at 2511. Where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, to successfully resist summary judgment they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*55** *\*7* When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict"). In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

#### B. *Fourteenth Amendment Procedural Due Process Claim*

Plaintiff challenges his involuntary commitment to CNYPC as violative of his right to due process and moves for summary judgment on this claim, arguing that the New York State Court of Appeals decision in *Harkavy,* should be given res judicata or collateral estoppel effect in this action. In *Harkavy,* the Court of Appeals held that the DOCS' resort to Article 9 of the MHL to institute commitment procedures for sex offenders in its custody was improper, observing that

> in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration, we

believe that [New York] Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility.

*Harkavy,* 7 N.Y.3d at 614, 825 N.Y.S.2d 702, 859 N.E.2d 508. [12] Having been committed to CNYPC under MHL § 9. 27, plaintiff now argues that *Harkavy* renders his commitment unconstitutional, and that defendants are bound by that decision. Defendants counter that since plaintiff was already removed from CNYPC and returned to prison by the time *Harkavy* was decided, the case has no bearing on his circumstances.

### 1. *Res Judicata*

Under the doctrine of *res judicata,* known also as "claim preclusion," a final judgment on the merits of an action precludes the parties, or those in privity with the parties, from relitigating issues that were or could have been raised in that action. *Allen v. McCurry* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Jacobson v. Fireman's Fund Insurance Co.,* 111 F.3d 261, 265 (2d Cir.1997); *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994). "It is a cardinal principle of *res judicata* that 'the first suit and the subsequent case must involve the same cause of action[,]' otherwise, *res judicata* will not bar the second action." *Thompson v. County Franklin,* No. 92–CV–1258, 1996 WL 341988, at *3 (June 18, 1996) (McCurn, S.J.) (quoting *Bloomquist v. Brady,* 894 F.Supp. 108, 114 (W.D.N.Y.1995)). In the Second Circuit, there are three separate but related factors which together inform the analysis of the preclusive effect to be given a prior judgment, including "[w]hether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." [13] *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 38 (2d Cir.1992) (quoting *NLRB v. United Technologies,* 706 F.2d 1254, 1260 (2d Cir.1983) (internal quotations omitted)).

**\*56 \*8** Neither Lane nor the defendants were parties to *Harkavy.* That lawsuit was a habeas corpus proceeding filed against the DOCS by the New York Mental Hygiene Legal Services seeking the immediate release of certain individuals whose prison terms had expired and were being held at the Manhattan Psychiatric Center. While it is arguable that defendants in this action are in privity with the DOCS, *see Browdy v. Lantz,* 3:03CV1981, 2006 WL 2711753, at *5 p.Conn. Sept. 21, 2006), plaintiff, who had been released

from CNYPC at the time *Harkavy* had been decided, was not a party to that action, does not allege any privity with the petitioners in *Harkavy,* and was never held in the Manhattan Psychiatric Center. Accordingly, the two actions do not arise from the same core of operative facts, nor would they involve the same evidence. In addition, although both *Harkavy* and this action involve MHL § 27, *Harkavy* did not determine the constitutionality of the DOCS' use of MHL § 9.27 to commit sex offenders leaving their custody. Rather, the issue presented and addressed by the New York Court of Appeals in that case was whether the DOCS' use of the MHL procedure, as distinct from that set forth in Correction Law § 402, was proper, and the court held only that it was not. *Harkavy,* 7 N.Y.3d at 610, 825 N.Y.S.2d 702, 859 N.E.2d 508. For these reasons, the *Harkavy* decision does implicate the doctrine of *res judicata* in this action.

### 2. *Collateral Estoppel*

The doctrine of collateral estoppel, or claim preclusion, is equally inapplicable in this case. Once a court has decided an issue of fact or law necessary to its judgment, a party to the first action, or one in privity with the party, cannot relitigate that specific issue in a subsequent lawsuit. *Allen,* 449 U.S. at 94; *Burgos,* 14 F.3d at 792; *Ryan v. N.Y. Telephone Co.,* 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (1984). Under New York law, collateral estoppel applies only if 1) the issue in question was necessarily decided in the prior proceeding and is decisive of the present proceeding; and 2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding. *Burgos,* 14 F.3d at 792; *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir.1991). The party asserting collateral estoppel has the burden of showing that the identical issue was previously decided, while the party opposing estoppel must show the absence of a full and fair opportunity to litigate in the prior proceeding. *Burgos,* 14 F.3d at 792. Because the issue decided in *Harkavy* was not identical to the issue raised in this lawsuit, collateral estoppel does not preclude litigation of the constitutionality of defendants' actions in this case.

### 3. *Due Process*

Turning to the merits of plaintiff's due process claim, I begin by noting that to successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted);

*Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul v. Matiyn v. Pataki,* 9:06–CV–1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117S, —— S.Ct. ——, ——, ——S, —— L.Ed.2d ——, ——, ——S, S.Ct. ——, ——, —— S, ——L.Ed.2d ——, ——, ——S.Ct. 2072, 2086 (1997)).

**\*57 \*9** Plaintiff was committed to CNYPC by way of the procedures set out in MHL § 9. 27, rather than Correction Law § 402. Lane was not afforded notice and an opportunity to be heard before, or even after, his transfer to that facility. In light of these facts, and for the reasons underpinning the Court of Appeals' decision in *Harkavy,* it appears that plaintiff's due process rights were violated in connection with his commitment. *Abdul,* 2008 WL 974409, at *10; *see also Wheeler v. Pataki,* No. 9:07–CV–0892, 2009 WL 674152, at *6–7 (N.D.N.Y. March 11, 2009) (McAvoy, S.J. and Lowe, M.J.). I therefore recommend denial of defendants' motionfor summary judgment dismissing plaintiff's due process claim to the extent that defendants' basis for dismissal is addressed to the merits of that cause of action. [14]

### 4. *"Fruit of the Poisonous Tree"*

In an apparent effort to make a claim for violation of his Fourth Amendment rights, plaintiff next argues that if he had not been committed to CNYPC under the MHL, he would not have been "illegally" confined and therefore would not have threatened defendant Lucenti and violated his parole. In a creative attempt to draw upon principles that do not translate well into this setting, Lane argues that the conduct giving rise to his parole revocation is "tainted" under the "fruit of the poisonous tree" principles.

"The fruit of the poisonous tree doctrine excludes evidence obtained from or as a consequence of lawless official acts." *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir.1999) (quoting *Costello v. United States,* 365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961)). It does not apply in this context where plaintiff apparently objects to use of evidence of his threats as a basis for a parole violation. *See Rabb v. McMaher,* No. 94–CV–614, 1998 WL 214425, at *7 (N.D.N.Y.Apr.24, 1998) (Pooler, J.) ("This doctrine applies to evidence that is obtained during a criminal investigation as a result of an unconstitutional search; it does not apply to to prison disciplinary hearings."). Simply stated, the fruit of the poisonous tree doctrine cannot link the conduct allegedly violating plaintiff's Fourth Amendment rights to his return to prison and establish an actionable claim, since this evidentiary doctrine is inapplicable in a civil section 1983 setting. *Townes,* 176 F.3d at 145.

### C. *Qualified Immunity*

As one of the bases for their summary judgment motion, defendants assert their entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143,152 (2d Cir.2007), *rev'd on other grounds, sub. nom. Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (May 18, 2009). The law of qualified immunity seeks to strike abalance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162–63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

**\*58 \*10** [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the

discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211–12 (2d Cir.2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id.; Gilles v. Repicky,* 511 F.3d 239, 243–44 (2d Cir.2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132–33 (2d Cir.2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier,* holding that while the sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory. *Pearson v. Callahan,* 555 —— U.S. ——, 129 S.Ct. 808, 820, 172 L.Ed.2d 565 (Jan. 21, 2009). In *Pearson,* the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price. *Id.* at 818. The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case. *Id.* Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by Saucier may serve to defeat this goal by requiring the parties "to endure additional burdens of suit-such as the cost of litigating constitutional questions and delays attributable to resolving them-when

the suit otherwise could be disposed of more readily." *Id.* (quotations and citations omitted).

**\*59 \*11** As a result of its reflection on the matter, the *Pearson* Court concluded that because "the judges of the district courts and courts of appeals are in the best position to determine the order of decision making [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original). "The *[Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.' " *Id.* (quoting *Pearson,* 129 S.Ct. at 818).

The question is whether "upon viewing the allegations of the complaint in the light most favorable to the plaintiff and drawing all inferences favorable to the plaintiff, [a] reasonable jury *could* conclude that it was objectively unreasonable for the defendants to believe that they were acting in a fashion that did *not* violate an established federally protected right," in which case the motion to dismiss must be denied. *Quartararo v. Catterson,* 917 F.Supp. 919, 959 (E.D.N.Y.1996) (quoting *Ying Jing Can v. City of New York,* 996 F.2d 522, 532 (2d. Cir.1993); *see also Schwartz v. Dennison,* 518 F.Supp.2d 560, 571 (S.D.N.Y.2007), *aff'd* 2009 WL 2172510 (2d Cir. July 22, 2009).

Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9. 27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy.* Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9. 27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio,* 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition

to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to CNYPC. In fact, prior to *Harkavy,* the Second Circuit had generally approved of MHL § 9 .27 as meeting both substantive and procedural due process requirements. *See, e.g., Project Release v. Provost,* 722 F.2d 950, 972–975 (2d Cir.1983). Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9. 27 in committing plaintiff to CNYPC. I therefore recommend a finding that, to the extent that any of the defendants were involved in the decision to commit plaintiff to CNYPC on his parole release date, they are entitled to qualified immunity with respect to plaintiff's claims for violation of his Fourteenth Amendment rights to due process, in light of the fact that it was objectively reasonable for them to believe that they were acting in a manner that did not violate any of plaintiff's protected rights.

**D.** *Eleventh Amendment*

**\*60 \*12** Although not specifically stated, plaintiff's claims in this action appear to be asserted against defendants both individually and in their official capacities as state employees. Complaint (Dkt. No. 1) U 3. Defendants contend that plaintiff's claims against them in their official capacities are subject to dismissal on the basis of the immunity that the Eleventh Amendment affords.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978).* This absolute immunity, which states enjoy under the Eleventh Amendment, extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. [15] *Richards v. State of New York Appellate Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh and Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Eleventh Amendment immunity does not extend, however,

to employees who are sued in their personal or individual capacity. *Schwartz,* 518 F.Supp.2d at 570 (citing *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988)).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, in part, and that all damage claims, except for those asserted against the defendants in their official capacities under the ADA, be dismissed. [16]

**E.** *Failure to Provide Reasonable Accommodations Under the ADA*

Plaintiff asserts that defendants knew, or should have known, that he is legally blind and that their refusal to provide him with reasonable accommodations for this alleged disability was in contravention of the ADA. Lane now moves for summary judgment in his favor on this claim, apparently on the grounds that his legal blindness constitutes a disability as a matter of law and that he has sufficiently demonstrated defendants' denial of reasonable accommodation for this disability. Defendants respond that they are entitled to dismissal of this claim because plaintiff has failed to allege that his legal blindness substantially limits a major life activity and also has failed to prove that he was excluded from participation in, or denied benefits of, some service or program. Defendants argue further that the taking of plaintiff's cane was not motivated by discriminatory animus. Finally, defendants contend that plaintiffs' claims against them in their individual capacities are not permitted under the ADA and damages against them in their official capacities are barred by the Eleventh Amendment.

**\*61 \*13** The ADA provides that

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990). CNYPC, operated by the New York OMH, is considered a public entity for the purposes

of the ADA, and as such is required to provide "reasonable modifications to rules, policies, or practices ..." *See* 42 U.S.C.A. § 12131(1)(B) & 42 U.S.C.A. § 12131(2). Public entities are not required to provide substantively different services to the disabled under the disability statutes, but instead must provide " 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000).

It is well established that under the ADA, suits against defendants in their individual capacities as state officials are barred. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Accordingly, I recommend dismissal of plaintiff's ADA claim to the extent that it seeks recovery of damages against defendants as individuals. The issue of whether defendants are immune in their official capacities is significantly more complicated.

### 1. *Eleventh Amendment: ADA Claims*

In *Henrietta D. v. Bloomberg,* **the Second Circuit held** that under *Ex Parte Young* an ADA plaintiff can assert a prospective claim for injunctive relief against a state official in his or her official capacity, as opposed to against the state directly. 331 F.3d 261, 287 (2d Cir.2003), *cert. denied.,* 541 U.S. 936, 124 S.Ct. 1658, 158 L.Ed.2d 366 (2004) (citing *Ex Parte Young,* 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908)). That court has not explicitly held likewise for ADA plaintiffs who seek money damages. Nonetheless, a request for monetary damages from state officials in their official capacities is the functional equivalent of a claim for damages directly from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State. *See, e.g., Garcia,* 280 F.3d at 107 **(citing** *inter alia,* Will v. Mich. Dep't of State Police,* 491 U.S. 58,71, 109 S.Ct. 2304,2312, 105 L.Ed.2d 45 (1989)).

It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity. *See, e.g., Kilcullen v. NY. State Dep't of Labor,* 205 F.3d 77, 79 (2d Cir.2000), *implicitly overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 368, **121 S.Ct. 955,965, 148 L.Ed.2d 866 (2001);** *Hallett v. N.Y. State DOCS,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000) (citations omitted). In this respect, the Eleventh Amendment, while

not directly controlling, confirms the broader, " 'background principle of sovereign immunity[.]' " *Garcia,* 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 72, 116 S.Ct. 1114, 1131, 134 L.Ed.2d 252 (1996)). When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority. *Garrett,* 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia, Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1122); *Garcia,* 280 F.3d at 108 (citations omitted). The pivotal question, in determining whether defendants are entitled to protection under the Eleventh Amendment when sued in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA. [17]

**\*62 \*14** The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits. In *Garrett,* the Supreme Court held that Congress had failed to validly abrogate state sovereign immunity under Title I of the ADA. 531 U.S. at 374, 121 S.Ct. at 967–68. In doing so, the Court was careful to distinguish Title II from its analysis, inasmuch as the issue had not been briefed by the parties, but did note that the remedial scheme of Title II is very different from that of Title I. *Id.* at 360 n. 1, 121 S.Ct. at 960 n. 1. The courts appear to be divided as to whether Garrett should extend to Title II of the ADA, especially since *Pennsylvania Dep't of Corr. v. Yeskey*—which held that Title II of the ADA applies to prisons-had been decided in the term previous to *Garrett,* but did not address sovereign immunity. 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998); *compare, e.g., Popovich v. Cuyahoga Cty. Ct. of Common Pleas,* 276 F.3d 808, 813–16 (6th Cir.2002) (holding that sovereign immunity validly abrogated by Congress as to the Due Process Clause), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72 (2002), with *Alsbrook v. City of Manuelle,* 184 F.3d 999, 1007 (8th Cir.1999), *cert. dismissed* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (finding that Congress exceeded authority by extending Title II of the ADA to the states and therefore did not validly abrogate sovereign immunity).

The Second Circuit has taken a slightly different approach than various other federal courts in addressing this question. In *Muller v. Costello,* decided before the Supreme Court issued its opinion in *Garrett,* the Second Circuit found that Congress had validly abrogated sovereign immunity within its authority under section five of the Fourteenth Amendment, subjecting states to potential monetary liability under the ADA. [18] 187 F.3d 298, 310 (2d Cir.1999). More recently,

however, in *Garcia v. S.U.N.Y. Health Sciences Ctr.,* the Second Circuit found that *Garrett* had "implicitly abrogated" its prior position that the states were not immune from ADA claims. 280 F.3d at 113 n. 3.

In *Garcia,* the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II. *Garcia,* 280 F.3d at 108. The circuit court went on to find, however, that Congress could exercise its authority under section five of the Fourteenth Amendment-the "sweep of congressional authority" allowing Congress to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities"-when enacting Title II of the ADA, as a whole, though it found the power to have been exceeded through enactment of Title II, since that provision conferred upon Congress the right to abrogate sovereign immunity and allow for private parties to sue non-consenting states for money damages. *Garcia,* 280 F.3d at 108–10.

**\*63** **\*15** Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id.* at 110–112. Specifically, in *Garcia* the Second Circuit concluded that Title II claims against the states for monetary damages and injunctive relief could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances-that is, in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability. *Garcia,* 280 F.3d at 111; *see Doe v. Goord,* No. 04–CV–0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004); *Lighthall v. Vadlamudi,* No. 9:04–CV–0721, 2006 WL 721568, at *18 (N.D.N.Y. Mar.17, 2006) (Mordue, C.J.). In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia,* 280 F.3d at 111. Since I find defendants' are not immune from suit under the Eleventh Amendment in their official capacities for alleged violations of the ADA, it is necessary to evaluate the merits of plaintiff's claim under that provision.

## 2. *McDonnell Douglas Analysis*

The court in *Garcia* conceded that it may be a difficult burden for a plaintiff to establish that an ADA violation resulted from discrimination, or ill will, and held that a plaintiff can rely on the *McDonnell Douglas* burden-shifting technique, or a motivating factor analysis under *Price Waterhouse,* to establish such a claim. *Garcia,* 280 F.3d at 112.

Under the *McDonnell Douglas* protocol, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 76 (2d Cir.2001) (citing *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000)). Upon establishment of a *prima facie* case, the burden of production shifts to the defendant, who at that juncture must come forward and articulate a legitimate, non-discriminatory reason for the adverse action in issue. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Holtz,* 258 F.3d at 77 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000)); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003). Once the defendant has successfully shouldered this burden, the focus then reverts to the plaintiff, who must establish that the alleged, nondiscriminatory rationale offered did not genuinely prompt the adverse action, but instead is a mere pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.2000) (citing *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839 (2d Cir.1996), *cert. denied,* 519 U.S. 824, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996)). While under the *McDonnell Douglas* paradigm the burden of production alternates back and forth between the parties, a plaintiff claiming intentional discrimination is tasked ultimately with establishing discrimination by a preponderance of the evidence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008).

**\*64** **\*16** Under *Price Waterhouse,* if the plaintiff can establish that the prohibited discrimination played "a motivating part" in the adverse action, the defendant must then demonstrate that he or she "would have made the same decision in the absence of discrimination." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252–53, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989). A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action,

irrespective of the plaintiff's disability. *See Bookman v. Merrill Lynch,* No. 02 CIV. 1108, 2009 WL 1360673, at *10–16 (S.D.N.Y. May 14, 2009).

To state a valid violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d at 272 (citing *Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998)).

**a.** *Plaintiff's Disability*

A person is considered to have a disability if he or she has "a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) [is] regarded as having such impairment." 42 U.S.C. § 12102(2). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U .S.C. § 12102(2)(A).

In support of his motion, plaintiff has presented evidence of an eye examination performed on July 22, 2005, while Lane was incarcerated at Sullivan Correctional Facility, diagnosing him as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4) Exh. B. Defendants admit their awareness of plaintiffs sight limitations, though they question his allegations regarding the severity of the vision impairment of his right eye. Notably, in and of itself, "monocular vision" is not a *per se* disability within the meaning of the ADA. *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F.Supp.2d 159, 167 (W.D.N.Y.2002) (citing *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 556, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999). "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual." *Id.; see also Ditullio v. Village of Massena,* 81 F.Supp.2d 397, 405 (N.D.N.Y.2000). To determine the particular impact of monocular vision upon a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3)

the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities." *Hoehn,* 244 F.Supp.2d at 167 (citing *Kirkingburg,* 527 U.S. at 566, 119 S.Ct. at 2169). Even though most people with monocular vision will meet the ADA'S definition of disability, they are still required to prove their loss is substantial. *Id.; see also, Gibbs v. City of New York,* No. 02–CV–2424–LB, 2005 WL 497796, at *5 (S.D.N.Y.Jan.21, 2005). Moreover, the fact that one can be characterized as "legally blind" does not, as a matter of law, establish a disability within the meaning of the ADA. *See Rivera v. Apple Indus. Corp.,* 148 F .Supp.2d 202, 207, 213 (E.D.N.Y.2001); *Hoehn,* 244 F.Supp.2d at 162, 171; *EEOC v. United Parcel Serv., Inc.,* 306 F.3d 794, 799, 803 (9th Cir.2002).

**\*65 \*17** Plaintiff has failed to come forward with sufficient evidence to establish that he is disabled as a matter of law. While plaintiff states that, in addition to a left eye prosthesis, he has glaucoma and increasing myopia of the right eye, the evidence as to the actual restrictions that he suffers and whether such restrictions affect a major life activity is equivocal, at best. Plaintiff contends that he is unable to read without the use of a magnifier and cannot participate in recreation without sports goggles and ankle braces. Defendants, on the other hand, assert that while housed at CNYPC, plaintiff demonstrated no signs of difficulty relating to his ability to write, read, or use a calculator without any supplemental aids or services, and that he was able to fully participate in his treatment programs. Affording defendants the benefit of all inferences, it appears that material questions of fact exist as to whether plaintiff is disabled within the meaning of the ADA, thus precluding the entry of summary judgment in his favor on the ADA cause of action set forth in his complaint.

**b.** *Plaintiffs Participation*

Even assuming that plaintiff sufficiently established that he suffers from a cognizable disability, his motion for summary judgment on his ADA claim nonetheless must fail. Plaintiff easily satisfies the second applicable requirement; since CNYPC and OMH are agencies of the State, defendants are required to adhere to the ADA. *See* 42 U.S.C. § 12131(1)(B). The third prong of the ADA analysis, however, entails analysis of whether Lane was denied the opportunity to participate in services, programs, or activities as a result of his alleged disability; again, this issue presents questions of fact not susceptible to resolution on the motion for summary judgment. Plaintiff argues that as a result of not receiving

reasonable accommodations, he was unable to participate in recreation without his requested sport goggles and ankle braces, and he was unable to read until his family provided him with a magnifier. Tr. p. 62–63. Plaintiff also claims that after his mobility cane was taken upon admittance to CNYPC, he was never offered another means of assistance and instead was told to by defendant Coppola to "crawl or feel his way". Lane Aff. (Dkt. No. 84–2) ¶ 6. In contrast, defendants contend that throughout plaintiff's stay at CNYPC, he demonstrated no signs of difficulty in his ability to write, read, or use a calculator without any supplemental aids or services and that he was able to fully participate in his treatment groups. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 11, 12, 14. From these competing claims, it is readily apparent that questions of fact preclude a finding in favor of plaintiff on the issue of whether he was denied reasonable accommodations.

### c. *Discriminatory Animus*

If the plaintiff is able to establish a *prima facie* claim under the ADA at trial, the burden will shift to defendants to come forward with a legitimate non-discriminatory reason for their conduct. While denying their awareness that plaintiff required accommodations for his visual impairment, defendant Nowicki asserts that upon being admitted to CNYPC, plaintiff's mobility cane was confiscated for safety and security purposes, and that plaintiff was immediately offered a wheelchair or walker, both of which he refused. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 7–8. Defendants contend further that plaintiffs records did not indicate that he experienced mobility problems, and that he indicated that he could read and write, a fact that became evident to them as result of Lane's active participation in the program. *Id.* at ¶¶ 9–12.

**\*66 \*18** Defendants have thus articulated legitimate nondiscriminatory reasons for their actions. In response, plaintiff has neither offered evidence of pretext, nor has he produced evidence of discriminatory animus. Indeed, plaintiffs complaint is devoid of any allegation that defendants actions were motivated by irrational discriminatory animus or ill will based upon his visual impairment, and Lane has produced no evidence that would support such a claim. *See Garcia,* 280 F.3d at 112.

In view of the foregoing, I recommend denial of plaintiff's motion for summary judgment on his ADA claim. And, based upon plaintiff's failure to produce any evidence of discriminatory animus, I further recommend that defendants' motion for summary judgment dismissing plaintiff's ADA

claim against defendants in their official capacities be granted.

### F. *Fourteenth Amendment Substantive Due Process Claims*

Several claims alleged in plaintiff's complaint are predicated upon alleged violations of the Eighth Amendment, although plaintiff also makes reference to the Fourteenth Amendment throughout his complaint. When plaintiff was released by the DOCS to CNYPC, he had served his prison term, subject to release on parole, and was no longer a prison inmate. The Eighth Amendment, prohibiting cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). Because plaintiff was not a prison inmate at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at \* 7 (S.D.N.Y. March 15, 2007) (citing cases).

Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiffs claims of failure to protect, excessive force, and medical indifference, all framed as arising under the Eighth Amendment, relate to allegedly unsafe conditions while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

### 1. *Failure to Protect*

**\*67** The Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision

that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y.Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid–Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

> **\*19** [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee respectively addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at \*8. The court went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level". *Id.* (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Vallen,* 2005 WL 2296620, at \*9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit. *Id.* at \*9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)). [19]

In *Dove v. City of New York,* a claim similar to that raised by Lane was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court

likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove,* 2007 WL 805786, at \*8. Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiffs constitutional rights. *Id.*

**\*68** I tend to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates constitutional concerns in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights. [20] *Vallen,* 2005 WL 2296620, at \* 9. Deliberate indifference, under the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (same). "In *Lewis,* the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing lewis, 523 U.S. at 849–40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

**\*20** As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients during his commitment at the CNYPC. The first incident occurred on September 18, 2006, shortly after plaintiff was admitted. Complaint (Dkt. No. 1) p. 7. Lane concedes that he was first struck by a football and then became involved in an altercation with a fellow patient, as a result of which he claims to have suffered injury to his face, nose and jaw. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. Plaintiff also admits that he is unable to distinguish between the injuries that he received from being hit by the football and those resulting from the ensuing altercation. *See* Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 84). The only treatment that was required for plaintiff's resulting injuries was pain medication for his discomfort. According to plaintiff's CNYPC records, upon observing the altercation defendant Crociata attempted to

intervene by getting between the two patients and preventing further contact. Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 114. Immediately after the other patient was escorted away from the area, Crociata approached plaintiff to see if he was hurt. *Id.* Plaintiff told Crociata that he had not been touched, and refused to let Crociata speak to him any further. *Id.* While plaintiff disputes telling Crociata that he was not touched, he does admit that after the incident Crociata approached him and asked him what had happened; Lane claims, however, that Crociata saw everything and states that he was angered by Crociata's question, apparently interpreting it as racist. Complaint (Dkt. No. 1) p. 7; *see also* Tr. pp. 31–32. Plaintiff also admits that Crociata saw him for his injuries, but alleges Crociata did not examine him. Tr. pp. 27–33.

**\*69** Significantly, plaintiff does not allege that he had any previous difficulties with the patient with whom he was involved in the altercation, or that the defendants had reason to know of the danger in exposing the two to each other. In fact, plaintiff states that he had "absolutely no" prior interaction with that patient. Tr. p. 28. Additionally, plaintiff has failed to allege that any other defendant had any involvement in this incident. Based on these facts, no reasonable factfinder could conclude that any of the defendants engaged in conduct that shocked the conscience, substantially departed from accepted professional judgment, practices or standards, or was deliberately indifferent to plaintiff's safety. Simply stated, the record discloses that the September 18, 2006 encounter stemmed from an unforseen accident that escalated into an altercation and that CNYPC staff immediately intervened and took appropriate action to secure both individuals involved.

**\*21** The second alleged incident occurred somewhere in the beginning of October, when plaintiff claims he was "attacked" by another patient. Complaint (Dkt. No. 1) p. 9. Plaintiff does not identify a specific date or recount the circumstances surrounding the alleged attack, nor does he claim to have suffered any injury. The record suggests an incident occurred between plaintiff and another patient on October 3, 2006 in which he and the other patient "had words." Higgins Decl. (Dkt. No. 75–4) Exh. D, p. 214. There is no evidence in the record that plaintiff was physically touched or in any way injured as a result of this incident. To the contrary, plaintiff admits that the only incident in which he received physical injury occurred on September 18. Tr. p. 44.

With regard to the October instance, I find that plaintiff has failed to establish a sufficiently serious deprivation to show

that he was subjected to an unreasonably unsafe condition and trigger the Fourteenth Amendment's protections.

In view of the foregoing, I find that plaintiff has failed to establish a Fourteenth Amendment claim for failure to protect and/or intervene and, accordingly, I recommend defendants' motion for summary judgment relating to this claim be granted.

### 2. *Medical Care*

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Centers Council, Inc. v. Sale,* 823 F.Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn,* 860 F.Supp. 966, 974 (N.D.N.Y.1994), *aff'd* 60 F.3d 812 (2d Cir.1995) (citing cases). "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that protects prisoners: 'deliberate indifference to serious medical needs.' " *Owens,* 860 F.Supp. at 974 (quoting *Haitian Centers Council,* 823 F.Supp. at 1043–44). At a minimum, due process forbids conduct that is deliberately indifferent to one that is involuntarily committed. *Haitian Centers Council,* 823 F.Supp. at 1044.

**\*70** Plaintiff's medical indifference claim has as it genesis the now familiar September 18, 2006 incident. Plaintiff claims that after being struck by a football and subsequently attacked by a fellow patient on that date, he sought medical treatment from defendant Crociata; Lane also alleges that he suffered back pain as a result of the events of that day. Complaint (Dkt. No. 1) p. 7; Tr. pp. 27–33. As was previously noted, plaintiff was unable to distinguish the injuries sustained from being hit by the football from those allegedly resulting from the altercation, if any. Tr. pp. 29–30. Lane alleges that when defendant Crociata saw him, Crociata told him, "[t]here's nothing wrong with you" and failed to perform an actual examination. Complaint (Dkt. No. 1) p. 7.

Plaintiffs CNYPC records contradict plaintiffs version, revealing that Crociata approached plaintiff immediately after the altercation to see if he was hurt, at which time plaintiff told him "I wasn't touched," and refused to let Crociata speak to him any further. Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 114. Later in the day, plaintiff apologized to Crociata for his behavior, and complained of general discomfort. *Id.* As a result, Crociata promptly prescribed 600 milligrams of Motrin for plaintiff's pain. *Id.* A follow-up note by Nurse Jane Helfert shows that after receiving the Motrin plaintiff slept

through the night, and made no further complaints about his pain. *Id.* p. 115.

**\*22** Plaintiff himself acknowledges that he did not report his injuries to Crociata, never complained to anyone that his back was hurting, and did not request any sort of pain medication for his alleged injuries. Tr. pp. 32–33, 35–36. Plaintiff also concedes that he was provided with ibuprofen and other pain medication when requested, including the day after the altercation. Tr. p. 34. Moreover, plaintiff is unable to articulate what follow up treatment he believes was constitutionally required. [21] *Id.* at 38.

Based upon these facts, I have determined that no reasonable factfinder could conclude that there was an unreasonable or deliberately indifferent "denial" or delay in treatment of plaintiff on September 18, 2006. I therefore recommend that defendants' motion to dismiss plaintiff's medical indifference claim be granted. [22]

### 3. *Excessive Force*

Plaintiff claims that on September 22, 2006, as a result of his refusal to talk to defendant Nowicki, he was beaten and held in restraints and thereby subjected to excessive force. Complaint (Dkt. No. 1) p. 8. As with plaintiff's failure to protect claim, the proper framework for analysis of this claim is the Fourteenth, and not the Eighth, Amendment. *Youngberg,* 457 U.S. at 312, 102 S.Ct. at 2456. "It bears remembering ... that not all bodily harm caused by a government actor is actionable as a constitutional violation." *West v. Whitehead,* No. 04–CV–9283, 2008 WL 4201130, at \* 14 (S.D.N.Y. Sept. 11, 2008) (citations omitted). "Only when bodily harm is caused by government action 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' will a constitutional violation result." *Id.* (quoting *Lombardi v. Whitman,* 485 F.3d 73, 81 (2d Cir.2007)).

**\*71** In the Second Circuit, it is recognized that individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians. *See Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) (citing *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995)). Factors to be considered in examining excessive force claims include: "the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously

and sadistically for the very purpose of causing harm." *Id.* at 251–52 (quoting *Metzger v. Osbeck,* 841 F.2d 518, 520 (3d Cir.1988)). With respect to the last factor, the Second Circuit has explained that

> [i]f the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, the conduct is presumptively unconstitutional.... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury, and serve no legitimate purpose unquestionably shock the conscience ... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

**\*23** *Id.* at 252 (citations omitted). "Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances." *West,* 2008 WL 4201130, at \*15 (citing *Johnson,* 239 F.3d at 254). [23] This analysis was found applicable by the court in *West* to an excessive use of force claim asserted under section 1983 by a profoundly mentally retarded individual committed to a state-operated facility for developmentally disabled individuals. *West,* 2008 WL 4201130, at \*14–15.

Plaintiff claims that on September 22, 2006 he was called from the day room by Nowicki, who said that he wanted to talk to plaintiff in the side room. Tr. p. 45. Plaintiff responded by stating that he did not have anything to say to Nowicki, at which point, plaintiff claims, Nowicki directed the twenty treatment assistants that were standing there to "take him down." Tr. p. 46. Plaintiff claims that he was then kicked and struck about his body, placed in restraints and transported by gurney to some other location where he was kept without being given food for two to three days, except for a sausage sandwich; plaintiff admits being offered drinks but states that he refused. Tr. pp. 45–61.

According to defendants, on the day of the alleged incident plaintiff had been hostile toward staff and residents, threatened to start a riot, and refused counseling by Nowicki in the side room. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 22–23. Plaintiff was recorded as saying "[d]on't try to take me to the side room or try to shoot me up, because when I come out of it, there will be trouble. That's a promise, not a threat." Higgins Decl. (Dkt. No. 79–4) Exh. D, p. 146. Because plaintiff attempted to return from the hallway to the day room, he was placed into a four point restraint for seven minutes, pursuant

to doctor's orders, and transported to the side room "without injury or physical altercation". Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–25; Higgins Decl. (Dkt. No. 79–4), Exh. D, p. 146.

**\*72** Nowicki states that after being restrained plaintiff continued to make threats and, consistent with hospital policy, remained in the side room with one-to-one supervision from 1:00 p.m. September 22, 2006 until 9:30 a.m. on September 25, 2006, during which time he was provided food and a mattress, slept and ate, and attended to his own daily self-care activities. Nowicki Aff. (Dkt. No. 79–5) ¶¶ 24–29. Plaintiff's CNYPC records also indicate that plaintiff's activity was monitored at fifteen minute intervals and that plaintiff was provided meals, saw a psychiatrist and was permitted to meet with his parole officer. Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 146–80. The record also reveals, and plaintiff admits, that at various times over this three-day period Lane refused to interact with staff, and plaintiff acknowledges that the purpose in putting him in isolation was behavior modification. Tr. pp 53–55, 60.

While the parties' versions of the events of September 22, 2006 vary, I do not find the differences material to the determination of this claim. Plaintiff does not dispute that he refused to go to the side room to speak with Nowicki, nor does he deny making threats in the day room. The decision to put plaintiff in a four point restraint was made by a physician in light of plaintiff's history, his serious threats, and his refusal to follow staff direction. Plaintiff does not claim to have been restrained for a period longer than that necessary to transport him. Plaintiff has produced no evidence that the force that was used was malicious or sadistic, for the very purpose of causing him harm.

**\*24** Although plaintiff generally alleges that he sustained injury to his back, shoulders and neck and was denied medical treatment as a result of the incident, plaintiff does not specifically identify any injury or treatment that was needed with specificity, and he does not allege that he has suffered any continuing problems. There is no evidence of any relevant injury noted in plaintiff's CNYPC records. The record indicates, and plaintiff admits, that within two hours of being placed in the side room, he was seen by a doctor, with whom he refused to speak. Significantly, plaintiff's allegation that he was denied medical treatment on that date directly contradicts his deposition testimony to the effect that the only time he was denied treatment was on September 18, 2006. Tr. p. 36.

Based upon the record now before the court, no reasonable factfinder could find defendant's conduct conscience-shocking. Rather, the record establishes that defendants were attempting in good faith to discipline plaintiff and restore order as a result of his failure to follow directions and his continuous threats to patients and staff at the facility. I therefore recommend that defendants' motion for summary judgment as to this claim be granted, and that plaintiff's excessive force claim be dismissed. [24]

### G. First Amendment

"The First Amendment Guarantees the right to 'petition the Government for a redress of grievances.' " *McKithen v. Brown,* 565 F.Supp.2d 440, 458 (E.D.N.Y.2008) (quoting U.S. Const. amend. I). Out of the Petition Clause of that amendment arises the right of access to courts, *City of New York v. Beretta U.S.A Corp.,* 524 F.3d 384, 397–98 (2d Cir.2008), *cert. denied* ––– U.S. ––––, 129 S.Ct. 1579, 173 L.Ed.2d 675 (2009), as well the right to petition for redress for grievances without retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

### 1. Access to the Courts

**\*73** Although not specifically stated in his complaint, defendants suggest that when liberally construed in light of his deposition testimony plaintiff's complaint makes a claim of denial of access to the courts. [25]

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. [26] *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495, 52 L.Ed.2d 72 (1977) (citations and internal quotation marks omitted). "However, this right is not an abstract, freestanding right to a law library or legal assistance and cannot ground a Section 1983 claim without a showing of actual injury." *Collins v. Coord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (internal quotations omitted). Thus, "[t]o survive a motion for summary judgment, plaintiff must present evidence showing that he has suffered actual injury." *Jarecke v. Hensley,* No. 3:07–cv–1281, 2009 WL 2030394, at \*9 (D.Conn. July 9, 2009) (citing *Lewis v. Casey,* 518 U.S. at 351–52). To prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of the defendants. [27] *Abdul–Matiyn,* 2008 WL 974409, at \* 13.

**\*25** Plaintiff has failed to prove his claim that defendants' failure to provide him with a laptop computer with zoom text, a scanner and inkjet color printer, 7x magnifier, books on tape, high intensity lamp and 20/20 pens as requested in his letter to defendant Sawyer on October 13, 2006, resulted in his inability to pursue any legal action. *See* Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. C. In fact, plaintiff admits he was able to file all of the legal proceedings that he desired. Tr. p. 67. Moreover, as defendants explain in their motion for summary judgment, CNYPC patients are afforded access to the Mental Hygiene Legal Services ("MHLS"), which provides "legal services, advice and assistance, including representation, with regards to the resident's hospitalization." Dkt. No. 79–3, p. 12. Plaintiff admits that he was familiar with the services MHLS provides, and actually attempted to bring an action with the assistance of that agency, but was transferred from CNYPC before the proceeding could move forward. Tr. p. 10. Because there is no evidence that plaintiff suffered actual injury due to defendants' alleged interference with his access to the courts, I recommend that any claim by plaintiff that he was denied such access be dismissed.

### 2. *Retaliation*

In his complaint plaintiff alleges that defendants retaliated against him because he and his family complained to various governmental agencies and officials, and he insisted on filing criminal charges against another patient. Complaint (Dkt. No. 1) p. 11. "[C]riticism of governmental agencies is protected speech under the First Amendment." *Olesen v. Morgan,* No. 1:06–CV–959, 2008 WL 5157459, at \*4 (N.D.N.Y.Dec.8, 2008) (quoting *Economou v. Butz,* 466 F.Supp. 1351, 1361 (S.D.N.Y.1979) (footnote omitted)). When adverse action is taken by governmental officials against a person being held in custody, motivated by his or her exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco,* 854 F.2d at 588–90.

**\*74** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there exists a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd.*

*of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*26** Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiffs retaliation claims. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

The right to file a grievance and petition the government for redress is "among the most precious of the liberties safeguarded by the Bill of Rights." *Franco,* 854 F.2d at 589 (quoting *United Mine Workers v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). Plaintiff therefore easily meets the first prong of the governing test by demonstrating that he engaged in protected activity.

It is in connection with the requirement that the two be linked that plaintiff's retaliation claim falls short. Plaintiff first claims that defendants retaliated against him by falsifying documents in order to have him removed from the facility. Complaint (Dkt. No. 1) p. 11. Lane has failed to offer proof, however, showing that any document was falsified by defendants with the intent to have plaintiff removed from CNYPC. As District Judge David N. Hurd recognized in his decision in *Barclay v. New York,* 477 F.Supp.2d 546 (N.D.N.Y.2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay,* 477 F.Supp.2d at 558. More than conclusory allegations are required to survive a summary judgment

motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

**\*75** Here, the evidence in the record overwhelmingly demonstrates that from the outset and repeatedly throughout his confinement at CNYPC, plaintiff voiced both his discontent with being placed at the facility and his desire to return to prison. There is ample evidence in the record demonstrating that while confined at CNYPC plaintiff was involved in more than one altercation and made repeated threats to the safety of staff and other patients, including threats to start a riot and to kill another patient; the event finally precipitating his removal was his threat to cut the throat of a treatment assistant. Conversely, there is no evidence in the record that suggests that any document authored by any defendant was false, let alone that falsification of such document was motivated by a desire to retaliate against the plaintiff for his written complaints to various governmental agencies. Moreover, the incident that caused plaintiff's removal from CNYPC also formed the basis for the parole violation that precipitated plaintiffs return to prison, for which he was afforded a hearing, was represented by counsel, and was permitted to cross-examine witnesses and present his own evidence, and he was ultimately found guilty.

**\*27** The second incident that plaintiff attributes to retaliatory animus relates to his September 22–26, 2006 confinement in an isolated room after he insisted on filing criminal charges against a fellow patient who assaulted him. Complaint (Dkt. No. 1) p. 11. On this count, plaintiff fails to demonstrate that the alleged adverse action was prompted by protected conduct. Preliminarily, it should be noted that plaintiff has repeatedly complained that he was prevented from filing any criminal charges, yet admits that following the September 18, 2006 altercation he participated in mediation with the other patient, leading to resolution of the matter. Even assuming that plaintiff pursued criminal charges, his claim would fail as it is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Accordingly, plaintiff had no constitutionally protected right to file a criminal complaint. Finally, even if plaintiff had sufficiently established that he engaged in protected activity,

he has failed to adduce any evidence demonstrating that his confinement in isolation was in any way related to his effort to pursue criminal charges in regard to the attack that occurred several days prior, or that it was maliciously motivated by a retaliatory animus.

Because plaintiff has failed to produce any evidence to support his retaliation claims, I recommend that this portion of defendants' motion for summary judgment be granted, and that those claims be dismissed.

### 3. *Investigation of Complaints*

Plaintiff's tenth cause of action purports to allege a claim for the acts or omissions of defendant Beebe in failing to investigate plaintiff's complaints regarding the conditions of confinement at the CNYPC. Complaint (Dkt. No. 1) p. 8, 12. Although the right to petition government is well established, there is no corresponding duty on the part of the government to act. *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 375 (N.D.N.Y.2003) (citations omitted), *aff'd* 83 Fed. Appx. 363 (2d Cir.2003); *Wolf v. Town of Mount Pleasant,* No. 06 Civ. 3864, 2009 WL 1468691, at \*6 (S.D.N .Y. April 27, 2009) (citing *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008)). Plaintiff has, therefore, failed to allege a cognizable claim. [28]

**\*76** I therefore recommend that all claims against defendant Beebe be dismissed.

### H. *Personal Involvement*

Defendants move to dismiss all claims asserted by Lane against defendants Carpinello and Sawyer based upon their lack of personal involvement in the allegedly offending conduct. At the outset, because the court has determined that plaintiff was not denied a constitutional right, his supervisory claims against Carpinello and Sawyer should be dismissed. *See Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). Even if there were a cognizable claim, however, the claims against Carpinello are subject to dismissal based upon a lack of personal involvement.

**\*28** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a

plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor can be found to have personal involvement in a constitutional violation if the evidence shows:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowing the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (1995) (quoting Wright, 21 F.3d at 501).

Plaintiffs claims against defendant Carpinello, Commissioner of the New York State OMH, and defendant Sawyer, the director of CNYPC, are premised exclusively upon their roles as supervisors. Plaintiff alleges that Carpinello was involved in the refusal of plaintiff's requests for accommodations under the ADA, refused to hire a disabilities rights coordinator, demonstrated deliberate indifference to his needs, failed to supervise employees at the facility, and instituted policies and procedures that she knew, or should have known, were unlawful. Complaint (Dkt. No. 1) pp. 9–12. For this claim plaintiff relies on a letter that he wrote to Carpinello in mid-October asking to be placed in protective custody and transferred from CNYPC. Complaint (Dkt. No. 1) p. 9. Plaintiff admits that he never received a response to his letter. Complaint (Dkt. No. 1) p. 9.

**\*77** Plaintiffs allegations against Sawyer are similar. On October 13, 2006 plaintiff sent defendant Sawyer a letter requesting certain accommodations under the ADA, including such things as a laptop computer, a magnifier and books on tape. Dkt. No. 57–4, Exh. C. Additionally,

plaintiff alleges that Carpinello and Sawyer should have been aware of his complaints by virtue of the letters that he and his wife had written to various state agencies and public officials. The mere receipt of a letter of complaint alone, however, is insufficient to establish personal involvement and liability under section 1983. *Porter v. Goord,* No. 04–CV–0506F, 2009 WL 2386052, at \*5 (W.D.N.Y. July 20, 2009) (citations omitted); *Lyerly v. Phillips,* No. 04 Civ. 3904(PKC), 2005 WL 1802972, at \*7 (S.D.N.Y. July 29, 2005) (Castel, J.) (citing *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002)). [29]

**\*29** Plaintiff also claims that there existed an unwritten policy and custom of patient abuse and assault at CNYPC, which had been in place for many years. Yet, plaintiff has produced no evidence of instances of alleged assault or abuse of patients, aside from the incident on September 22, 2006, of which he now complains. In opposition to defendants' motion, Lane offers the affidavit of John Palombo (Dkt. No. 84–6), a former patient confined at CNYPC from July, 2006, until November of 2007. The Palombo affidavit, however, is fatally conclusory. Palombo states that he personally witnessed staff members attack and beat patients at CNYPC on a least six different occasions, but fails to identify with any specificity the dates on which such beatings allegedly occurred, the patients that were involved, or the circumstances surrounding the alleged beatings. *Id.* ¶ 13. Nor does Palombo allege that supervisors were notified or aware of the matter, or that complaints were made about these incidents. In fact, plaintiff has produced no evidence of any complaints of abuse made by or on behalf of patients, other than his own. In view of the foregoing, I conclude that the evidence in the record is insufficient to permit a reasonable juror to find the existence of an unwritten policy or custom of patient abuse at CNYPC. *See Upton v. County of Orange,* 315 F.Supp.2d 434, 447 (S.D.N.Y.2004).

For the foregoing reasons, I recommend that defendants' motion for summary judgment dismissing the claims against Carpinello and Sawyer for lack of personal involvement be granted. [30]

## I. *Conspiracy*

Embedded within plaintiff's complaint, though not separately stated, is a conspiracy claim asserted under 42 U.S.C. §§ 1983 and 1985. [31] Defendants also seek dismissal of that claim.

### 1. *Section 1983*

To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983), (per curiam) *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158(1983). In order to support a claim of conspiracy to commit a civil rights violation, a plaintiff must establish the existence of such a deprivation; a claim of conspiracy, standing alone, is insufficient to support a finding of liability under section 1983. *Britt v. Garcia,* 457 F.3d 264, 269–70 (2d Cir.2006); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (collecting cases).

**\*78** Plaintiff's conspiracy claim, if existing at all, appears to rest entirely upon an e-mail from defendant Babula, a treatment assistant, to defendant Barboza, the director of the SOTP at CNYPC, dated October 20, 2006, which plaintiff construes as a concerted effort to have plaintiff's parole violated. Lane Aff. (Dkt. No. 84–2) Exh. C, p. 12. In the e-mail Babula expresses his concerns relating to plaintiff's continuing threatening conduct and goes on to say, "Sharon if there is a way to get this man violated, and you could do it, you need to ..." *Id.* While this e-mail reflects defendant Babula's safety concerns about plaintiff's continued presence at CNYPC, it is not sufficient to raise a question of fact precluding summary judgment dismissing plaintiffs claim of conspiracy.

**\*30** I note that because I have not found that plaintiff's complaint states a sustainable claim for deprivation of a constitutional right, his conspiracy claim is likewise subject to dismissal for failure to state a cause of action. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). Moreover, plaintiff has offered only conclusory allegations that defendants acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, to violate plaintiffs rights, and for this reason as well his claim of conspiracy fails.

## 2. *Section 1985*

Plaintiffs complaint also alleges violation of 42 U.S.C. § 1985. To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 834–39, 103 S.Ct. 3352, 3359–61, 77 L.Ed.2d 1049 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994); *Gleason v. McBride,* 869 F.2d 688, 694 (2d Cir.1989); *Patterson v. County of Oneida,* No. 5:00–CV–1940, 2002 WL 31677033, at \*4 (N.D.N.Y.Oct.30, 2002) (Hurd, J.), *aff'd in relevant part,* 375 F.3d 206 (2d Cir.2004); *Benson v. United States,* 969 F.Supp. 1129, 1135–36 (N.D.Ill.1997) (citing, *inter alia,* United Brotherhood, 463 U.S. at 434–37); *see also LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir.1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially, through a showing that the parties had a " 'tacit understanding to carry out the prohibited conduct.' " *LeBlanc–Sternberry,* 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon,* 709 F.2d at 175; *Williams v. Reilly,* 743 F.Supp. 168, 173 (S.D.N.Y.1990) ( "[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). Moreover, it is well settled that a plaintiff attempting to establish a claim under section 1985(3) must demonstrate that the defendant under consideration acted with class-based, invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 266–68, 506 U.S. 263, 113 S.Ct. 753, 758–759, 122 L.Ed.2d 34 (1993).

**\*79 \*31** Plaintiff's claim of conspiracy under section 1985 fails for the same reasons that require dismissal of his conspiracy claim alleged under section 1983. Plaintiffs section 1985 claim is also subject to dismissal based upon the fact that plaintiff has produced no evidence of any class-based discriminatory animus.

In view of the foregoing, I recommend that defendants' motion as to plaintiff's conspiracy claims be granted, and that plaintiff's conspiracy claims be dismissed. [32]

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff asserts a variety of claims in his complaint relating to his involuntary commitment to CNYPC in September and October of 2006. Having carefully reviewed the extensive record before the court and considered both plaintiffs motion for partial summary judgment and defendants' cross motion for summary judgment, I find that defendants are entitled to qualified immunity with regard to plaintiff's claim that he was committed to CNYPC in violation of his right to procedural due process [33] and that defendants are entitled to immunity under the Eleventh Amendment for all of plaintiff s claims against them in their official capacities and for alleged violations of the ADA in their individual capacities, and that such claims should therefore be dismissed. As to plaintiff's remaining claims under the ADA, I conclude that he has failed to prove any violation of his rights under Title II of that statute, and that these claims should also be dismissed on the merits, as a matter of law. In addition, I find that plaintiff cannot state a claim under the Eighth Amendment for conditions arising out of his confinement in CNYPC, and that he has failed to establish claims under the Fourteenth Amendment for failure to protect and/or intervene, medical indifference, or excessive use of force, and that these claims therefore are similarly subject to dismissal. Likewise, I have determined that plaintiff has failed to establish that he was denied access to the courts, that defendants' retaliated against him, or that he was otherwise denied his First Amendment rights, including by defendant Beebe's alleged failure to investigate, and accordingly recommend that all First Amendment claims asserted by Lane be dismissed. Because I find that plaintiff has failed to establish a constitutional violation or violation of the ADA, plaintiff's claims of conspiracy as well as those for supervisory liability against defendants Carpinello, Sawyer and Barboza are also subject to dismissal. Additionally, I find that plaintiff has failed to produce any evidence of a conspiracy, or of the personal involvement of Carpinello, Sawyer and Barboza, and therefore recommend dismissal of plaintiff's conspiracy claims and those against Carpinello, Sawyer and Barboza on this basis as well. Accordingly, it is hereby respectfully RECOMMENDED that plaintiffs motion for partial summary judgment (Dkt. No. 57) be DENIED, defendants' cross motion for summary judgment (Dkt. No. 79) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

**\*80 \*32** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FedR.Civ.P. 6(a) and 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2010 WL 3613806 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

David McCHESNEY, Plaintiff,

v.

Michael HOGAN, Donald Sawyer, Dr. Terri Maxymillian, Jeffrey Norwicki, Bill Owens, Corey Connelly, Charmine Bill, Regina Anderson and the Treatment Team, Defendants.

Civil Action No. 9:08–CV–0563

(NAM/DEP). | Aug. 11, 2010.

### Attorneys and Law Firms

David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, Dean J. Higgins, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC") or ("Center") for in-patient sex offender treatment, has commenced this action pursuant to 42 U.S.C. § 1983 claiming that he was deprived of his civil rights during the course of his confinement at the Center. In his complaint plaintiff recites three instances on which he was assaulted by fellow patients on two separate days, asserting that the attacks resulted from defendants' failure to properly protect him from harm in violation of his constitutional rights.

Plaintiff's complaint seeks declaratory and injunctive relief, as well as awards of compensatory and punitive damages.

Currently pending before the court is a motion by the defendants seeking judgment dismissing plaintiff's claims against them, both on the merits and based upon the lack of any showing of their personal involvement in the constitutional violations alleged. For the reasons set forth below I recommend defendants' motion, which plaintiff has not opposed, be granted.

## I. *BACKGROUND* [1]

Plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health ("OMH"), and designated to the CNYPC on or about December 6, 2007, pursuant to the mandates of the New York Mental Hygiene Law Article 10.[2] Complaint (Dkt. No. 1) ¶ 3; *see also McChesney v. Hogan,* No. 9:08–CV–1186 (NAM/DEP), Dkt. No. 23 at pp. 4–5.The Center is an adult psychiatric facility located in Marcy, New York, with a 210 bed maximum security inpatient capacity from which the 150 bed Sexual Offender Treatment Program ("SOTP") is operated. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 1–2.[3] During the times relevant to his claims, plaintiff was assigned to unit 304, located within a Motivation On Deck ("MOD") wing. Bill Decl. (Dkt. No. 34–8) ¶ 6. Residents are assigned to MOD units based upon a history of violence, threats of violence, or other chronic treatment interfering behaviors, and are treated in a setting which permits more intense containment and observation. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 19.

**\*81** On March 19, 2008 plaintiff became involved in an altercation with another patient at the Center.[4] Complaint (Dkt. No. 1) ¶¶ 15–17; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 20–27. The two were separated by staff members, and plaintiff was escorted to a side room. Complaint (Dkt. No. 1) ¶¶ 17–18. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 27. Prior to the incident, plaintiff had no prior difficulties with the fellow patient. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 28.

Later that day plaintiff returned to the day room, where the earlier altercation had occurred, and while there was struck by another patient. Complaint (Dkt. No. 1) ¶¶ 19–21; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 30–39. The two patients were separated, and plaintiff was placed in a secure location from 4:00 p.m. until 10:00 p.m. for his own protection. Complaint (Dkt. No. 1) ¶ 22; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶ 40.

**\*2** A second, seemingly unrelated incident occurred on April 29, 2008 when plaintiff became embroiled in a verbal dispute with a fellow resident in charge of handing out extra packets of sugar for the evening meal. Complaint (Dkt. No. 1) ¶ 25; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 42–56. Although the oral confrontation subsided, the resident with whom plaintiff had words later came up from behind plaintiff and struck him in the back of the head, knocking him unconscious and requiring that he undergo emergency medical treatment at a local hospital. Complaint (Dkt. No. 1) ¶¶ 26–30. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 56–57.[5] As a result of the incident plaintiff suffers from residual affects of the head injury including head and neck pain and memory loss. Complaint (Dkt. No. 1) ¶¶ 31–32, 38–40.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 28, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint are Michael Hogan, Ph.D ., Commissioner of the New York OMH; Donald Sawyer PhD., the Executive Director of the CNYPC; Terri Maxymillian, a licensed doctoral psychologist and the director of the SOTP;[6] Corey Connelly, the Chief of Security at the Center; Charmine Bill, R.N., a Registered Nurse and a treatment team leader at the CNYPC; William Owen, the Chief of Security at the CNYPC; and Regina Anderson, R.N., also a treatment team leader at the Center.[7] Complaint (Dkt. No. 1) ¶¶ 5–12; Defendants' Local Rule 7.1(a)(3) Statement ¶¶ 6–14. Plaintiff's complaint asserts a single cause of action, complaining of defendants' failure to protect him from harm while involuntarily detained at the Center. *See generally* Plaintiff's Complaint (Dkt. No. 1).

Following joinder of issue and the completion of discovery, which included the taking of plaintiff's deposition, on October 6, 2009 the defendants moved for summary judgment dismissing plaintiffs claims in their entirety. Dkt. No. 34.Despite passage of the October 26, 2009 deadline for responding, plaintiff has failed to file any papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

**A.** *Plaintiffs Failure to Oppose Defendants' Motion*

**\*82** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiffs complaint. This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

**\*3** N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at \*1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.).[8] Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

It should also be noted that the plaintiffs failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[9] *See Elgamil v. Syracuse Univ.,* No. 99–CV–

611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[10]

**B.** *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 **S.Ct.** 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

**\*83** **\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiff's are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348,

1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## C. Merit's of Plaintiff's Claim

The essence of plaintiff's claim is that the defendants failed to take appropriate measures to protect him from harm at the hands of the fellow patients who attacked him during the course of the two incidents at issue. In their motion, defendants maintain that no reasonable factfinder could conclude, when applying the requisite standard, that defendants violated plaintiff's constitutional rights during the course of those events.

Plaintiff's claim in this action purports to be brought under both the Eighth Amendment and the due process clause of the Fourteenth. The Eighth Amendment prohibits cruel and unusual punishment of those convicted of crimes. *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 2456, 73 L.Ed.2d 28 (1982). When plaintiff was released by the DOCS into the SOTP program at the Center, he had completed serving his prison term, subject to release on parole, and was no longer a prison inmate; as such, the Eighth Amendment is not applicable under the circumstances. *Id.* Plaintiff's claims are therefore subject to analysis under the due process clause of the Fourteenth Amendment. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases).

**\*84  \*5** Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg,* 457 U.S. at 315–16, 102 S.Ct. at 2458. "The

Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.' " *Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). Plaintiff's claim of failure to protect, although framed as arising under the Eighth Amendment, relates to allegedly unsafe conditions encountered while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

The Second Circuit has yet to articulate the proper standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter. The Supreme Court "established [in *Youngberg* ] that involuntarily committed mental patients have substantive due process rights, ... [and] ... held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y.Sept.20, 2005) (quoting *Youngberg,* 457 U.S. at 323). In *Vallen,* the court examined *Youngberg* and whether the substantial departure standard evolving from that decision should be applied where the plaintiff, who was a patient involuntarily committed to the Mid–Hudson Forensic Psychiatric Facility, alleged that he was subjected to violence and that the defendants, security hospital treatment assistants, failed to prevent those incidents. Distinguishing *Youngberg,* the court stated that

> [u]nlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

*Vallen,* 2005 WL 2296620, at *8.

The court in *Vallen* went on to acknowledge that the general approach to substantive due process claims asserted under section 1983 requires that a plaintiff show that the defendants' actions, taken under color of state law, involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level." 2005 WL 2296620, at *8 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 1718, 140 L.Ed.2d 1043 (1998)). Ultimately, however, the court suggested that this test would result in an unduly heavy burden being placed upon a plaintiff and also would be inconsistent with the state's central role in supervising and caring for the involuntarily committed. *Id.* at *9. Instead, citing *Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees, the court suggested its agreement with the "deliberate indifference" standard employed in such circumstances by the Eighth Circuit.[11] *Id.* at *9 (citing *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004)).

**\*85 \*6** In *Dove v. City of New York,* a claim similar to that now raised by McChesney was interposed by the plaintiff, another involuntarily committed individual, arising out of altercations with other patients. Rejecting the applicability of the Eighth Amendment to the plaintiff's circumstances, the court likewise acknowledged the lack of certainty as to whether the claim against the defendants should be measured by a "substantial departure" or "deliberate indifference" standard. *Dove v. City of New York,* No. 03–CV–5052, 2007 WL 805786, at *8 (E.D.N.Y. Mar. 15, 2007). Citing *Vallen,* the court failed to reach the issue of which standard would apply, finding that under either no reasonable factfinder could conclude that defendants violated plaintiff's constitutional rights. *Id.*

I am inclined to agree with the *Vallen* court's conclusion that the "standard of 'deliberate indifference' " best accommodates the constitutional concerns implicated in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[12] *Vallen,* 2005 WL 2296620, at * 9. Deliberate indifference, for purposes of the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference."

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970 1979, 128 L.Ed.2d 811 (1994); *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In lewis, the Court equated deliberate indifference for substantive due process and Eighth Amendment purposes." *Moore,* 381 F.3d at 774 (citing *Lewis,* 523 U.S. at 849–40, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

As in *Vallen* and *Dove,* however, I find it unnecessary to resolve the issue of which standard may here be appropriate since under any of the potentially applicable standards plaintiff's claim of failure to protect must fail. Plaintiff's complaint describes two occasions on which he was allegedly assaulted or attacked by other patients while at the CNYPC. There is no evidence that prior to those incidents plaintiff complained with regard to either of the other civilly committed individuals involved. Nor is there any indication in the record, including the extensive notes of plaintiff's daily treatment, of circumstances which should have alerted the defendants and others at the Center to the potential for danger. Accordingly, regardless of which standard is ultimately applied, there is no evidence in the record suggesting that any defendant knew of and disregarded a serious risk of harm to plaintiff, or that any defendant substantially departed from accepted practices or standards, and no reasonable factfinder could conclude that defendants' actions deprived plaintiff of a constitutionally-protected right. I therefore recommend dismissal of plaintiff's claims on the merits.

**D.** *Personal Involvement*

**\*86 \*7** In their motion, defendants also assert that McChesney's claims against them are subject to dismissal based upon his failure to alleged their personal involvement in the claimed failure to protect him from harm.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Many of the defendants named in plaintiff's complaint are nowhere referenced in the body, which contains the factual allegations giving rise to his claims. Certain of them appear to have been named exclusively based upon their supervisory capacities. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can only be established where that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

The only named defendants against whom specific allegations of fact are made are defendants Bill, Owens, and Maxmillian. Plaintiff alleges that following the first incident, defendant Bill arrived on the scene and, after discussing the incident, sent him back into the day room where he was again assaulted, although by a different individual. Complaint (Dkt. No. 1) ¶ 19. Plaintiff further alleges that defendant Bill placed plaintiff's antagonist back in the same ward as plaintiff, although there is no allegation that any further incidents involving that person thereafter occurred. *Id.* ¶ 36. These allegations fail to suffice with regard to establishing defendant Bill's personal involvement in a failure to protect the plaintiff from harm.

**\*87** Defendant Terry Maxmillian is also specifically referenced in plaintiffs complaint, but only as having ordered defendant Bill to remove plaintiff from Ward 304 after the individual who had previously attacked him was reassigned there. *Id.* ¶ 47. This allegation does not form an integral part of plaintiffs failure to protect claims.

**\*8** The sole remaining defendant named in the body of plaintiffs complaint is defendant Owens who, it is alleged, was assigned to take photographs of the plaintiff following the first incident. Complaint (Dkt. No. 1) ¶ 23. Once again, this does not appear to implicate defendant Owens in any claimed failure to protect McChesney from harm.

It is true that, in a wholly conclusory fashion, plaintiff alleges at one point in his complaint that "[u]pon information and belief, Defendants knew or reasonably should have known, from the Single Detail Progress Notes in both [the second assailant's] and [the third attacker's] clinical records what each of them did to vulnerable people, as if the people were victims of prey." Complaint (Dkt. No. 1) ¶ 43. This is allegation, however, falls in the category of potentially shocking, but since it is lacks any factual support, it has no meaning. *Barr v. Abrams,* 810 F.2d 358, 363 (2d cir.1987).

Simply stated, plaintiff's complaint does not contain sufficient factual allegations establishing plausible claims of personal involvement in his failure to protect cause of action on the part of any of the defendants named in his complaint. I therefore recommend dismissal of plaintiff's claims against each of the defendants on this independent, alternative basis.

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint asserts that defendants failed to protect him from known harm while confined within the CNYPC to receive sex offender treatment. The record now before the court, however, contains no evidence from which a reasonable factfinder could conclude that the defendants knew or should have reasonably been aware of the exposure of plaintiff to danger, and that they were deliberately indifferent to that potential threat. The record also fails to establish a basis to conclude that any of the defendants in this case should be held personably liable for the constitutional deprivations alleged. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED, and that plaintiff's complaint in this action be dismissed in all respects, with leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

2005 WL 2296620 Only the Westlaw citation is currently available. United States District Court, S.D. New York.

Barry Lee VALLEN Plaintiff,

v.

S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson; S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A. Brown; S.H .T.A. Jones; and Various S.H.T.A. John Does, Defendants.

No. 02 Civ. 5666(PKC). | Sept. 20, 2005.

***MEMORANDUM AND ORDER***

**\*88** CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant to 42 U.S .C. § 1983, alleging that he was the victim of multiple patient-to-patient assaults and deprivations of property during the time that he resided at the Mid–Hudson Forensic Psychiatric Center ("Mid–Hudson"), a facility operated by an agency of the state of New York. In a Memorandum and Order dated September 2, 2004, I dismissed defendants New York State Office of Mental Health and Mid–Hudson on the basis of the state's constitutionally-based immunity from suit. *Vallen v. Mid–Hudson Forensic Office of Mental Health,* 2004 WL 1948756 (S.D.N.Y. Sept.2, 2004). I concluded that the Complaint set forth allegations sufficient to state claims against the individual defendants for deliberate indifference to confinement conditions that were seriously and dangerously unsafe. *Id.* at \*3. I held that plaintiff's claim did not arise under the Eighth Amendment because he was not serving a term of imprisonment pursuant to a conviction, but, generously construed, his *pro se* Complaint could be read as alleging that persons acting under color of state law had deprived him, as an involuntarily detained person, of rights protected by the Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants have moved for summary judgment dismissing the plaintiff's claims. For the reasons explained below, the defendants' motion is granted.

***Background***

The following facts are taken from plaintiff's pleadings, his sworn deposition testimony or are otherwise not disputed. Where multiple inferences canbe drawn from the facts, I have considered only the one most favorable to Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of second-degree murder in connection with the death of his parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty by reason of mental illness or defect and was diagnosed as a paranoid-schizophrenic. (Vallen Dep. at 169–71) A Justice of the New York Supreme Court, Orange County, found that, at that point in time, the plaintiff suffered from a dangerous mental illness and ordered that he be committed to a psychiatric facility. (Vallen Dep. at 170) Subsequently, plaintiff was discharged to outpatient care on two occasions, but in each instance he was later recommitted. (Vallen Dep. at 172–84) From April 18, 1997 through June 14, 2000, plaintiff was an inpatient at Mid–Hudson (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B. Mukasey dismissed plaintiff's deprivation of property claim and ruled that the State of New York provided adequate post-deprivation remedies for the recovery of lost property. (July 22, 2002 Order at 3) He also ruled that the Complaint inadequately detailed the assault claims, and dismissed those claims without prejudice. (July 22, 2002 Order at 2, 4–5) Plaintiff filed an Amended Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment at Mid–Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-today needs and activities. (DeLusso Aff. ¶¶ 2–3)

**\*89 \*2** Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid–Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided

at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accordMatsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. SeeFed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

**\*90 \*3** The defendants have served the *pro se* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56. 2. I am mindful of the latitude afforded to a *pro se* party opposing a summary judgment motion. See*Forsyth,* 409 F.3d at 570 ("special solicitude" owed to *pro se* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ.,* 2003 WL 21983025, at \*5 (S.D.N.Y. Aug.20, 2003) (obligation to construe leniently *pro se* opposition papers on a summary judgment motion). However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, at \*9 (S.D.N.Y. Aug.25, 2004).

### Discussion

### 1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997). The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action .' " *Id.* (quoting *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980)).

This action was filed in the *pro se* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the

delivery to the *prose* office on December 10, 2001. *See* *Ortiz v. Cometta,* 867 F.2d 146 (2d Cir.1999); *Toliver v. Sullivan County,* 841 F.2d 41 (2d Cir.1988). It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. *See* *Doe v. Holy See (State of Vatican City),* 17 A.D.3d 793, 794, 793 N.Y.S.2d 565 (3d Dep't 2005); *Assad v. City of New York,* 238 A.D.2d 456, 457, 656 N.Y.S.2d 669 (2d Dep't 1997).

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am.,* 55 N.Y.2d 543, 450 N.Y.S.2d 457, 435 N.E.2d 1072 (1982). The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". *Id.* at 548, 450 N.Y.S.2d 457, 435 N.E.2d 1072. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548–549, 450 N.Y.S.2d 457, 435 N.E.2d 1072. New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. *See, e.g.,* *Eberhard v. Elmira City School Dist.,* 6 A.D.3d 971, 973, 775 N.Y.S.2d 431 (3d Dep't 2004) (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York,* 294 A.D.2d 177, 178, 742 N.Y.S.2d 39 (1st Dep't 2002) ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*91 \*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume for the purposes of this motion that, during

the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff, Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical attack. [2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y..Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y..Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS). [3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y..Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *prose,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. *Cf.* *Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813, 604 N.Y.S.2d 543, 624 N.E.2d 680 (1993)

(considering, inter alia, the numerous lawsuits filed by the party claiming toll in rejecting such a claim).

**\*92  \*5** In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56. 2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

To the state employees who are named as individual defendants in plaintiffs Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has felt aggrieved.

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City),* 17 A.D.3d at 794, 793 N.Y.S.2d 565; *Assad,* 238 A.D.2d at 457, 656 N.Y.S.2d 669. However, there remains the question of which incidents occurred more

than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid–Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid–Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219–20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56–59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*93  \*6** The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001.[4] The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's action is dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *See Jute v. Hamilton Sanstrand Corp. .,* Docket No. 04–3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

## 2. *Lack of Showing of a Defendant's Personal Involvement*

The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *SeeColon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may not be anchored in a theory of *respondeatsuperior.Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid–Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11–12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and

*94 3.[5] (Vallen Dep. Tr. at 106–07) As such, his claims arising from this incident (No. 4) are dismissed.

*7 The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120–21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid–Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10–11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation. *Cf. Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid–Hudson patient, A.A., had a long history of attacking people, and that Mid–Hudson staff intentionally placed A.A. in the plaintiffs proximity. (AC at 15–16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15–16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid–Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N, kicked and punched him, and that staff members laughed because N. was an older man. (AC at 24–25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched

him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid–Hudson staff who were involved in these incidents. As a result, all claims arising from these three incidents (Nos.14–16) are dismissed as to all defendants.

### 3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

**\*95 \*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323.This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively valid." *Id.* In defining its use of the term "professional",

the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs. [6] In *Lewis,* the Court reasoned:

**\*96 \*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *SeeDeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See, e.g., Lombardo v. Stone,* 2001 WL 940559, \*7 n. 7 (S.D.N.Y. Aug.20, 2001) (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth

Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same: no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) setforth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89–96; AC at 9–10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C. J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and

restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

 ***97 *10** Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid–Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20–21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See, e.g., Rodriguez v. Ames,* 287 F.Supp.2d 213, 219–20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept.11, 1997) ("plaintiffs claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf.Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid–Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown

attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid–Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor.' In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *seealsoGallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994)* ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9–10; Vallen Dep. Tr. at 97–98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff s claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

### 4. *Qualified Immunity and Law of the Case*

**\*98 \*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

### *CONCLUSION*

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

### *APPENDIX TO MEMORANDUM AND ORDER IN VALLEN V CARROL, 02 CIV. 5666(PKC)*

### 1. *Allegations Based on Events that Occurred During Plaintiffs First Few Months at Mid–Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid–Hudson Forensic-within a few months of April 8, 1997. (Vallen Dep. Tr. 216, 219–20)

### 2. *The First Patient C.J. Allegation*

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89–91, 95–96; AC at 9–10)

### 3. *The Patient S.W. Allegation*

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9–10)

### 4. *The Second Patient C.J. Allegation*

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where

plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11–13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106–07)

**5.** *The Third Patient C.J. Allegation*

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120–21)

**6.** *The Fourth Patient C.J. Allegation*

**\*99 \*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10–11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

**7.** *The Patient A.A. Allegation*

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15–16)

**8.** *The Allegation Against SHTA Leper*

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16–17)

**9.** *The "Reshawn" Allegation*

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17–21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37–38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222–23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff, Exh. C, at 1)

**10.** *The Gantz Bathroom Allegation*

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21–22; Vallen Dep. Tr. at 56–59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56–57; Peeples Aff, Exh. C, at 1)

**11.** *The SHTA March Bathroom Allegation*

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

**12.** *The SHTA Brown Allegation*

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

**13.** *The SHTA Malfatone Water Allegation*

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231–32)

**14.** *The Patient N. Allegation*

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24–25) Plaintiff cannot identify the staff members. (AC at 24–25; Vallen Dep. Tr. at 233–35)

**15.** *The $35.00 Allegation*

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235–39)

**16.** *The Patient B. Bathroom Allegation*

**\*100 \*13** Patient B. punched plaintiff in the bathroom, and plaintiff chased patient B. out of the bathroom. (AC at 25) Unidentified staff saw plaintiff chasing patient B, but did not see patient B. assault plaintiff in the bathroom. (AC at 25; Vallen Dep. Tr. at 238–39)

2012 WL 1995839 Only the Westlaw citation is currently available. United States District Court, N.D. New York.

Willie James YELDON, Plaintiff,

v.

Donald SAWYER, Director; James Morgan, Director; Maxmillian, Dr., Director; Bill Charmain, Treatment Leader; [1] Kumar Bahl, Dr., Physical; Brennan, T.A.; Fairbrother, T.A.; Espinosa, T.A.; Searcy, T.A.; Crocket, Nurse; Forstie; Frazier, T.A.; Fical, T.A.; Pirachia, T.A.; [2] Ashley, T.A.; McCann, T.A.; Leonard, T.A.; Parrish, T.A .; Gray, N.A.; Delmedico, N.A.; Brett Davis, T.A.; Hollenbeck, T.A.; Donna Nardozza, Nurse; Lauren Barrett, Nurse; Nurse Media, [3] Defendants.

Civ. No. 9:10–CV–266 (TJM/RFT). | April 26, 2012.

**Attorneys and Law Firms**

Willie James Yeldon, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Dean J. Higgins, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants. [4]

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Willie James Yeldon, who is currently confined at the Central New York Psychiatric Center, commenced this action pursuant to 42 U.S.C. § 1983, alleging that the Defendants used excessive force against him and failed to protect him from the use of such excessive force. Dkt. No. 1, Compl. Defendants now bring a Motion for Summary Judgment under Federal Rule of Civil Procedure 56. Dkt. Nos. 41 & 45. Plaintiff opposes the Motion Dkt. No. 47.For the reasons that follow, this Court recommends that Defendants' Motion be granted in part and denied in part.

### I. BACKGROUND

The following facts were derived mainly from the Defendants' Statement of Material Facts, submitted in accordance with this District's Local Rules of Practice, which was not specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) ("*The Court shall deem admitted any*

*facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*" ) (emphasis in original). [5]

At all times relevant to the claims included in the Complaint, Plaintiff was under civil commitment and participating in the sexual offender treatment program at the Central New York Psychiatric Center ("CNYPC") located in Marcy, New York. Dkt. No. 41–2, Defs.' Statement Pursuant to Rule 7.1(a)(3) [hereinafter "Defs.' 7.1 Statement"], at ¶ 1. On November 18, 2009, Plaintiff was moved from Ward 305 to a holding ward side room in Ward 604 for disciplinary reasons and was kept there until the other residents returned from recreational activities. *Id.* at ¶¶ 15–16.Plaintiff initially resisted his transport to the holding ward by refusing to move, but he eventually consented. SeeDkt. No. 45–1, Pl.'s Dep., at pp. 24–25.Plaintiff was very upset that he had to wait in this side room. Defs.' 7.1 Statement at ¶ 17.

**\*101** At approximately 6:30 p.m., Plaintiff was escorted back to Ward 305 by various Secure Care Treatment Assistants ("TA"), TAPiracha, and Nurse Madia. *Id.* at ¶ 18; Pl.'s Dep. at p. 28.0n the elevator, Plaintiff told Defendant Piracha that he "didn't want him in [Plaintiff's] face," and when they arrived on Ward 305, Defendant Madia told Plaintiff to go into the side room. Pl.'s Dep. at pp. 28–29; Defs.' 7.1 Statement at ¶ 19.

Plaintiff claims that when he was in the side room of Ward 305, Defendant TA Davis came into the side room and called in "all of the other [D]efendants ... [who] rushed in and threw [Plaintiff] to the floor, started kicking [him] and beating [him]." Pl.'s Dep. at p. 33; *see also* Defs.' 7.1 Statement at ¶ 22. Plaintiff claims this beating lasted about twenty minutes. Defs.' 7.1 Statement at ¶ 35.

Defendants submit evidence claiming that Plaintiff was very upset at his confinement in the side room on Ward 305 and was arguing with Defendant Piracha and loudly threatening the CNYPC staff. *Id.* at ¶¶ 21 & 25–26. After Piracha left the side room and stood in the hallway, out of Plaintiff's sight, Plaintiff started screaming, "I'm going to kill that little m-f-er" and attempted to push the door to the hallway open. Dkt. No. 41–16, Nicholas Hollenbeck Decl., dated Sept. 21, 2011, at ¶¶ 19–30. As Plaintiff "pointed to Piracha," and screamed, "I'm going to kill that m-f-er," he punched Defendant Hollenbeck in the left ear. *Id.* at ¶¶ 30–31; Defs.' 7.1 Statement at ¶ 30. Other TAs, including Defendant McCann, responded and grabbed Plaintiff and took him to the ground, but it "wasn't a hard takedown." Hollenbeck Decl. at ¶¶ 32–34 & 39; Defs.'

7.1 Statement at ¶¶ 31–33. Plaintiff struggled hard until he was placed in restraints on the bed in the room. Hollenbeck Decl. at ¶¶ 41–46.

**\*2** Conversely, Plaintiff testified that he did not punch nor hit any of the staff, and that he did not have any particular problem with Defendant Piracha, but rather that the Defendants gathered on this occasion as a "beat-up crew" to assault the Plaintiff. Pl's Dep. at pp. 34–35, 41 & 64. He claimed that he saw "all of the other defendants listed in [his][C]omplaint" in or around the side room on Ward 305. *Id.* at p. 39. He also claims that Defendant Madia was the "boss," such that she would give TAs directions, and that Madia, Crocket, Forstie, Gray, and Delmedico were present but did not hit Plaintiff, and instead "looked the other way and let [the abuse] happen." *Id.* at pp. 36–37 & 42. In his deposition, Plaintiff specifically names Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann, and Nardoza as participating in the attack. *Id* at pp. 43–46. He states that Charmaine Bill, Maxymillian, Morgan, and Sawyer were not present at the time of the assault, and that he sued them solely because of their supervisory roles. *See id.* at pp. 43–47. He did not know who Defendant Barrett was when asked during his deposition. *Id.* at p. 44.

 **\*102** Lastly, Plaintiff claims that Defendant Dr. Bahl administered medication to him while he was in restraints. *Id.* at p. 47. However, Defendants submit evidence that Dr. Bahl did not see Plaintiff after he was transferred from Ward 604 back to Ward 305, nor did he have any role in Plaintiff's restraints or medication. *See* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011. The evidence shows that Plaintiffs injuries are relatively minor. *See* Pl.'s Dep. at pp. 62–64 (describing headaches treated with pain medication, swelling and bruises that have gone away, and a treatment of ointment for abrasions on Plaintiffs legs); Defs.' 7.1 Statement at ¶ 36. Plaintiff refused any medical evaluation or treatment after he was released from his restraints, but wanted his "slightly swollen" left ear area and "superficial abrasions [that looked liked] scrapes as if from going up a ladder" on his right lower leg documented. *See* Dkt. No. 41–19, Stephanie Oldick Decl., dated Sept. 26, 2011.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d at 54 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*3** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998)." [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d

169, 173 (2d Cir.1995). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001).

## B. Unserved Defendants

**\*103** Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [6] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, dismissing the case without prejudice as to that defendant. *Id.*

In this case, there is no indication that Defendants Crocket or McCann have been properly served. *See* Dkt. Nos. 11, Summons Returned Unexecuted as to Crocket, McCann, & 29, Summons Again Returned Unexecuted as to Crocket. In a Letter–Motion and Notice of Appearance, Dean Higgins, Esq., Attorney for the Defendants, notified Plaintiff and this Court that Defendants McCann and Crocket-as well as Defendant Nardozza-"no longer work at the Central New York Psychiatric Center," and that their whereabouts were unknown. *See* Dkt. No. 15.

More than the required 120 days have passed since the complaint was filed herein. Further, the Discovery deadline in this litigation has expired as of June 19, 2011. Plaintiff has provided no explanation nor good cause for his failure to serve these Defendants. Under these circumstances, the claims against Defendants Crocket and McCann should be **dismissed** without prejudice to renew, pursuant to FED. R. CIV. P. 4(m).

## C. Excessive Force

**\*4** Plaintiff claims that on November 18, 2009, he was beaten, held in restraints, and administered medication against his will. Defendants maintain that only a modest amount of force was used to maintain order after Plaintiff attacked a TA, and thus they should be entitled to summary judgment.

As an initial matter, Plaintiff asserts that certain policies and restrictions imposed on him at the CNYPC amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff, however, was released by the New York State Department of Corrections and Community Supervision to CNYPC upon the completion of his prison term and thus is no longer a prison inmate. The Eighth Amendment, which prohibits the "cruel and unusual punishment of those convicted of crimes, is therefore not applicable under the circumstances." *Lane v. Carpinello,* 2009 WL 3074344, at * 18 (N.D.N.Y. Sept.24, 2009) (citing *Youngberg v. Romeo,* 457 U.S. 307, 312, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)). This does not mean that a patient involuntarily committed for treatment is without constitutional protections; rather, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed ... in unsafe conditions." *Youngberg v. Romeo,* 457 U.S. at 315–16 (1982). [7] Plaintiff's claims predicated upon violations of the Eighth Amendment are instead analyzed and evaluated under the Due Process clause of the Fourteenth Amendment. *See Lane v. Carpinello,* 2009 WL 3074344, at * 18 & *22 (citing *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar.15, 2007) and *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir.2001) for the proposition that "individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians"). However, the Eighth and Fourteenth Amendment tests that apply to the claims of excessive force are essentially the same. *See United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999) (citing *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

**\*104** To determine whether an excessive force violation occurred, the "core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. at 6–7 (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an excessive force claim, the plaintiff must show (1) objectively, that the defendants' actions violated "contemporary standards of decency," and (2) subjectively, that the defendants acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted). The Second Circuit has provided additional guidance in evaluating an excessive force claim in the non-prisoner environment, noting that the district court must consider

**\*5** the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm.... [I]f the force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective and it results in substantial emotional suffering or physical injury, then the conduct is presumptively unconstitutional.... [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury and serve no legitimate government purpose unquestionably shock the conscience.... [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251–52 (internal quotation marks and citations omitted).

Here, the record shows two conflicting views of what transpired in the side room on Ward 305. Plaintiff claims that a "beat-up crew" consisting of Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, McCann and Nardoza threw Plaintiff on the floor, punched and kicked him for about twenty minutes. *See generally* Dkt. No. 45–1, Pl.'s Dep. He was then placed in restraints, and Defendant Bahl administered medication to him against his will. *Id.* at p. 47. Plaintiff claims his injuries consisted of a swollen ear and his shin being scraped. *Id.* at pp. 62–64; *see also* Dkt. No. 41–4, Ex. A, Investigative Report, at pp. 85–87 (photos taken of the Plaintiff's injuries). Defendants, on the other hand, submit considerable evidence that Plaintiff, agitated at being placed in the holding ward in Ward 604 during recreation time, verbally threatened the CNYPC staff, pushed open the door of the side room in Ward 305, shouted obscenities at Defendant Piracha, and punched Defendant Hollenbeck in the left ear. *See, e.g.,* Dkt. Nos. 41–10, Brett Davis Decl., dated Sept. 22, 2011; 41–16, Nicholas Hollenbeck Decl.; 41–19, Stephanie Oldick Decl.; & 41–21, Qasim Piracha Decl., dated Sept. 21, 2011. Further, many Defendants claim to have not been present on Ward 305 at the time Plaintiff was restrained. *See, e.g.,* Dkt. No. 41–8, Kumar Bahl, M.D., Decl., dated Sept. 21, 2011 (also stating he did not administer medication to Plaintiff); 41–12, Michael Fairbrother Decl., dated Sept. 21, 2011; & 41–22, Jason Searcy Decl., dated Sept. 25, 2011; *see also* Dkt. No. 41–23, Christopher Smith Decl., dated Sept. 22, 2011 (stating that he was on Ward 305 and "heard the commotion from the sideroom ... [but that Smith] remained where [he] was because there were enough staff with Resident Yeldon already and [he] was monitoring the dayroom"). Lastly, Defendants submit evidence that the abrasion on Plaintiff's left leg was self-inflicted and caused from picking a scab off. *See* Dkt. No. 41–15, Luis Hernandez, M.D., Decl., dated Sept. 21, 2011 (noting that Dr. Hernandez, who is not a Defendant in his action, examined Plaintiff while in restraints and did not find any injury, but later noticed red area on right shin that "appeared to be an old lesion that [Plaintiff] had picked the scab off").

**\*105  \*6** If the circumstances of Plaintiff's restraint were as Defendants' evidence states that they were, Plaintiff's claim should be dismissed on summary judgment as Defendants only used *de minimis* force for a limited period of time and only for the purpose of restoring order. However, if Plaintiff's sworn testimony in his deposition is to be believed, Defendants assaulted Plaintiff without any "reason, because [he] didn't do anything to them.... [Plaintiff] was complying with the rules." Pl.'s Dep. at p. 50.Despite Defendants' overwhelming evidence, a genuine issue of material fact exists as to whether "force was maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate government objective." *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d at 251. These two versions of the event are best reconciled by a jury, rather than by this Court on a summary judgment review. *See, e.g., Robbins v. Aetna Life Ins. Co.,* 2006 WL 2589359, at *10 (E.D.N.Y. Sept.8, 2006) ("In light of the conflicting ... evidence, the court finds that neither party has succeeded in eliminating any genuine issue of material fact, making summary judgment on the merits inappropriate."). Therefore, we recommend that Defendants' Motion for Summary Judgment be **denied** as it relates to Plaintiff's claim that Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl used excessive force in the Ward 305 side room.

This Court additionally notes that Plaintiff also claims that Defendants Hollenbeck and Piracha kick, beat, punched, hit, and "sexually harassed" him while he was in the side room in Ward 604, before being brought down to Ward 305. *See* Dkt. No. 1, Compl., at ¶ 52. In his Deposition, however, Yeldon explicitly stated that no one placed their "hands on [Plaintiff] or assaulted [Plaintiff] ... until [he] returned back to 305 Ward." Pl.'s Dep. at pp. 31–32.Plaintiff provides this Court with no other evidence regarding this assault allegation in Ward 604. Accordingly, because no issue of material fact exists such that a reasonable jury could find that Plaintiff was subjected to excessive force while he was in the side room of Ward 604, it is recommended that Defendants' Motion for Summary Judgment be **granted** as to any such claim.

**D. Failure to Protect**

Plaintiff also brings claims against Defendants Madia, Crocket, Forstie, Gray, and Delmedico, the medical staff at CNYPC, for failing to protect Plaintiff during the incident in Ward 305, who he claims instead "looked the other way and let [the abuse] happen." *See* Pl.'s Dep. at pp. 36–37 & 42.

As with excessive force claims, claims of failure to protect by patients who are involuntarily committed are analyzed within the framework of the Fourteenth Amendment, instead of the Eighth Amendment. *See, e.g., Beck v. Wilson,* 377 F.3d 884, 889 (8th Cir.2004) ("The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being.' ") (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (alterations in original)). However, the "Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter." *Lane v. Carpinello,* 2009 WL 3074344 at *18.

**\*106  \*7** As the Supreme Court established in *Youngberg,* "involuntarily committed mental patients have substantive due process rights, .... [and] held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient." *Vallen v. Carrol,* 2005 WL 2296620, *8 (S.D.N.Y. Sept.20, 2005) (quoting *Youngberg v. Romeo,* 457 U.S. at 310). However, some courts in this district have held that the general approach to substantive due process claims asserted under section 1983, which requires that a plaintiff show that the defendants' actions involved "conduct intended to injure [plaintiff] in some way unjustified by [any] ... governmental interest and most likely rise to the conscience-shocking level," would result in an unduly heavy burden being placed upon a plaintiff who is under the care and control of the state. *Id.* at *8–*9. Analogizing the plaintiff's rights to those of a pretrial detainee, these courts have suggested their agreement with the "deliberate indifference" standard employed in analyzing such circumstances. *See id.* at *9 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

We need not resolve this issue here, because whether the Defendants' actions are measured under the "conscience-shocking" and "substantial departure" standard or the "deliberate indifference" standard, the result is the same. The evidence posits two conflicting stories. If the Defendants' narrative and evidence is to be believed, Plaintiff was unruly, violent, and presented a danger to staff and to himself. In that situation, "failing to protect" Plaintiff from being restrained and administered medication would neither shock the conscience or consist of deliberate indifference towards Plaintiff's health or safety. However, if Plaintiff's answers in his Deposition are truthful, Defendants Madia, Crocket, Forstie, Gray, and Delmedico stood idle outside the Ward 305 side room while other CNYPC staff assaulted the Plaintiff, without provocation, for about twenty minutes. This action would violate both of the above-listed standards. The Court may not now, on a motion for summary judgment, "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury." *Nimely v. City of New York,* 414 F.3d 381, 390 (2d Cir.2005) (quoting *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995). Therefore, as with Plaintiff's claims of excessive force, we recommend that Defendants' Motion for Summary Judgment on Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico be **denied.**

**E. Personal Involvement**

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position. *See, e .g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown when:

**\*107  \*8** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in

supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873. [8]

Defendants contest that Defendants Maxymillian, Sawyer, Bill, and Morgan were personally involved in any of Plaintiff's alleged constitutional violations; rather, they were included by virtue of their supervisory positions only. Dkt. No. 41–24, Defs.' Mem of Law, at p. 15.All evidence in the record agrees with that contention. In his deposition, Plaintiff explicitly states that he included these Defendants in his lawsuit because they were "the head person[s] of the program" but were not "directly involved in the assault." Pl .'s Dep. at pp. 43–47.Our review of the record undisputedly establishes that Plaintiff has failed to show any direct participation by Defendants Maxymillian, Sawyer, Bill, and Morgan in the alleged violations, that the Defendants' policies allowed the continuance of constitutional violations, or that the Defendants were negligent in their supervision of subordinates. Therefore, Defendants' Motion for Summary Judgment should be **granted** and Plaintiff's claims against Defendants Maxymillian, Sawyer, Bill, and Morgan should be **dismissed** for want of personal involvement.

Likewise, Defendant Barrett should be **dismissed** from this action. In his Complaint, Plaintiff claims that Barrett was also present during the assault on him, and that Barrett wrote a note on November 19, 2009, stating that Plaintiff had refused to take his insulin medication. Compl. at ¶¶ 45 & 54. However, Plaintiff made no allegations against Barrett at his Deposition. *See* Pl.'s Dep. at p. 43.Plaintiff has submitted no evidence that Defendant Barrett was involved in any wrongdoing in his action, and accordingly, this Court recommends dismissal of any claims against him as lacking in personal involvement.

### F. Eleventh Amendment

Defendants also raise in their Motion for Summary Judgment dismissal of Plaintiff's claims made against them in their official capacity, pursuant to the Eleventh Amendment. *See* Defs.' Mem of Law at p. 6–7.

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although by its terms, the amendment bars suit by citizens of one State against another State, the Supreme Court has held that such amendment similarly bars suits against a State by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep'of of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the State, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing, *inter alia, Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer....").

***108 *9** In appropriate circumstances, the jurisdictional bar of the Eleventh Amendment may immunize a state official acting in his or her official capacity. *See In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007) (citationo mitted). However, under the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a suit may proceed against a state official in his or her official capacity-notwithstanding the Eleventh Amendment-when a plaintiff "(a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency,* 482 F.3d at 618 (quotations and citations omitted).

Here, Plaintiff seeks injunctive relief as well as compensatory damages against state employees. *See* Compl. at ¶ 55. Therefore, as state officials, Defendants cannot be sued in their official capacities in a claim for money damages. However, Plaintiff may seek monetary damages from them in their individual capacities. Further, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against

the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)). Accordingly, Defendants' Motion for Summary Judgment should be **granted** to the extent that Plaintiff asserts claims for monetary relief against them in their official capacities.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 41) be **granted in part** and **denied in part** as follows:

1. Defendants McCann and Crocket should be **dismissed** from this action based upon Plaintiff's failure to effectuate service of process within 120 days of the filing of his Complaint, pursuant to Federal Rule of Civil Procedure 4(m); 2. To the extent asserted, Plaintiff's excessive force claims against Defendants Ashley, Brennan, Davis, Espinosa, Fairbrother, Fical, Frazier, Hollenbeck, Leonardi, Parrish, Piracha, Searcy, Nardoza, and Bahl, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

3. To the extent asserted, Plaintiff's excessive force claims against Defendants Hollenbeck and Piracha, relating to an assault on Plaintiff in the side room in Ward 604, should be **dismissed;**

4. To the extent asserted, Plaintiff's failure to protect claims against Defendants Madia, Forstie, Gray, and Delmedico, relating to an assault on Plaintiff in the CNYPC side room of Ward 305, should survive Defendants' Motion;

5. To the extent asserted, Defendants Maxymillian, Sawyer, Bill, Morgan, and Barrett should be **dismissed** from this action based upon Plaintiff's failure to assert their personal involvement in any wrongdoing;

6. All causes of action seeking monetary relief should be **dismissed,** pursuant to the Eleventh Amendment, insofar as they are stated against the Defendants in their official capacities; and it is further

**\*109 \*10 ORDERED,** that the Clerk of the Court update the Docket to reflect the correct spellings of the names of Defendants Charmaine Bill, Qasim Piracha, and Marianna Madia; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2015 WL 710544

---

Footnotes

1   Plaintiff in this action is not a prisoner, but an involuntarily committed patient under the New York Mental Hygiene Law. N.Y. Mental Hygiene Law art. 10 (McKinney 2014).

2   Plaintiff's complaint (Dkt. No 1) describes these incidents as occurring over at least three days, while his response (Dkt. No. 21) describes the same incidents as occurring over two days.

3   Plaintiff does not mention Defendant Frazier until this point in his complaint.

4   Plaintiff contradicts himself and alleges that Defendants Tucker and Frazier, "as well as many residents did [write] notes, and letters concerning being fearful for Gonzalez threatening everyone." (Dkt. No. 1 ¶ 9.)

5   Plaintiff does not specify the date on which Gonzalez hit him with the chair.

6   A pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint-to the extent those papers are consistent with the allegations in the complaint. *See Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam); *Gill v. Mooney,*

*824 F.2d 192, 195 (2d Cir.1987); Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.), *amended on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

7    Plaintiff also states that as "the CQC Report by the Quality Care and Advocacy Agency clearly shows, the ... Central New York Psychiatric Center made [ ]and did minimum reports, but did not do any Documentations on Reported Staff assaults on Residents, and did not do any Investigations, or Investigation Reports, or file any documentation follow up reports on staff assaults on Residents." (Dkt. No. 21 at 4–5.)

8    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

9    "Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the ['professional judgment standard'] has no applicability." *Vallen,* 2005 WL 2296620 at *8.

1    Because plaintiff was a pre-trial detainee, his conditions of confinement is analyzed under the due process clause of the Fourteenth

1    Defendants Jewish Board of Family & Children Services, the owners of the Maple Street Residence, Jeffrey Clark, Arlene Bishop, Esther, the Staff at Maple Street, Lionel Young, and Abbot Laboratory of Illinois are no longer parties to this action.

2    Plaintiff failed to serve the unidentified staff and patients named in the complaint. Thus, those defendants have not appeared in the instant action.

3    Defendants submitted a statement, pursuant to Local Civil Rule 56. 1, which asserts material facts that they claim are undisputed in this case. Defendants also complied with Local Civil Rule 56. 2 by providing notice to plaintiff that he is not entitled simply to rely on allegations in his complaint, but to submit evidence, including sworn affidavits, witness statements and documents to respond to the motion for summary judgment, pursuant to *Fed.R.Civ.P. 56(e).* (*See* Dkt. Entry # 84.) This action provided actual notice to plaintiff of the consequences of noncompliance with the requirements of *Fed.R.Civ.P. 56.* See, e. g., *Irby v. N.Y. Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of *Rule 56....* [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with *Rule 56,* vacatur of the summary judgment is virtually automatic"). Although plaintiff did not respond to defendants' *Rule 56.* 1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56. 1). Therefore, where the Court cites to defendants' *Rule 56.* 1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre–Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006) (deeming facts in defendants' *Rule 56.* 1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56. 2 and the court's review of the record did not reveal that there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Natl Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005) (deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56. 2 and where plaintiff did not submit evidence controverting those factual assertions).

4    The Hospital's records also indicate that, on June 22, 2002–the alleged date of the chair-throwing incident according to plaintiff–members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

5    There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident As discussed *supra,* the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation

indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent

6 The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's remaining submissions to the Court-that is, other than his response brief-fail to allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Deck, Ex. G.) Accordingly, the Court declines to address any such claim at this time.

7 Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17–503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. *See Sewell v. N.Y.C. Transit Auth.,* 809 F.Supp. 208, 217 (E.D.N.Y.1992) ( "[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

8 Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern, which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. See, *e.g., Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at *9–*10 (S.D.N.Y. Sept.30, 2002) (dismissing New York state statutory claims due to plaintiffs failure to file a notice of claim)

1 This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2 At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3 The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4 *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5 *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6 It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough

fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7   *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y.Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at 8–9 (S.D.N.Y.Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y.Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12   *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y.Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y.Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y.Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13   *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14   For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

**15** Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**1** In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *See Burtnieks v. City of New York,* 716 F.3d 982, 985–86 (2d Cir.1983) (citations omitted). It should be noted, however, that many of plaintiff's allegations regarding his case and treatment while at CNYPC are vigorously contested by defendants.

**2** Plaintiff was given a vision impairment assessment on July 22, 2005 while incarcerated at Sullivan Correctional Facility, and was diagnosed as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57–4), Exh. B. Defendants acknowledge the existence of one artificial eye, but state their belief that plaintiff is able to use his other eye to read, write, and operate a calculator. *See* Affidavit of Jeffrey Nowicki, LCSW–R ("Nowicki Aff.") (Dkt. No. 79–5) ¶¶ 10–11; Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62–3) ¶ 3.

**3** The CNYPC is a secure adult psychiatric center established within the New York State Office of Mental Health. Defendants' Statement Pursuant to Local Rule 7.1(a)(3) (Dkt. No. 79–2) ¶ 3.

**4** To protect plaintiff's privacy, and with the permission of the court, defendants filed plaintiff's records from CNYPC as well as those records from the Commission on Quality of Care and Advocacy traditionally and under seal as Exhibits D and E, respectively, to the Declaration of Dean J. Higgins, Esq. ("Higgins Decl."), Dkt. No. 79–4.

**5** The record is unclear as to whether the incident occurred on September 17 or 18, 2009. The parties agree, however, that plaintiff was involved in an altercation in the recreation yard during that period, as a result of which he later sought to pursue criminal charges.

**6** Plaintiff's deposition transcript, which was filed as Exhibit F to Defendants' Motion for Summary Judgment (Dkt. No. 79–7), will be referenced herein as "Tr."

**7** Plaintiff ultimately agreed to settle the matter through that channel. *See* Higgins Decl. (Dkt. No. 79–4) Exh. D, pp. 134–35.

**8** Defendant Nowicki asserts that the CNYPC staff was not aware that plaintiff needed protection and that it was actually the other residents who needed protection from the plaintiff. Nowicki Aff. (Dkt. No. 79–5) ¶ 17.

**9** The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in a Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations, and could result in unlimited keeplock or SHU confinement, with significant restrictions on access to exercise, showers, and other programs and privileges available in general prison population, and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. Although Lane appears to dispute their accuracy, parole records indicate that while in prison he was accused of sixty-one Tier III infractions and forty-one Tier II violations, including harassing, threatening, lewd, unhygienic and violent conduct, resulting in a total of approximately five years in keeplock, eight years of disciplinary SHU confinement and seven months of involuntary protective custody. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 153–80.

**10** Plaintiff stated during his deposition that approximately twenty staff members were present during the assault; as a result, he is unsure which defendants actually kicked and punched him. Tr. pp. 49–50.

**11** Defendant Beebe's name is incorrectly spelled as "Bebe" in the caption and throughout plaintiff's complaint. The court will respectfully direct the clerk to amend the caption to reflect the correct spelling of that defendant's name.

**12** The Correction Law requires that the prison superintendent first apply to the court for appointment of two examining physicians and then petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to the psychiatric hospital. *Harkavy,* 1 N.Y.3d at 612, 7 N.Y.3d 607, 825 N.Y.S.2d 702, 859 N.E.2d 508. In contrast, the requirements of MHL Article 9 do not necessitate that the examining physicians be appointed by the court, nor do they require either notice to the inmate or the opportunity for a hearing. *Harkavy,* 7 N.Y.3d at 612, 825 N.Y.S.2d 702, 859 N.E.2d 508. In the wake of *Harkavy,* on March 14, 2007, then-New York Governor Eliot Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the MHL, creating a new legal regime for committing sex offenders to mental health facilities for treatment in the SOTP.

13    Both the Full Faith and Credit Clause of the United States Constitution, see U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect that it would merit under the law of the state from which it originated. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 1889–90, 72 L.Ed.2d 262 (1982); *Burgos v. Hopkins,* 14 F.3d at 790. This principle applies fully to claims brought pursuant to 42 U .S.C. § 1983. *Migra,* 465 U.S. at 84–85, 104 S.Ct. at 897–98; *Allen v. McCurry,* 449 U.S. at 103–04, 101 S.Ct. at 419–20. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996). Since the state court determination upon which Lane rests his res judicata and collateral estoppel argument originated in New York, the law of that state controls in determining the extent of the preclusive effect of which *Harkavy* is deserving. *Giakoumelos,* 88 F.3d at 59; *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002); *LaFleur v. Whitman,* 300 F.3d 256, 271–72 (2d Cir.2002). It should be noted, however, that while the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the decision in *Harkavy,* this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel." *Marvel Characters, Inc.,* 310 F.3d at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n. 14 (2d Cir.2001)).

14    It is worth noting that the only named defendant who was even remotely involved in plaintiff's civil commitment was defendant Sawyer, to the extent that he signed the certification of service of a "Notice of Application for Court Authorization to Retain a Patient" on October 26, 2006, forty-four days after plaintiff was committed to CNYPC. *See* Higgins Decl. (Dkt 79–4) Exh. D, p. 391. Plaintiff has not named as defendants in this action any prison official who was involved in his commitment under the MHL. Because I ultimately recommend that such a claim against prison officials would be subject to dismissal based upon qualified immunity, I find that any attempt by plaintiff to amend his complaint to name such defendants would not cure this fatal substantive defect, and would therefore be futile. *Cuoco v. Mohtsugu,* 222 F.3d 99, 112 (2d Cir.2000).

15    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

16    As will be seen, defendants' Eleventh Amendment argument relating to plaintiff's claims under the ADA against defendants in their official capacities are not so easily discounted. *See* pp. 38–43, post.

17    In making my analysis I have assumed, without deciding, that plaintiff's failure to include the state the OMH, and/or the CNYPC as a named defendant is not fatal to his claims.

18    That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend XIV, § 5.

19    While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same...." *Vallen,* 2005 WL 2296620, at * 9.

20    Though endorsing *Vallen,* I respectfully disagree, to some extent, with the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been violated requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460. To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at. 849, 118 S.Ct. at 1718. Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S .Ct. at 1718. As the Lewis court explained,

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.
>
> *Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851–52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043). In discussing the concept of deliberate indifference in Lewis, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted). In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience-shocking in that environment.

21  laintiff testified at his deposition that other than the particular day in question, whenever he asked for medical treatment it was provided, and "[i]n fact, I would give them credit, that their attentiveness to patients' conditions, medical conditions is good." Tr. p. 36.

22  Plaintiff further alleges in his complaint, upon information and belief, that defendant Crociata "deliberately falsified official state documents with regards to plaintiffs [sic] request for medical attention." Complaint (Dkt. No. 1) p. 7, 11. To create a factual issue, the complaint must be based on personal knowledge, not on "mere 'information and belief or hearsay." *Cabassa v. Gummerson,* No. 01–CV–1039, 2006 WL 1559215, at *2 (N.D.N.Y.Mar.30, 2006) (Lowe, M.J.). Since plaintiff's speculative allegation is not supported by any evidence, and indeed, contradicts his own testimony that he saw Crociata and did not request treatment, the court has no reason to doubt the authenticity of CNYPC records.

23  Plaintiff claims that defendants violated 14 N.Y.C.R.R. § 27.7(a), a New York regulation regarding use of restraint and seclusion in institutional care. Review of this provision and the record before the court suggests that defendants fully complied with this regulatory provision. Even if they did not, however, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

24  To the extent that plaintiff also challenges the conditions experienced while in isolation, I find that such a claim would fall squarely within the test enunciated in *Youngberg.* The record shows that the decisions to place plaintiff in four point restraints, to isolate him and to release him were all made by a physician and effectuated in accordance with hospital policy. These decisions are entitled to deference, and are therefore presumptively valid. *Youngberg,* 457 U.S. at 322–23, 102 S.Ct. at 2461–62. While plaintiff disputes being provided with regular meals, he admits being provided at least one meal and offered liquids, and he has failed to come forward with any evidence demonstrating that the conditions of his confinement were a substantial departure from accepted professional judgment, practice or standards. *Id.* at 323, 102 S.Ct. at 2462; *Zigmund v. Foster,* 106 F.Supp.2d 352, 361–62 (D.Conn.2000). Accordingly, any claim by plaintiff that he was denied due process by the conditions of his isolation should also be dismissed as a matter of law.

25  Plaintiff testified that prior to his family providing him a magnifier in midOctober he was unable to litigate and challenge his illegal commitment. Tr. p. 62.

26  Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context. *See Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 WL 2543573, at *7 n. 6 (S.D.N.Y. June 25, 2008); *see also Samuels v. Stone,* No. 98 Civ. 776, 1999 WL 624549, at *4 (S.D.N.Y. Aug. 17, 1999).

**27**    In apparent recognition of some level of constraint necessarily imposed in institutional environments, courts have applied the standard applied to prison inmates to circumstances involving the involuntarily committed in claims relating to access to courts as well as retaliation. *See Lombardo,* 2008 WL 2543573, at * 6 n. 6; *Zigmund,* 106 F.supp.2d at 358.

**28**    Moreover, the record belies plaintiff's assertion that defendant Beebe failed to properly investigate the complaints made by plaintiff and his wife relating to plaintiff's treatment while committed at CNYPC. Defendant Beebe was assigned to investigate the complaints made by plaintiff and either engaged in personal phone calls or exchanged voice mail messages with plaintiff's wife on October 1, 2006, October 23, 2006, November 1, 2006, November 3, 2006 and November 7, 2006. Defendants' Response to Request for Admissions (Dkt. No. 62–3) ¶¶ 8–9. The record also shows that Beebe's investigation included a personal visit to CNYPC on November 21, 2006. Higgins Decl. (Dkt. No. 79–4) Exh. E, pp. 32–33.

**29**    Plaintiff's conclusory allegations that Carpinello and Sawyer were also made aware by repeated telephone calls are also insufficient. He fails to identify when and by whom such alleged telephone calls were made, whether he or someone on his behalf spoke to Carpinello or Sawyer, and if so, the substance of such alleged conversations.

**30**    Although defendants do not move to dismiss the claims against defendant Barboza, Director of the SOTP, for lack of personal involvement, it appears that the only basis for plaintiff's claims against her result from her supervisory role. The sole allegations made by the plaintiff relating to defendant Barboza are that he wrote two separate letters to her complaining of his circumstances at CNYPC. As noted above, these allegations, even if true, are insufficient to support liability against Barboza, *Porter,* 2009 WL 2386052, at *5, and I find that all claims against her should be dismissed for lack of personal involvement.

**31**    Plaintiff's complaint additionally alleges violation of 42 U.S .C. § 1984. No such provision exists.

**32**    Plaintiff's conspiracy claim, as alleged in his sixth cause of action, names Nowicki, Lucenti, Crociata, Menz, Coppola and Babula, all of whom were employed at the CNYPC. In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y.2002); *Griffin–Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10–11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). Plaintiff's conspiracy claim is thus also subject to dismissal on this basis.

**33**    Because I have already concluded that plaintiff has failed to allege any other constitutional violations during plaintiff's commitment at CNYPC, I have declined to address the defense of qualified immunity with respect to plaintiff's remaining claims.

**1**    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

**2**    Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community. *See* NY. Mental Hyg. Law § 10.01.

**3**    As will be seen, by failing to respond in opposition to defendants' motion, plaintiff is deemed to have admitted the facts set forth Defendants' Local Rule 7.1(a)(3) Statement. *See* pp. 8–9, *post.*

**4**    There exists some discrepancy in the record as to the date of the first incident. While plaintiff's complaint alleges that it occurred "[o]n or about March 23, 2008", see Complaint (Dkt. No. 1) ¶ 15, it appears more likely from defendants' submissions that it occurred on March 19, 2008. *See* Bill Decl. (Dkt. No. 34–8) ¶¶ 8–9; *see also* Higgins Decl. (Dkt. No. 34–9), Exh. A at p. 35 of 112.This potential discrepancy is meaningless for purposes of determining defendants' summary judgment motion.

**5**    The fellow patient who struck McChesney on the head was criminally prosecuted as a result of the assault, leading to a conviction and a sentence of six months of incarceration. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 34–1) ¶¶ 58–59.

**6**    Defendant Maxyimillian has submitted a declaration in support of defendants' motion. Dkt. No. 34–7.That declaration, however, is unsigned and therefore has not been considered by the court. *See* Dkt. No. 34–7.

**7**    Plaintiff's complaint also names "the treatment team", which is neither an individual nor a recognized entity amenable to suit. See, *e.g., Hoisington v. Co. of Sullivan,* 55 F.Supp.2d 212, 214 (S.D.N.Y.1999) (Stating that under New York law a department of a municipal entity is merely a subdivision of the municipality, having no separate legal existence and is not amenable to suit) (citations omitted).

**8**     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**9**     Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* See N.D.N. Y.L.R. 7.1(a)(3) (emphasis in original).

**10**     Included within defendants' motion papers was a notice to plaintiff advising him of the consequences of failing to respond to their summary judgment motion, in compliance with Northern District of New York Local Rule 56. 2.

**11**     While the court stated that it was "inclined to agree with the Eighth Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in that case that "whether the defendants' actions are measured under the 'conscience shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result is the same...." *Vallen,* 2005 WL 2296620, at *9.

**12**     Though endorsing *Vallen,* I respectfully question the court's reasoning in that case. At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis,* 523 U.S. at 845, 118 S.Ct. at 1716. Determining whether the right to due process has been abridged requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty. *Youngberg,* 457 U.S. 320, 102 S.Ct. 2460. To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis,* 523 at 846, 118 S.Ct. at 1717. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id* . at 849, 118 S.Ct. at 1718. Negligence is "categorically beneath the threshold of constitutional due process." *Id.* Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S.Ct. at 1718. As the *Lewis* court explained,

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. *Id.* Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

> The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding. In *Moore,* the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient. In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg,* or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs,* 381 F.3d 771. Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscienceshocking and violated one or more fundamental rights." *Moore,* 381 F.3d at 773. In addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical ... [and] ... [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.' " *Id.* (emphasis in original) (quoting *Lewis,* 523 U.S. at 851–52, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043).

> In discussing the concept of deliberate indifference in *Lewis,* the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis,* 523 U.S. at 851, 118 S.Ct. at 1719. Analogizing to *Youngberg,* the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n. 12, 118 S.Ct. 1719 n. 12 (internal citations omitted).

> In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience eshocking in that environment.

**1**     The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff, Ex. F)

**2**     To protect their privacy, all Mid–Hudson patients other than the plaintiff will be identified via their initials.

**3**     *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

**4**    Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

**5**    According to Donna DeLusso, director of Human Resources at Mid–Hudson, SHTA Nelson has not been employed by Mid–Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

**6**    In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Officials must take " 'reasonable measures to guarantee the safety of the inmates,' " including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294,297(1991)).

**1**    The record before the Court indicates that the correct spelling of this Defendant's name is Charmaine Bill. *See* Dkt. No. 15–1, Notice of Appearance.

**2**    The correct spelling of this Defendant's name is Qasim Piracha. *See* Dkt. No. 15–1, Notice of Appearance.

**3**    The correct spelling of this Defendant's name is Marianne Madia. *See* Dkt. No. 15–1, Notice of Appearance.

**4**    Dean J. Higgins, Esq., has appeared on behalf of the Defendants, *except* Defendants McCann and Crocket, who have not been served. *See infra* Part II.B.

**5**    In his Opposition to the Defendants' Motion for Summary Judgment, Plaintiff includes a section entitled "Statement of Facts ." *See* Dkt. No. 47 at p. 3. However, this section appears to contest only the Defendants' Memorandum of Law and the legal conclusions drawn thereof; it does not, as Local Rule 7.1(a)(3) requires, mirror the movant's Statement by matching numbered paragraphs, or set forth specific references to the record where the material fact is alleged to have arisen. Even a liberal reading of Plaintiff's "Statement of Facts" does not provide this Court with any specific factual allegations Plaintiff is either offering or contesting.

     In a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001). The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *See Giguere v. Racicot,* 2002 WL 368534, at *2 (N.D.N.Y. Mar.1, 2002) (citing, *inter alia, Bundy Am. Corp. v. K–Z Rental Leasing, Inc.,* 2001 WL 237218, at *1 (N.D.N.Y. Mar.9, 2001)). Nothing in Rule 56 imposes an obligation on the Court to conduct an independent search and review of the record to find proof of a factual dispute. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002).

**6**    Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y .L .R . 4.1(b).

**7**    While Plaintiff does not allege that the conditions at CNYPC are unsafe, the same rationale applies to his general Eighth Amendment claims of freedom from cruel and unusual punishment due to excessive force and a failure to protect. *See, e.g., Youngberg v. Romeo,* 457 U.S. at 316; *Dove v. City of New York,* 2007 WL 805786, at *7 (S.D.N.Y. Mar.15, 2007) ("However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment.")

**8**    Several lower courts have struggled with the impact *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) had upon *Colon,* and specifically whether *Iqbal* calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009) (collecting cases). Because the Second Circuit has not yet issued a decision settling this matter, *Colon* remains good law.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5750998
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

John SUGGS, Andre Lane, Richard
Rosado, and Ryan Przesiek, Plaintiffs,
v.
Dr. Terri MAXYMILLIAN, Jeff Nowicki,
Peter Russell, and Ann Sullivan, Defendants.

No. 9:13–CV–359 (NAM/TWD).
|
Signed Sept. 30, 2015.

**Attorneys and Law Firms**

Bond, Schoeneck & King, PLLC, George H. Lowe, Esq., of counsel, Syracuse, NY, for Plaintiffs.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant New York State Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** Plaintiffs filed a *pro se* complaint on April 1, 2013. On March 28, 2014, United States Magistrate Judge Thérèse Wiley Dancks granted plaintiffs' request for appointment of counsel and stayed the remaining pretrial deadlines pending further order. On September 2, 2014, Magistrate Judge Dancks appointed Bond, Schoeneck & King, PLLC, as *pro bono* counsel for plaintiffs. On December 5, 2014, defendants made the instant motion (Dkt. No. 37) for summary judgment. On July 24, 2015, plaintiffs moved (Dkt. No. 51) for leave to file a first amended complaint.

Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Thérèse Wiley Dancks issued a Report and Recommendation (Dkt. No. 58) recommending that plaintiffs' motion for leave to file a first amended complaint be granted; that a new discovery scheduling order be issued; that defendants' motion for summary judgment be denied without prejudice to refiling after the conclusion of discovery; and that Clerk be directed to correct the docket to reflect changes in the parties. [1]

Objections to the Report and Recommendation were due on or before October 1, 2015. Defendants filed their objection on September 28, 2015. Plaintiffs' counsel has informed the Court that he does not intend to submit anything further. Therefore, the Court proceeds to address the Report and Recommendation and defendants' objections thereto. Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts *de novo* review.

Defendants oppose amendment of the complaint primarily on the ground of futility. The Court finds, however, as does Magistrate Judge Dancks, that plaintiffs have adequately shown that there are triable issues of fact regarding the claims in the proposed first amended complaint, and that plaintiffs are entitled to counseled discovery. On *de novo* review of Magistrate Judge Dancks' thorough Report and Recommendation, defendants' objection thereto, and the papers underlying both pending motions, the Court accepts the Report and Recommendation.

It is therefore

ORDERED that the United States Magistrate Judge Thérèse Wiley Dancks' Report and Recommendation (Dkt. No. 58) is accepted in its entirety; and it is further

ORDERED that plaintiffs' motion for leave to file a first amended complaint (Dkt. No. 51) is granted; and it is further

ORDERED that the Clerk's Office is directed to file plaintiffs' proposed first amended complaint (Dkt. No. 51–2, pp. 4–13) as the first amended complaint herein, and that it become the operative pleading in the case; and it is further

ORDERED that a new discovery schedule be agreed upon with Magistrate Judge Dancks; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 37) is denied; and it is further

ORDERED that the Clerk's Office is directed to correct the docket to show the substitution of Peter Russell, currently the Acting Executive Director of CNYPC, for former Executive Director Maureen Bosco, as a defendant in the case; the substitution of Ann Sullivan, currently the Commissioner of the New York Office of Mental Health, for former Acting Commissioner of the New York Office of Mental Health

Kristin Woodlock, as a defendant in the case; and the termination of Raymond Lagree as a plaintiff in the case.

**\*2** IT IS SO ORDERED.

### REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

Plaintiffs John Suggs ("Suggs"), Andre Lane ("Lane"), Richard Rosado ("Rosado"), Raymond Lagree ("Lagree"), and Ryan Przesiek ("Przesiek"), all of whom have been involuntarily confined in the Sex Offender Treatment Program ("SOTP") at the Central New York Psychiatric Center ("CNYPC") pursuant to Article 10 of the New York State Mental Health Law ("MHL"), commenced this civil rights action seeking injunctive and declaratory relief under 42 U.S.C. § 1983.[1] Dr. Terri Maxmillian ("Maxmillian"), Director of the SOTP; Jeffrey Nowicki ("Nowicki"), Chief of Mental Health Treatment Services for the SOTP at CNYPC; Maureen Bosco ("Bosco"), former Executive Director at CNYPC; and Kristin Woodlock ("Woodlock"), former Acting Commissioner of the New York Office of Mental Health ("OMH") were named as original Defendants.[2] In their pro se complaint, filed on April 1, 2013, Plaintiffs claim that their constitutional rights are being violated with regard to the denial of access to the courts, their conditions of confinement, and the free expression of their religious beliefs. (Dkt. No. 1.)

### I. PROCEDURAL BACKGROUND

Plaintiffs moved for appointment of counsel at the time they filed the complaint, and the Court denied the motion without prejudice on June 6, 2013. (Dkt. Nos. 7 and 8.) Defendants answered the complaint on August 16, 2013 (Dkt. No. 17), and the Court issued a Mandatory Pretrial Discovery and Scheduling Order ("Scheduling Order") on August 19, 2013. (Dkt. No. 19.) The Scheduling Order directed that discovery be completed by December 16, 2013, and that dispositive motions be filed by March 17, 2014. *Id.*

Plaintiffs filed a second application for appointment of counsel on August 27, 2013. (Dkt. No. 20.) In the application, Suggs stated that Plaintiffs were unable to prepare an adequate defense without access to a law library where they could properly research the law to respond to motions and

court orders. *Id.* at ¶ B. Suggs referenced the Scheduling Order and explained that Plaintiffs were at a big disadvantage in meeting the court imposed deadlines because they did not have access to the documents they needed, which were in Defendants' possession, and they did not have access to a copier. *Id.* at ¶ B 1–2. According to Suggs, Plaintiffs were not allowed to come together for legal discussions on the case because they were in separate buildings, and that in addition to having no access to a law library, they were not allowed access to a computer to research the law and prepare legal motions. *Id.* at ¶ B 3–4.

Suggs explained in his application that Plaintiffs had requested help from Mental Hygiene Legal Service ("MHLS") and been told that MHLS was not allowed to assist in the civil action that the only matters they could assist in were those under Article 10 of the MHL. *Id.* at ¶ C. According to Suggs, Plaintiffs did not have funds to pay for a lawyer. *Id.* Suggs requested that if the Court did not feel it necessary to appoint counsel, it order in the alternative that Defendants allow Plaintiffs access to one another and access to a law library or a computer on which they could do legal research.[3] *Id.* at ¶ D.

**\*3** Defendants filed a memorandum of law in opposition to Plaintiffs' application on September 11, 2013. (Dkt. No. 22.) Defendants argued that: (1) the Court was without jurisdiction to grant the alternative relief requested by Plaintiffs, i.e. access to one another and to a law library or computerized legal research, because CNYPC was a nonparty state agency entitled to Eleventh Amendment protection, *id.* at 3–4; (2) the request that Plaintiffs be allowed access to one another without staff oversight lacked merit because it would seriously interfere with the day-to-day operation of the facility and violate policies designed to maintain a safe and therapeutic environment, *id.* at 4–5; (3) MHL § 47.03, which specifically references MHL Article 9 but makes no reference to Article 10, "appeared" to authorize MHLS to provide legal services to Plaintiffs in this action, *id.* at 5; and (4) allowing Plaintiffs access to a computer to do legal research was contrary to CNYPC policy because in the past when CNYPC attempted to implement a computer laboratory, some residents made improper use of the computers, resulting in the decision that residents would generally not be allowed access to computers. *Id.* at 6–7.

The Court granted Plaintiffs' request for appointment of counsel by Decision and Order filed on March 28, 2014. (Dkt. No. 31). In that Order, the Court also stayed the remaining

pretrial deadlines pending further order. *Id.* By Order of September 2, 2014, the Court appointed the law firm of Bond, Schoeneck & King, PLLC, as pro bono counsel for Plaintiffs in the action. (Dkt. No. 33.) Approximately three months after appointment of pro bono counsel, Defendants moved for summary judgment.[4] (Dkt. No. 37.) Plaintiffs filed papers in opposition to Defendants' motion (Dkt. No. 39), to which Defendants replied. (Dkt. No. 40.) Plaintiffs' request to fde a sur-reply was granted. (Dkt.Nos.41, 42.)

Before filing the sur-reply, Plaintiffs' pro bono counsel requested additional time to file an amended complaint alleging unconstitutional conditions of confinement, a denial of access to the courts claim regarding the lack of a law library, and a religious freedom claim.[5] (Dkt. No. 43.) Plaintiffs have now moved for leave to file a first amended complaint (Dkt. No. 51) and have filed their sur-reply to Defendants' motion for summary judgment. (Dkt. No. 52.) Defendants have opposed Plaintiffs' motion for leave to file their proposed first amended complaint on futility grounds. (Dkt. No. 53.) Plaintiffs have filed a sur-reply in support of their motion to amend. (Dkt. No. 57.)

Both motions are presently before the Court. For reasons explained below, the Court recommends that Plaintiffs' motion for leave to file their first amended complaint be granted and that Defendants' motion for summary judgment be denied without prejudice to refiling after the conclusion of discovery.

## II. PLAINTIFFS' PRO SE COMPLAINT

**\*4** Plaintiff Suggs has been confined at CNYPC since September 9, 2009; Plaintiff Lane since August 25, 2006; Plaintiff Rosado since February 28, 2008; and Plaintiff Przesiek since December 13, 2006.[6] (Dkt. No. 1–2.) The allegations in Plaintiffs' pro se complaint (Dkt. No. 1) challenge the conditions of their confinement in CNYPC as violative of their due process rights under the Fourteenth Amendment, the denial of their right of access to court as violative of their First Amendment rights, and the denial of their First Amendment right to religious expression.

### A. Conditions of Confinement

#### 1. *Restraints Used During Transport*
According to Plaintiffs, when they are taken outside of the facility, they are handcuffed with a Department of Corrections black box, waist chains, leg shackles, and a short chain between the black box and leg shackles. (Dkt. No. 1 at 5–6.)

#### 2. *Communications*
Plaintiffs allege that they are not allowed to watch local news on television or to possess or read any news publication from within sixty-five miles of CNYPC. (Dkt. No. 1 at 6.) In addition, they are not allowed to possess or read the *New York Daily News,* the *New York Post,* the *New York City Village Voice,* or the *New York City Islamic News. Id.* at 5–6.

#### 3. *Personal Electronic Devices*
Plaintiffs claim that they are not allowed to possess personal televisions, phones, computers/laptops, MP3 players, and CDs, DVDs and their players. (Dkt. No. 1 at 6.)

#### 4. *Visitation*
Plaintiffs allege that visitors must call and request permission to visit them; can visit only on Saturdays regardless of the visitor's schedule; and cannot bring food into CNYPC or send food packages. (Dkt. No. 1 at 7.) Plaintiffs further allege that visits are denied/prohibited by the Treatment Team Leader without proper authorization by the treating doctor; visitation privileges are taken away for non-compliance with the program; and Plaintiffs are pat frisked before visits and strip searched after visits. *Id.* at 6.

#### 5. *Safety of Conditions*
Plaintiffs claim that they are deprived of the right to safe conditions that are free of physical and mental abuse and physical and chemical restraint, as well as the right to voice concerns without retribution. (Dkt. No. 1 at 7.) They complain of Secure Care Treatment Assistants being given "carte blanche" to punish using physical restraints and the Treatment Team depriving Plaintiffs of their constitutional rights without due process; searches without probable cause; arbitrary on the spot rules and rule changes by Secure Care Treatment Assistant II's to accommodate staff whims or moods; making Plaintiffs compliant through fear of physical abuse; and lack of ventilation and air-conditioning. *Id.* at 8.

#### 6. *Equal Protection*
Plaintiffs allege they are being denied equal protection by not being allowed personal typewriters, musical instruments, or bed clothes; not being allowed to work; having free access to the dayroom, sleeping room, gym/activity center, drinking

cups, books for entertainment, education and religious practices, and radios considered "privileges" that can be taken away as punishment; being denied/deprived of anything and everything for not participating in treatment; being denied advancement in treatment for not taking responsibility for unsubstantiated, uncharged, dismissed, vacated, and overturned crimes and convictions; being denied access to programs for not admitting to something not in the official record; having fewer rights as an involuntarily committed resident of CNYPC than as an inmate in the Department of Corrections and Community Supervision ("DOCCS") system; and being discriminated against by not having equal protection with regard to religious practice. (Dkt. No. 1 at 8–9.)

### 7. *No Board of Visitors Consisting of Staff and Non–Staff*

**\*5** According to Plaintiffs, CNYPC should have a Board of Visitors consisting of staff and non-staff members, one of whom should be a resident's family member. (Dkt. No. 1 at 9.)

## B. Denial of Access to Court

Plaintiffs also allege in their pro se complaint that they do not have access to a law library, they must use their own funds, stamps, and phone minutes to contact MHLS attorneys or private attorneys; MHLS attorneys were stripped of their ability to enter the building at will and can only see clients once a week and only by pre-scheduling with administration in writing; and when attorneys call, they are not allowed to speak to Plaintiffs if they are not on the ward. (Dkt. No. 1 at 7.)

## III. PLAINTIFFS' COUNSELED FIRST AMENDED COMPLAINT

As noted above, Plaintiffs, through their pro bono counsel, have moved to file a first amended complaint. The proposed first amended complaint (Dkt. No. 52–2 at 4–13) includes a claim for denial of access to the courts in violation of Plaintiffs First and Fourteenth Amendment rights, a number of conditions of confinement claims alleging the violation of their Fourteenth Amendment right to due process, and a First Amendment free exercise of religion claim.

## A. Denial of Access to the Courts

Both Plaintiffs' pro se complaint and proposed first amended complaint include claims for the denial of access to the courts. (Dkt. No. 52–2 at ¶ 10.) The denial of access to court claim asserted in the proposed first amended complaint, while

also alleging denial of a law library, provides significantly more factual detail regarding the unavailability of MHLS attorneys to assist Plaintiffs in pursuing their conditions of confinement claims. Plaintiffs allege that they sought the assistance of MHLS attorneys with regard to their conditions of confinement claims and that, upon information and belief, those attorneys were unable to assist them because of other responsibilities and obligations. *Id* . at ¶ 11. The allegation in the proposed first amended complaint is in accord with the statement in Suggs' application for appointment of counsel that MHLS was not allowed to assist in the civil action. (Dkt. No. 20 at C.)

According to Plaintiffs proposed first amended complaint, during the time they were seeking the assistance of MHLS attorneys, MHLS had a staff of approximately 35 attorneys, including management, who were to advise and represent inpatients at 193 different hospitals, developmental facilities, and other facilities spanning twenty counties in upstate New York. (Dkt. No. 52–2 at 12 and pp. 15–24.) Plaintiffs allege, upon information and belief, that since the enactment of the New York Sex Offender Management and Treatment Act in March 2007, MHLS attorneys have devoted much of their time to the Act's procedures aimed at confining persons who are believed to be "sex offenders requiring civil commitment," as codified in MHL Article 10, at the expense of MHLS' other work, and resulting in a drain on MHLS' resources. *Id.* at ¶ 13. Plaintiffs assert that given the unavailability of MHLS attorneys and Defendants' knowing and deliberate failure to provide a law library, they have been denied access to the courts during their involuntary commitment in violation of their rights under the First and Fourteenth Amendments. *Id.* at ¶¶ 11, 14.

## B. Conditions of Confinement Claims

**\*6** Plaintiffs proposed first amended complaint, as with their pro se complaint, contains a number of claims regarding conditions of confinement which Plaintiffs contend constitute a punitive system of detention in violation of the due process clause of the Fourteenth Amendment. (*See generally* Dkt. No. 52–2.)

### 1. *Failure to Provide Treatment*

Plaintiffs proposed Amended Complaint includes a claim for failure to provide treatment at CNYPC. (Dkt. No. 52–2 at ¶¶ 15–17.) Plaintiffs claim that they spend no more than six or seven hours per week in "treatment," that the treatment staff is not qualified to treat sex offenders, and that Plaintiffs remain

in the same treatment phase for years, during which time the substance of the treatment program is basically recycled. *Id.*

### 2. *Failure to Provide Training*

Plaintiffs allege that while in SOTP, assignments to facility employment opportunities are severely limited, and that Plaintiffs are provided with no vocational training, which was available to them while they were incarcerated in the DOCCS system. (Dkt. No. 52–2 at ¶¶ 18–19.) As a result of the lack of access to employment and vocational training, Plaintiffs are left wholly unprepared for re-entry into society, should they at some point be released from CNYPC. *Id.* at ¶ 20.

### 3. *Lack of Access to Media*

Plaintiffs claim that during their involuntary confinement at CNYPC, they are prohibited by Defendants from having access to personal television sets and other electronic devices they were allowed to own and use while incarcerated in the DOCCS system. (Dkt. No. 52–2 at ¶ 21.) In addition, Plaintiffs allege that in the DOCCS system, they were allowed to subscribe to and possess a wide range of printed material, including books, magazines, and newspapers. *Id.* at ¶ 22. At CNYPC, on the other hand, Defendants have allegedly imposed punitive and arbitrary restrictions on Plaintiffs' access to mainstream printed materials, including, among others, the *New York Post,* the *New York Daily News,* the *New York Islamic News, Esquire, Field & Stream, Flex, Men's Fitness, Rob Report, Rolling Stone, Sportsman Guide, Men's Health, Computer Gamer, Gentlemen's Quarterly, Go NYC, Democrat Chronicle, Maxim, Low Rider, Jet, ESPNThe Body Issue, Tattoo Life, Hunting Illustrated, Game Informer, National Geographic, North American Hunter, Rides, Cosmo, Vanity Fair, National Enquirer, Old Cars, Outdoor Life, Auto Trader,* and *Auto Locator. Id.* at ¶ 22.

Plaintiffs further claim that Defendants have adopted and enforced a policy that denies all persons confined at CNYPC access to local news programming and newspapers published within a 65 mile radius of CNYPC restrictions that were not applied to Plaintiffs while they were incarcerated in the DOCCS system. *Id.* at ¶ 23.

Plaintiffs contend that although there were some restrictions on their access to movies, computers/laptops, videos, MP3 players, CDs, and DVDs while they were confined in the DOCCS system, Defendants' policies and rules at CNYPC are more severely restrictive. *Id.* at ¶ 24.

### 4. *Defendants' Visitor Program*

**\*7** Plaintiffs allege that visitation at CNYPC is more restrictive than when they were incarcerated in the DOCCS system and is, in fact, so restrictive as to be punitive. (Dkt. No. 52–2 at 25.) At CNYPC, visitors must contact a facility official seven days in advance to make visitation arrangements and be placed on the scheduled visitor list. *Id.* In addition, in Building 39 where Plaintiff Rosado is housed, visitation is allowed only on Saturdays from 9:45am to 2:45pm, and visitors are not allowed to bring in food. *Id.*

### 5. *Use of Punitive Physical Restraints*

Plaintiffs claim, as they did in their pro se complaint, that when they are taken outside of CNYPC, they are placed in extremely painful, punitive restraints, including the "black prison box" and waist chains, often for an extended period of time. (Dkt. No. 52–2 at 26.) In their proposed first amended complaint, Plaintiff also allege, upon information and belief, that such painful restraints are not used at the St. Lawrence County Psychiatric Center and Manhattan Psychiatric Center where persons in SOTPs are committed, or at local and county jails. *Id.*

### 6. *Arbitrary, Capricious and Punitive Privileging System*

Plaintiffs challenge the CNYPC policy implementing a "privileging" system. (Dkt. No. 52–2 at 27.) The policy states:

> Privileges are explicit rewards that are afforded based upon positive conduct and attitudes as well as overall clinical progress in the program. Negative consequences are prescribed for behaviors and attitudes that violate the rules of the program or that persistently fail to meet community expectations.

*Id.* Plaintiffs contend that having been involuntarily committed to CNYPC by a court following the completion of their prison sentence, they have to be there, but they should not have to endure "negative consequences" based upon whether or not they are perceived to have exhibited "positive conduct and attitudes" or to be making "clinical progress in the program," or to be "persistently fail [ing] to meet community expectations." *Id.* at 28. Plaintiffs allege that Defendants' practice of imposing "negative consequences" for minor infractions is, in practice, "arbitrary, capricious and unconstitutionally punitive." *Id.* at 29.

## C. Inadequate Accommodation of Plaintiffs' Religious Practices

Plaintiffs Rosado and Suggs also claim that their rights under the Free Exercise Clause of the First Amendment are being violated. (Dkt. No. 52–2 at 45.) Rosado alleges that he is a follower of Neopaganism, and that there is no spiritual leader available and he is not allowed to practice the traditions of his religion at CNYPC. *Id.* at ¶ 30. Suggs alleges that he is a Muslim who follows the traditions of Islam, and that he has limited access to an Imam, to an appropriate location for worship, and to Islamic media at CNYPC. *Id.* at 31.

## D. Relief Requested

As with Plaintiffs' pro se complaint, the proposed first amended complaint seeks declaratory and injunctive relief. (Dkt. No. 52–2 at 12.) More specifically, Plaintiffs demand judgment: (1) declaring that Defendants' policies and actions, as described in the proposed amended complaint, are in violation of Plaintiffs' constitutional rights; (2) enjoining Defendants and their agents and employees from enforcing the unconstitutional policies and from continuing to engage in the unconstitutional actions described in the proposed first amended complaint; and (3) directing Defendants to establish a law library that is accessible to Plaintiffs at CNYPC. *Id.*

**\*8** Plaintiffs, as in their pro se complaint, have included no claim for compensatory damages in their proposed first amended complaint. *Id.* They have, however, added a claim for attorneys fees and costs pursuant to 42 U.S.C. § 1988. *Id.*

## IV. ANALYSIS

Now before the Court are Defendants' motion for summary judgment and Plaintiffs' motion for leave to amend their complaint. (Dkt. Nos. 37 and 51.)

## A. Legal Standard for Motion to Amend

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint should be "freely" granted "when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should not be denied unless there is evidence of undue delay, bad faith, prejudice to the non-movant, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The decision to grant or deny a motion to amend is within the sound discretion of the district court. *Id.* A *pro se* complaint "should not [be] dismiss[ed] without [the Court] granting

leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

Defendants have opposed Plaintiffs' motion for leave to amend on futility grounds. (Dkt. No. 53.) The clearly articulated Second Circuit standard applicable to a determination of whether leave to amend should be denied on the basis of futility is: "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002). However, the Second Circuit has applied a different rule where a cross-motion to amend the complaint is made in response to a motion for summary judgment, "and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions." *Milanese v. Rust–Oleum Corp.,* 244 F.3d 104,

110 (2d Cir.2001). In that case, "even if the amended complaint would state a valid claim on its face, the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendants would be entitled to judgment as a matter of law under Fed.R.Civ.P. 56(c)." *Id.*

## B. Plaintiffs' Motion for Leave to Amend and Federal Rule of Civil Procedure Rule 56(d) Affirmation

The Court finds that the history of this litigation has substantial relevance in the consideration of the standard to be applied with regard to Plaintiffs' motion for leave to amend in that it reveals that Plaintiffs are greatly disadvantaged in "present[ing] all relevant evidence in support of their position[ ]" in opposition to Defendants' summary judgment motion as a result of the lack of pre-motion counseled discovery. *Milanese,* 244 F.3d at 110.

**\*9** Defendants' opposition to Plaintiffs' motion on futility grounds relies in part upon the Court's October 2, 2014, Text Order, which indicates Defendants had complied with the Court's mandatory disclosure order, and pro bono counsel had "advise[d] the Court that plaintiffs need no other discovery from defendants before filing of motions." (Dkt. No. 53 at 3.) However, in his Federal Rule of Civil Procedure 56(d)[7] Affirmation requesting an order denying Defendants' **\*** 1 summary judgment motion and scheduling a Rule

16 conference, Plaintiffs' pro bono counsel explained the reasoning behind his initial agreement to move forward with dispositive motions only three months after being appointed and with no further discovery:

> 5. As a practical matter, there has been little discovery in this case. (Pursuant to the Court's mandatory disclosure order, the defendants previously produced the exhibits attached to the Nowicki affidavit.) Despite this, I agreed with defendants' counsel that a prompt summary judgment motion would be appropriate. Text Minute Entry, 10/2/14. I saw no reason to waste everyone's time on discovery if *undisputed* facts and the applicable law made it clear that plaintiffs could not state a meritorious cause of action. But I did not foresee the Nowicki affidavit.

(Dkt. No. 39–1 at ¶ 5.)

Pro bono counsel elaborated, noting that the Nowicki Affidavit was silent with respect to who created the CNYPC policies and procedures; how it was done; the professional literature, studies, research, and data considered; and whether less restrictive conditions of confinement were considered. *Id.* at ¶ 6. Defendants, according to Plaintiffs' counsel, argued in totally conclusory fashion and with no factual basis, that the CNYPC conditions of confinement "result from policies formulated by mental health professionals" and "are the product of *appropriate* professional judgment." *Id.* Nowicki's Reply Affidavit provides additional information regarding his qualifications, time spent consulting with experts in the field, and the individuals involved in the creation of the policies submitted in support of Defendants' motion for summary judgment. (Dkt. No. 40–1.) However, the information Nowicki has elected to include in his Reply Affidavit is no substitute for counseled discovery from Nowicki and the other Defendants, or from nonparties identified in the Nowicki Reply Affidavit, with regard to the creation, implementation, and enforcement of the policies and procedures complained of by Plaintiffs, as well as any monitoring of their effectiveness.

A nonmoving party should not be "railroaded" into his offer of proof on a summary judgment motion. *See Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmoving party must have "had the opportunity to discover information that is essential to his opposition" to the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(d) "is a safeguard against premature

grants of summary judgment and should be applied with a spirit of liberality." *Holmes v. Lorch,* 329 F.Supp.2d 516, 529 (S.D.N.Y.2004); *DelphiDelco Electronics Systems v. M/V NEDLLOYD EUROPA,* 324 F.Supp.2d 403, 417–18 (S.D.N.Y.2004) ( Rule 56(d) "is an important safeguard against improvident or premature motions for summary judgment, courts generally avoid overly technical rulings under this subdivision and apply it with a spirit of liberality.") (citation and internal quotation marks omitted). The grant of relief pursuant to Rule 56(d) is within the discretion of the court. *See United States v. Private Sanitation Indus. Ass'n Nassau/Suffolk, Inc.,* 995 F.2d 375, 377 (2d Cir.1993).

**\*10** Given the absence of counseled discovery in this case, Plaintiffs' Rule 56(d) Affirmation in opposition to Defendants' summary judgment motion, and, as discussed below, Plaintiffs' lack of access to a law library, computerized legal research, and assistance from MHLS, the Court concludes that the Second Circuit rule applied in *Lucente,* 310 F.3d at 58, rather than the rule in *Milanese,* 244 F.3d at 110, should be applied in assessing Defendants' argument that Plaintiffs' motion for leave to amend their complaint is futile. However, as discussed below, the Court finds that even if the District Court concludes that the *Milanese* rule must be applied, despite the absence of counseled discovery pre-summary judgment and Plaintiffs' Rule 56(d) request, Plaintiffs have adequately shown that there are triable issues of fact with regard to claims asserted in their proposed first amended complaint.

## C. Denial of Access to the Courts Claim in Plaintiffs' Proposed First Amended Complaint

It is well-established that prisoners have a constitutional right to access the courts. *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "Undeniably[,] the civilly committed patients [at CNYPC], like convicted inmates, enjoy a First Amendment right of meaningful access to the courts." *McChesney v. Hogan,* No. 9:08–CV–0163 (FJS/DEP), 2010 WL 3602660, at \*12, 2010 U.S. Dist. LEXIS 92948, at \*37 (N.D.N.Y. Aug.17, 2010) (citing *Lane v. Carpinello,* No. 9:07–cv–751 (GLS/DEP), 2009 WL 3074344, at \* 24, 2009 U.S. Dist. LEXIS 88345, at \* 84 (N.D.N.Y. Sept. 24, 2009). The right of access requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828.

In *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court explained that

> prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.... Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense.

Under *Lewis,* an inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* A plaintiff must show that a defendant's interference caused him actual injury that "a nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendant's actions. *Lewis,* 518 U.S. at 353.

### 1. *Claim of Denial of Law Library or Adequate Legal Assistance*

In this case, Defendants have conceded that CNYPC has no law library and that Plaintiffs are not allowed access to computerized legal research. (Dkt. Nos. 22 at 6–7; 37–2 at 52.) In support of their motion for summary judgment, Defendants claim in conclusory fashion that residents who wish to challenge admission, retention or care and treatment are afforded access to MHLS for legal services and assistance. (Dkt. No. 37–2 at 53.) In their opposition to Plaintiffs' motion to amend, Defendants do not dispute Plaintiffs' allegation that the MHLS caseload is too great for them to render effective assistance of counsel to Plaintiffs. (Dkt. No. 53 at 4.) They instead argue that even if that is true, it is beyond their control because MHLS is an independent state agency.[8] *Id.* at 4–5. Immediately thereafter, Defendants fall back on the conclusory assertion in their summary judgment motion that residents who wish to challenge care and treatment at CNYPC are afforded access to MHLS attorneys. *Id.* at 4–5.

**\*11** In his application for appointment of counsel, or in the alternative for access to a law library or computerized legal research, signed under penalty of perjury, Plaintiff Suggs

explained that Plaintiffs had requested help from MHLS and been told MHLS was not allowed to assist in the civil action. (Dkt. No. 20 at C.) Defendants sole response was that MHL § 47.03 "appeared" to authorize MHLS to provide legal services to Plaintiffs in the lawsuit. (Dkt. No. 22 at 5.) The provision relied upon by Defendants contains no reference to conditions of confinement claims by individuals civilly confined under Article 10 of the MHL.

In support of the allegation in their proposed first amended complaint that MHLS was not available to assist Plaintiffs because of the MHLS attorneys' other responsibilities, Plaintiffs have included statistics showing that MHLS attorneys are not only severely short staffed given the number of facilities and clients, but that MHLS's focus on the Article 10 commitment procedures has occurred at the expense of MHLS's other work and resulted in a drain on MHLS resources. (Dkt. No. 52–2 at ¶¶ 11–15 and pp. 14–24.)

The extent to which, if at all, MHLS is tasked with providing legal assistance to individuals confined under Article 10 on conditions of confinement claims is not entirely clear from the language of MHL Article 10 or MHL § 47.03, which sets forth the functions, powers, and duties of MHLS.[9] The only specific reference to MHL Article 10 in MHL § 47.03 is at subsection (f), which provides that one of the duties of MHLS is "[t]o provide legal services and assistance in accordance with article ten of this chapter." MLH § 10.06(c), dealing with judicial proceedings for the civil commitment or supervision of sex offenders, for which sex offenders are entitled to the appointment of counsel, provides that when a civil management petition is filed, "[t]he court shall appoint the mental hygiene legal service if possible." MHL § 10.11 provides for the involvement of MHLS when the regimen of strict and intensive supervision and treatment imposed on a sex offender released into the community is revoked. MHL § 10.13, addressing appeals from orders issued under Article 10, provides for the appointment of counsel in connection with appeals and states that "[i]f possible, the court shall appoint the mental hygiene legal service." Defendants have cited no provision in the MHL specifically tasking MHLS with providing legal assistance in conditions of confinement matters to those civilly confined under Article 10.

### 2. *Actual Injury*

Defendants contend that the denial of access to the courts claim is futile because Plaintiffs have failed to allege actual

injury as a result of the lack of access to a law library and to legal assistance. (Dkt. No. 53 at 5.) The Court disagrees.

In *Youngberg v. Romeo,* 457 U.S. 307, 321–22, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court directed that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." In their pro se complaint, Plaintiffs asserted a number of conditions of confinement claims against Defendants, including, *inter alia,* the use of restraints, severely restricted access to media, not being allowed personal electronics, restrictive visitation policies, physical and mental abuse, lack of the right to voice concerns without retribution, and the "privilege" "punishment" system employed. (*See generally* Dkt. No. 1.) Plaintiffs also asserted, albeit in equal protection terms, a First Amendment free exercise of religion claim. *Id.* at 6. Plaintiffs' conditions of confinement and free exercise of religion claims all survived initial review conducted pursuant to 28 U.S.C. § 1915(e)(2) (B). [10] (Dkt. No. 8 at 6.) Defendants made no attempt to seek dismissal of

 **\*12** Plaintiffs' conditions of confinement or free exercise of religion claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 17.) Plaintiffs, who initially attempted to litigate their claims with no access to a law library or computerized legal research and no legal assistance, realized it was too formidable an undertaking and, after the Scheduling Order had been issued, turned to the Court for help in the form of access to a law library or computerized legal research or appointment of pro bono counsel. [11] (Dkt. No. 20.)

The proposed first amended complaint includes additional allegations regarding the punitive nature of the conditions of which Plaintiffs complained in their pro se complaint, as well as new claims regarding failure to provide treatment, failure to provide training, inadequate accommodation of Plaintiffs' religious practices, and Defendants' "privileging" system. (Dkt. No. 52–2 at 15–20, 27–31.) As pointed out in Plaintiffs' Reply Memorandum of Law in Support of Motion to Amend, Plaintiffs claim to have been forced to endure the conditions about which they complain for six to eight years as a result of being denied access to the courts. (Dkt. No. 57 at 5.)

Based upon the foregoing, the Court concludes that Plaintiffs, who are entitled to more considerate treatment and conditions of confinement than criminals whose conditions

of confinement are designed to punish, *Youngberg,* 457 U.S. at 321–22, have adequately asserted that their "nonfrivolous legal claim[s] ha[ve] been frustrated or [were] being impeded," *Lewis,* 518 U.S. at 353, as a result of Defendants' actions. Therefore, the Court finds that at the very least, there are triable issues of fact as to the "actual injury" element of Plaintiffs' denial of access to courts claim. *See Dorsey v. Hogan,* 511 F. App'x 96, 101 (2d Cir.2013), in which the Second Circuit acknowledged in the context of the SOTP at CNYPC that:

> The Magistrate Judge found that plaintiff had failed to allege "actual injury," as required to state a claim for a denial of access to the courts. Because we conclude, as discussed above, that plaintiff may have been confined in violation of the preliminary injunction, and that he may have been unable to vindicate his claim while incarcerated by virtue of his lack of access to a law library or counsel, we also conclude plaintiff has plausibly alleged that his efforts to pursue relief in state court were improperly hindered. We therefore reverse the district court's dismissal of plaintiff's access-to-courts claim and remand for further proceedings.

### D. Conditions of Confinement Claims in Plaintiffs' Proposed First Amended Complaint

As noted above, civilly committed persons "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321–22. Conditions of confinement claims asserted by civilly committed plaintiffs must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *See Groves v. New York,* No. 9:09–CV–0412 (GLS/DEP), 2010 WL 1257858, at \* 6, 2010 U.S. Dist. LEXIS 29722, at \* 21 (N.D.N.Y. March 1, 2010). "[D]ue process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young,* 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001) (citations omittd).

 **\*13** Courts determining whether a plaintiff's constitutional rights have been violated are required to balance "the

legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Yoimgberg, 457 U.S. at 321*. In considering whether a civilly committed individual's Fourteenth Amendment rights have been violated, courts must "show deference to the judgment exercised by a qualified professional." *Yoimgberg, 457 U.S. at 322*. "[A] decision, if made by a professional, is presumptively valid," and "liability may be imposed only when the decision of the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such judgment." *Id.* at 323.

1. *Failure to Provide Treatment*
Included in the Legislative findings with respect to MHL Article 10 are the following:

> (b) That some sex offenders have mental abnormalities that predispose them to engage in repeated sexual offenses.

These offenders may require long-term treatment modalities to address their risk to reoffend. They should receive such treatment while they are incarcerated as a result of the criminal process, and should continue to receive treatment when that incarceration comes to an end.

> (f) That the system should offer meaningful forms of treatment to sex offenders in all criminal and civil phases, including during incarceration, civil commitment, and outpatient supervision.

MHL § 10.01(b) and (f).

In their proposed first amended complaint, Plaintiffs allege that Defendants fail to provide them with treatment in that they spend no more than six or seven hours a week in treatment, the treatment staff is not qualified, and Plaintiffs remain in the same treatment phase for years, with the substance of the treatment program being recycled. (Dkt. No. 52–2 at 15–17.) Defendants' argument that the claims lacks merit and is futile is based upon: (1) the description of the four phase treatment program established for use at CNYPC set forth in the Nowicki Affidavit (Dkt. No. 37–2 at ¶ 95) and the CNYPC Phase Movement Policy (Dkt. No. 37–14);

and (2) a claim that Plaintiffs' failure to provide treatment claim is a deliberate medical indifference claim, which at best constitutes a disagreement over treatment, or is a negligence or malpractice claim that does not support a claim under § 1983. (Dkt. No. 53 at 5–6.)

Defendants have not addressed any of the specific allegations in Plaintiffs' proposed amended complaint with regard to the alleged failure to provide treatment. As a part of their Reply Memorandum in Support of Motion to Amend Complaint, Plaintiffs have submitted an August 13, 2015, Decision and Order of the Hon. James C. Tormey, New York State Supreme Court Justice, County of Onondaga, in *State of New York v. Richard Z,* Supreme Court, Oneida County, Index No. CA2007–2605, on a hearing to determine whether petitioner in the case was a dangerous sex offender requiring continued civil confinement in the SOTP at CNYPC. (Dkt. No. 57 at 15–40.)

**\*14** According to the Decision and Order, Justice Tormey has heard hundreds of cases under MHL Article 10, has visited facilities for civilly confined sex offenders in New York and Canada, and has organized and prepared training programs and materials with the Office of Court Administration, which sponsors statewide training between OMH, MHLS, the New York Attorney General's Office, Parole, and the Judiciary. *Id.* at 34. Based upon the evidentiary record, Justice Tormey made numerous critical observations and findings about treatment in SOTP at CNYPC. *Id.* at 7–8. Judge Tormey referenced an expert opinion that "the programs at CNYPC have good ideas," but that the treatment program for the petitioner did not necessarily "adhere to the program parameters," *id.* at 19; the treatment program submitted for the petitioner did not have "program integrity," *id;* and that the petitioner was clearly suffering from treatment fatigue, a concept that the OMH Chief Psychiatric Examiner refused to acknowledge even existed. *Id.* at 22.

Justice Tormey found that there is no definition of "meaningful treatment" under MHL Article 10, § 10.01(a), and that there was no testimony at the hearing that adequately defined it. *Id.* at 33–34. He wrote:

> However, this Court knows what meaningful treatment "isn't when it sees it". In this case, we can say having repeated, attended and actively participated in over 700 group therapy sessions, having doctors testify inconsistently as to

what is expected of patients in treatment to advance, having no individualized plan for [petitioner] is not "meaningful treatment" .... and simply focusing on *de minimis* rule violations to mandate a repeat of completed Phases and therapy is not "meaningful treatment". A common sense definition of "meaningful" can be found in Webster's College Dictionary as "significant, purposeful or (having) value". [Petitioner] is not presently receiving "meaningful treatment" and he has received the maximum psychological benefit for treatment as an in-patient at [CNYPC].

*Id.* at 34.

Justice Tormey concluded that "[i]t is time for the State of New York and OMH to review [MHL Article 10] and develop individualized needs for patients which complies with 'meaningful treatment' and allows patients such as [petitioner] to progress through the program ." *Id.* at 35–36. Justice Tormey took the "extraordinary measure of appointing a world-renowned expert ... to render expert advice to the Court for a program of 'meaningful treatment' for [petitioner] as a condition of [ordering a regimen of Strict and Intensive Supervision and Treatment]." *Id.* at 39.

The Court finds that Defendants' mere reiteration of the parameters of the four phase treatment plan in effect at CNYPC and claim that Plaintiffs are, in effect asserting a medical indifference claim, do not establish futility. Rather, the Court finds that Defendants' failure to address the deficiencies in treatment specifically identified in Plaintiff's proposed first amended complaint, bolstered by Justice Tormey's Decision and Order, serves to highlight the existence of triable issues of fact with regard to whether Plaintiffs are being provided the treatment intended under Article 10 of the MHL.

### 2. *Failure to Provide Training*

**\*15** In their proposed first amended complaint, Plaintiffs allege that the severe limitation on employment opportunities and the complete absence at CNYPC of vocational training, which was available to them while they were incarcerated in the DOCCS system, leaves them wholly unprepared for re-entry into society should they be released from CNYPC.

(Dkt. No. 52–2 at ¶¶ 18–20.) In his Affidavit in support of Defendants' motion for summary judgment, Nowicki states that "[w]ork is not a right nor is it required." [12] (Dkt. No. 37–2 at ¶ 88.) Nonetheless, Nowicki acknowledges that for many residents, work is an important part of their treatment. *Id.* According to Nowicki, Phase II residents are eligible for up to fours hours of work a week, Phase III residents up to six hours a week, and Phase IV residents up to eight hours a week. [13] *Id.* Nowicki states that the residents allowed to work "are engaged in their treatment and value being involved in the vocational program," and that the "program is so popular that [CNYPC] has a waiting list." *Id.*

Despite Nowicki's acknowledgment that work is an important part of many residents' treatment, and that those who are allowed to work value their involvement in the program, he concedes that "[t]he reason for our wait list is based on the number of vocational staff, vocational space and available work. Since it is a limited resource, residents are not permitted unlimited hours of work." *Id.*

In their opposition to Plaintiffs' motion to amend, Defendants' "short answer" to the failure to provide training claim is that "CNYPC is not an employment program." (Dkt. No. 53 at 7.) Rather, it is a secure treatment facility for dangerous sex offenders who have been found by the Legislature to "require long-term specialized care and treatment designed to address the risks they pose to society." *Id.* Defendants assert that "[a]ccordingly, plaintiffs claim should be summarily dismissed since that is not why the CNYPC Sex Offender Treatment Program was created." *Id.* Defendants do not appear to argue that the limitations in the employment program and lack of vocational training as alleged by Plaintiffs are the result of reasoned judgment exercised by qualified professionals as opposed to a limitation of staff and resources and the absence of a specific legislative directive.

Whether or not SOTP was created as a jobs programs, Defendants have acknowledged the importance of work to residents' treatment and have conceded that limited staff and resources force residents to be placed on waiting lists for valued employment. Therefore, the Court finds that there are issues of fact that warrant counseled discovery with regard to Plaintiffs' claim that the severe limitation on employment opportunities and absence of vocational training, which was available while they were incarcerated, leaves them wholly unprepared for re-entry into society, presumably a goal of the CNYPC treatment program.

3. *Lack of Access to Media*

**\*16** In their proposed first amended complaint, Plaintiffs challenge the prohibition at CNYPC on residents having access to personal television sets and certain other electronic media devices; the punitive and arbitrary restrictions on access to a host of mainstream printed materials; the prohibition on access to local news media; and restrictions on access to movies, computers/laptops, videos, MP3 players, CDs and DVDs. (Dkt. No. 52–2 at ¶¶ 21–24.) Plaintiffs contend that the prohibitions and restrictions are far more severe than those imposed while they were incarcerated in the DOCCS system. *Id.*

Defendants rely upon the evidence submitted in support of their motion for summary judgment for their opposition to Plaintiffs' motion to amend. (Dkt. No. 53 at 8.) The CNYPC Policy on Resident Access and Usage of Media, submitted by Defendants in support of their motion for summary judgment states that the CNYPC's SOTP "recognizes that the responsible use of music, videos, TV, and printed media can be an important aspect of therapeutic leisure, can possess educational value and may be incorporated into actual program curricula." (Dkt. No. 37–4 at 1.) The Policy also notes that SOTP has a responsibility to provide guidance to residents regarding media use and to provide limits and parameters such as prohibiting media content determined to be clearly counter-therapeutic. *Id.* The Policy states that "[t]he SOTP staff shall maintain an individualized approach in the implementation of this policy and this policy does not replace the clinical experience of the Treatment Team." *Id.*

In his Affidavit, Nowicki describes the policy with regard to outside news as one "which minimizes access to personal information about staff members and their families" so that inmates cannot use personal information about staff to further their own self-interests. (Dkt. No. 37–2 at ¶¶ 24–25.) According to Nowicki, a reasoned administrative determination was made that safety concerns outweighed the interest of the residents in having access to local media. *Id.* at 27. Nowicki acknowledges that a significant number of magazines, newspapers, and periodicals are not permitted due to their content, i.e., materials containing nudity, inciting violence or civil disobedience, depicting how to make weapons, or targeted to minors. *Id.* at ¶ 28.

Nowicki states in his Affidavit that the SOTP at CNYPC has several day rooms where residents are permitted to watch television shows found acceptable, but that personal televisions are not allowed because they might prevent residents from meaningful participation in programs offered at CNYPC. *Id.* at ¶ 35. According to Nowicki, television viewing is allowed only during non-program hours because "[t]ime spent sitting idle, watching television, will not provide a resident with any knowledge and skills to address his sex offending history." *Id.* at 38. Another concern expressed by Nowicki regarding personal televisions is that it would be impossible to monitor their viewing for unacceptable content. *Id.* at 35–36.

**\*17** Personal computers are not allowed because they have internet capability, and unfettered access to the internet would allow residents to view inappropriate websites. *Id.* at ¶ 41. DVDs, CDs and their players, along with MP3 machines are considered contraband because "[a]llowing such devices would only further frustrate CNYPC constant vigilance in maintain (sic) a therapeutic and safe environment by giving residents an additional opportunity to receive and distribute contraband." *Id.* at ¶ 45.

Defendants rely upon the district court decisions in *McChesney v. Hogan,* 2010 WL 3584360, 2010 U.S. Dist. LEXIS 91322 (N.D.N.Y. Sept.7, 2010) and *June v. Blair,* 9:09–CV–323 (FJS/TWD), 2012 WL 1048463, 2012 U.S. Dist. LEXIS 42594 (N.D.N.Y. March 28, 2012) in support of their motion for summary judgment and opposition to Plaintiffs' motion for leave to amend with regard to Plaintiffs' media access claim. (Dkt. Nos. 37–18 at 14–15; 53 at 8.) In *McChesney,* the District Court granted summary judgment to defendants on plaintiffs Fourteenth Amendment claim regarding media access restrictions at CNYPC. In *June,* following *McChesney,* the District Court granted defendants' motion to dismiss a media access restriction claim for failure to state a claim on a Rule 12(b)(6) motion.

As noted above, Plaintiffs appeared pro se in both *McChesney* and *June* and presumably had no access to a law library. Moreover, there is no indication they received legal assistance from MHLS or other legal counsel with regard to their media access claims. Therefore, while *McChesney* and *June* no doubt provide guidance on the issue, the Court finds them to be of little precedential value.

Plaintiffs' constitutional claim regarding access to media must be balanced against the legitimate interests of the State in restricting that access. *See Youngberg,* 457 U.S. at 321. In that process, deference must be shown to the judgment of qualified professionals involved in developing, monitoring, and enforcing the media access policy. *Youngberg,* 457

U.S. at 322. Moreover, the decisions of those qualified professionals must be deemed presumptively valid. *Id.*

The Court acknowledges the likelihood that the CNYPC policies regarding media access will ultimately be upheld in part, or in their entirety as they were in *McChesney* and *June* where plaintiffs did not have the benefit of counseled discovery. However, the Court finds that finds that given CNYPC's recognition that music, videos, TV, and printed media can be an important aspect of therapeutic leisure; the comprehensive nature of the media access restrictions at CNYPC and Policy statement that staff are to maintain an individualized approach in its application; and Plaintiffs' assertion that the restrictions surpass those imposed in the DOCCS system, Plaintiffs should be given the opportunity to conduct counseled discovery with regard to their media access claims prior to summary judgment motions in the case.

### 4. *The Visitor Program*

**\*18** Plaintiffs allege in their proposed first amended complaint that the restrictions on visitation at CNYPC are more restrictive than those imposed while they were incarcerated in the DOCCS system and are so restrictive as to be punitive. (Dkt. No. 52–2 at 25.) More specifically, Plaintiffs complain of the requirement that visitors must contact a CNYPC official seven days in advance and be placed on a schedule to visit; visitation is limited to Saturdays in Building 39 where one of the Plaintiffs is housed, visits are permitted only from 9:45 am to 2:45pm; and visitors are not allowed to bring food. *Id.*

Defendants have submitted the CNYPC Visitation Policy in support of their motion for summary judgment. (Dkt. No. 37–6.) According to the Policy, "[t]he Sex Offender Treatment Program (SOTP) recognizes the importance of the residents to have an opportunity for their family to have a role in their treatment and recovery and visit with significant others." *Id.* at 1.

In his Affidavit, Nowicki states that "[v]isiting at facilities is strongly encouraged for both family and friends as it helps maintain ties to the community," although according to Nowicki, visitation should not interfere with regularly scheduled programs and because of the nature of the SOTP population at CNYPC, visitation must be pre-approved. (Dkt. No. 37–2 at 47–48.)

Despite Defendants' acknowledgment of the importance of visits by family and friends to residents' treatment and recovery, Nowicki discloses in his Affidavit that SOTP has only one visiting room in each of its two buildings, and there are significant space limitations in those two rooms. *Id.* at ¶ 48. According to Nowicki, Building 39 houses 180 residents, and the visiting room has a capacity of forty people, including residents and staff. *Id.* Building 41 houses up to 150 residents and the visiting room has a capacity of thirty people, including residents and staff. *Id.* The Visitation Policy indicates that Buildings 39 and 41 have visitation on Saturdays and major holidays from 9:45am to 2:45pm. (Dkt. No. 37–6 at 1.) Building 41 also has visitation on Sundays from 9:45am to 2:45pm. *Id.*

Given the acknowledgment in both the Visitation Policy (Dkt. No. 37–6 at 1) and the Nowicki Affidavit (Dkt. No. 37–2 at 47) of the therapeutic importance of visitation with family and friends, and the absence of any claim by Defendants that the space allowed for visitation is limited for therapeutic reasons, the Court finds that there are triable issues of fact with regard to Plaintiffs' claim, and Plaintiffs should be allowed an opportunity to engage in discovery on the visitation issue.

### 5. *Physical Restraints*

Plaintiffs allege in their proposed first amended complaint that they are placed in extremely painful physical restraints when they are taken out of the facility. (Dkt. No. 52–2 at 26.) They allege, upon information and belief, that such painful restraints are not used in two other New York SOTP facilities or at local or county jails. *Id.*

**\*19** In support of their motion for summary judgment, Defendants rely upon the Use of Safety and Security Devices for Transport Purposes Policy, which provides for the use of safety and security devices for all SOTP resident transports, (Dkt. No. 37–3 at 3), and the Nowicki Affidavit which explains that the use of such restraints in resident transports is "designed to ensure staff and public safety." (Dkt. No. 37–2 at ¶ 18.) In *Balkum v. Sawyer,* No. 6:06–CV–1467 (NPM), 2011 WL 5041206, at * 9–10, 2011 U.S. Dist. LEXIS 122467, at *27 (N.D.N.Y. Oct.21, 2011), the court granted defendants' motion for summary judgment on the plaintiffs challenge to CNYPC's policy of restraining residents with handcuffs, waist chains, and leg shackles during transport, finding that plaintiff had not shown that "the use of restraints in this manner and for this purpose represents a substantial departure [from] accepted professional judgment, standards, or practice." *See also June v. Hogan,* No. 9:09–CV–0323 (FJS/TWD), 2014 WL 502536, 2014 U.S. Dist. LEXIS 16039, at *11–12 (N.D.N.Y. Jan.16,

2014) (recommending summary judgment for defendants on plaintiff's Fourteenth Amendment challenge to use of shackles and handcuffs during transport outside the facility), *Report–Recommendation accepted in its entirety,* 2014 WL 502536 at * 1; *Miller v. Dobier,* 634 F.3d 412, 414–15 (7th Cir.2011) (detainee under sexually violent persons act had no constitutionally protected liberty interest in avoiding the "black box" restraints).

The Court recognizes based on the legitimate state interest in ensuring staff and public safety, as well as legal precedent, that Defendants may more likely than not ultimately prevail on this claim. However, given Defendants' failure to respond to the allegation in Plaintiffs' proposed first amended complaint that the restraints about which Plaintiffs complain are not utilized at two other SOTP facilities, the Court finds that Plaintiffs should be allowed the opportunity to conduct discovery on the claim.

### 6. *The Privileging System*

In their proposed first amended complaint, Plaintiff challenge the privileging system at CNYPC in which, according to Plaintiffs, "negative consequences" are imposed based upon whether residents are perceived to have exhibited "positive conduct and attitudes," to be making "clinical progress in the program," or to be "persistently fail[ing] to meet community expectations." (Dkt. No. 52–2 at 28.) Plaintiffs contend that the imposition of "negative consequences," often for minor in fractions, is, in practice arbitrary, capricious and unconstitutionally punitive." *Id.* at ¶ 29.

Defendants contend generally in opposition to Plaintiffs' motion to amend, that the privileging policies, in which residents must participate in the sex offender program to earn privileges, "is an effective treatment approach in assisting in the development of pro-social, desirable behavior." (Dkt. No. 53 at 10.) They do not directly address the imposition of negative consequences which Plaintiffs allege are a part of the privileging policy and the claim that, in practice, they are imposed in an arbitrary, capricious, and unconstitutionally punitive manner.

**\*20** Plaintiffs have had no opportunity to conduct discovery concerning their privilege system claims. In his Decision and Order in *State of New York v. Richard* Z, Justice Tormey addressed an instance of the imposition of negative consequences for minor infractions:

Richard Z. received a demotion to Phase II (acquisition and practice) for receiving non-toxic glue from his 89 year old mother taped in a sweatshirt pocket; paint from his Brother, which was delivered by mail order from a non-approved vendor; and referred to the New York State Attorney General, a non-offensive DVD title "Blue Rose" rated in the PG category, within a greeting card. Additionally, triple hearsay allegations were written in a report wherein one worker told another worker that he overheard Richard Z. on the telephone with his Mother asking her to send \$80.00 in cash to him, which would be a violation of the rules of CNYPC if cash was received. No cash had been received or reportedly ever found.

(Dkt. No. 57 at 16.) Justice Tormey concluded that "simply focusing on *de minimis* rule violations to mandate a repeat of completed Phases and therapy, is not 'meaningful treatment.' " *Id.* at 34.

In light of Defendants' failure to address Plaintiffs' "negative consequences" claim and Justice Tormey's Decision and Order, the Court finds that it reasonable to conclude that triable issues of fact exist with regard to Defendants' privileging system and whether it is implemented in an arbitrary, capricious, punitive manner, and that Plaintiffs should be given an opportunity to conduct counseled discovery on the claim.

### E. Plaintiff's Free Exercise of Religion Claim

Plaintiffs allege in their proposed first amended complaint that Defendant Rosado, who is a follower of Neopaganism, is not allowed to practice the traditions of his religion at CNYPC, and that no spiritual leader is available at the facility. (Dkt. No. 52–2 at 30 .) They also allege that Suggs, who is a Muslim who follows the religion of Islam, has limited access to an Imam, to an appropriate location for worship, and to Islamic media. *Id.* at 31.

In their opposition to Plaintiffs' motion to amend, Defendants do not deny Rosado and Suggs' claims. (Dkt. No. 53 at 11.) Rather, they state generally that CNYPC religious policy

(Dkt. No. 37–17) permits any resident to practice his religion as he may chose, and quote from Nowicki's Affidavit in support of Defendants' motion for summary judgment that Rosado and Suggs "are permitted to practice their religions, observe religious holy days, maintain religious texts and follow dietary restrictions of their faith." (Dkt. No. 53 at 11.)

Therefore, the Court finds that there are triable issues of fact with regard to Plaintiffs' free exercise of religion claim that warrant discovery.

## V. CONCLUSION

Based upon the foregoing, the Court recommends that Plaintiffs' motion for leave to file an amended complaint (Dkt. No. 51) be granted, and that the Clerk be directed to file Plaintiffs' proposed first amended complaint (Dkt. No. 52–2 at 4–13) and that it become the operative pleading in the case; and that a new Scheduling Order allowing the parties a reasonable period of time for discovery and motions be agreed upon with the Court. The Court further recommends that Defendants' motion for summary judgment (Dkt. No. 37) be denied without prejudice to refiling after the conclusion of discovery.

**\*21 ACCORDINGLY,** it is hereby

**RECOMMENDED** that Plaintiffs' motion for leave to file a first amended complaint (Dkt. No. 51) be granted, and that the Clerk be directed to file Plaintiffs' proposed first amended complaint (Dkt. No. 52–2 at 4–13), and that it become the operative pleading in the case; and it is further

**RECOMMENDED** that a new Scheduling Order allowing the parties a reasonable period of time for discovery and motions be agreed upon with the Court; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be denied without prejudice to refding after the conclusion of discovery; and it is further

**RECOMMENDED** that the Clerk's Office be directed to correct the docket to show thesubstitution of Peter Russell, currently the Acting Executive Director of CNYPC, for former Executive Director Maureen Bosco, as a Defendant in the case; the substitution of Ann Sullivan, currently the Commissioner of the New York Office of Mental Health, for former Acting Commissioner of the New York Office of Mental Health Kristin Woodlock, as a Defendant in the case; and the termination of Raymond Lagree as a Plaintiff in the case.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir.1989)* (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Sept. 14, 2015.

**All Citations**

Slip Copy, 2015 WL 5750998

## Footnotes

1    The changes in the parties are reflected in the caption of the proposed first amended complaint (Dkt. No. 51) and in this Memorandum–Decision and Order.

1    Michael Hogan ("Hogan"), former Commissioner of the New York State Office of Mental Health, was originally named as a defendant. (Dkt. No. 1 at 4.) The action was dismissed on Eleventh Amendment grounds as against the now retired Hogan by the Hon. Norman A. Mordue, Senior United States District Judge, in a Decision and Order dated June 20, 2013. (Dkt. No. 8.)

2    The Court takes judicial notice that Peter Russell ("Russell") is currently the Acting Executive Director of CNYPC, and Ann Sullivan, M.D. ("Sullivan") is currently the Commissioner of the New York OMH. See ht tps://www.omh.ny.gov/omhweb/aboutomh/omh_facility.html (last visited September 11, 2015). Under Federal Rule of Civil Procedure 25(d), a public "officer's successor is automatically substituted as a party" when an "officer who is a party in an official capacity ... ceases to hold office while the action is pending." Because Plaintiffs are seeking declaratory and injunctive relief against Defendants in their official capacities in this lawsuit, Russell and Sullivan, have been substituted for Bosco and Woodlock

as defendants, respectively, and will be treated as defendants for purposes of this Order and Report–Recommendation. Russell and Sullivan have also been substituted as defendants in the proposed first amended complaint. (*See* Dkt. Nos. 51–2 at 1–2; 52–2 at 4–6.)

3   *See Pollack v. Holanchock,* No. 10 CV 2402(RPP), 2011 WL 4867558, at *2, [no LEXIS citation] (S.D.N.Y. Oct. 13, 2011) (finding that the Mid–Hudson Psychiatric Center, a secure adult forensic psychiatric inpatient facility, had eliminated its law library, and the MHLS did not represent the plaintiff in his denial of access to court litigation, the district court ordered, as temporary relief, that the plaintiff be provided with free internet access of Findlaw and Wikipedia Legal Research, as well as access to fax, and incoming and outgoing legal correspondence to conduct the ongoing litigations to which he was a party).

4   During a telephone conference with the Court on October 2, 2014, Defense counsel stated that Federal Rule of Civil Procedure 26 disclosures were complete and all discovery had been provided to Plaintiffs. Pro bono counsel for Plaintiffs indicated at that time that Plaintiffs needed no further discovery from Defendants before the filing of dispositive motions. A deadline of December 5, 2014, was set for dispositive motions. (Dkt., October 2, 2014, Text Order .)

5   During a March 20, 2015, status conference call with the Court, counsel were directed to discuss whether the case would go forward with an amended complaint, or the parties would stipulate to discontinue the action without prejudice and Plaintiffs would bring a new action. (Dkt., March 20, 2015, Text Minute Entry). The case was stayed until June 18, 2015. *Id.* During a June 18, 2015, status conference call, Plaintiffs' counsel reported that after discussion, the case would move forward with an amended complaint (Dkt., June 18, 2015, Text Minute Entry) and by Text Order, dated June 18, 2015, the Court granted Plaintiffs' request to move for leave to file an amended complaint (Dkt. No. 43), and again granted permission to file a surreply to Defendants' summary judgment motion. (Dkt., June 18, 2015, Text Order.)

6   In his Affirmation dated July 24, 2015 (Dkt. No. 51–2 at 1), pro bono counsel George H. Lowe, Esq. has stated upon information and belief that Plaintiff Lagree, who had been confined at CNYPC June 2, 2011, has been released from commitment. Lagree has not been included as a plaintiff in Plaintiff's proposed first amended complaint. (Dkt. No. 52–2 at 4.)

7   Fed.R.Civ.P. 56(d), formerly subdivision 56(f), provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

8   Plaintiffs do not appear to be claiming that Defendants are responsible for ensuring that MHLS provide them with legal assistance. Rather, they are claiming that Defendants, who include the OMH Commissioner, SOTP Director, CNYPC Executive Director, and Chief of Mental Health Treatment Services for the SOTP at CNYPC, are denying Plaintiffs' First Amendment right to access to the courts by not providing either a law library or legal assistance.

9   *See Pollack v. Holanchock,* No. 10 CV 2402(RPP), 2012 WL 1646893, at * 3, 2012 U.S. Dist. LEXIS 66033, at *11 (S.D.N.Y. May 10, 2012) ("Retention proceedings and admission proceedings are the raison d' être of MHLS.")

10   28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

11   The Court notes that individuals civilly confined under MHL Article 10, who have in the past filed unsuccessful pro se conditions of confinement lawsuits challenging some of the same conditions being challenged by Plaintiffs (one of which is relied upon by Defendants in seeking summary judgment), either failed to file any opposition papers or filed incomplete papers in response to the defendants' summary judgment motions. *See, e.g., Yeldon v. Hogan,* No. 9:08–CV–769 (NAM/RFT), 2010 WL 983819, 2010 U.S. Dist. LEXIS 23825 (N.D.N.Y. March 15, 2010) (summary judgment granted against pro se plaintiff claiming, *inter alia,* denial of access to local media, restricted phone use, being forced into a test program in which he was denied treatment and denied interaction with the general population where plaintiff's only response to the motion was a response to defendants' statement of material facts), *aff'd,* 400 F. App'x 580 (2d Cir.2010); *McChesney v. Hogan,* No. 9:08–CV–163 (FJS/DEP), 2010 WL 3602660, 2010 U.S. Dist. LEXIS 91681 (N.D.N.Y. Aug.17, 2010) (grant of summary judgment to defendants recommended where pro se plaintiff failed to oppose grant of summary judgment to defendants on conditions of confinement claims that included, *inter alia,* prohibitions regarding access to local media, receipt of food packages, telephone usage policy, search policy, and treatment policies and practices), *Report–Recommendation accepted in its entirety,* 2010 WL 3584360, 2010 U.S. Dist. LEXIS 91322 (N.D.N.Y. Sept.7, 2010); *see also Jirne v. Blair,* 9:09–CV–323 (FJS/TWD), 2012 WL 1048463, 2012 U.S. Dist. LEXIS 42594 (N.D.N.Y. March

28, 2012) (dismissing Plaintiff's pro se claim regarding limitations on access to local newspapers and periodicals with prejudice on a Rule 12(b)(6) motion based on *McChesney* ). Defendants have acknowledged that there is no law library available to the SOTP residents at CNYPC, plaintiffs in the above-cited cases were not represented by MHLS, and there is no indication that any of the plaintiffs received legal assistance from MHLS or any other legal counsel.

12   It appears from CNYPC's Privileging Policy that work is a privilege that may be taken away for clinical reasons. (Dkt. No. 37–13 at 1.)

13   According to Nowicki, four of the Plaintiffs are in Phase II and one is in Phase III. (Dkt. No. 37–2 at ¶ 89.)

---

**End of Document**            © 2016 Thomson Reuters. No claim to original U.S. Government Works.